# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| JAMES COPPEDGE ON BEHALF OF<br>COPPEDGE REAL ESTATE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.: 1:07-cv-00684-***-MPT |

## DEFENDANT CITY OF PHILADELPHIA'S
## OPENING BRIEF IN SUPPORT OF ITS
## <u>MOTION TO DISMISS</u>

Michael R. Robinson (Bar No. 4452)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899-1266
Telephone:    (302) 421-6800
Facsimile:    (302) 421-6813
Email: mrobinson@saul.com
*Counsel for Defendant City of
Philadelphia*

Dated: December 31, 2007

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ii

NATURE AND STAGE OF THE PROCEEDINGS ...........................................................1

STATEMENT OF RELEVANT FACTS ...........................................................................2

ARGUMENT......................................................................................................................3

    I.      THE COMPLAINT MUST BE DISMISSED BECAUSE THIS COURT
            LACKS SUBJECT MATTER JURISDICTION. ..........................................3

          A.     Diversity Does Not Exist as Plaintiff and Defendant Are Citizens
                of the Same State. ..............................................................................4

          B.     Plaintiff Fails to Properly Invoke a Federal Law or Other
                Constitutional Basis. ..........................................................................5

    II.     THIS ACTION MUST BE DISMISSED BECAUSE THIS COURT
            DOES NOT HAVE PERSONAL JURISDICTION OVER THE CITY OF
            PHILADELPHIA..........................................................................................6

    III.    THIS ACTION MUST BE DISMISSED BECAUSE THE DISTRICT OF
            DELAWARE IS AN IMPROPER VENUE FOR A CONTROVERSY
            BETWEEN THE CITY OF PHILADELPHIA AND ONE OF ITS
            CITIZENS....................................................................................................9

    IV.    THE COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO
            STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED............10

CONCLUSION.................................................................................................................12

# TABLE OF AUTHORITIES

## FEDERAL CASES

Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) ......................................12

Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) ............................................3

Buckley v. O'Hanlon, 2007 WL 956947, at *2 (D. Del. Mar. 30, 2008) .........................................3

Burt v. Barry, 962 F.Supp. 185 (D.D.C. 1997) ...............................................................10

Collins v. Johnson County, KS, 2003 WL 42164 (8th Cir. 2002) ......................................................6

County of Delaware v. Gov't Systems, Inc., 230 F. Supp. 2d 592, 596 (E.D. Pa. 2002) ...........................................................................................................6

Dalton v. R & W Marine, Inc., 897 F.2d 1359, 1361 (5th Cir. 1990) ...............................................6

Floyd v. Saturn of Newark, 2005 WL 1657119, at *2 (D. Del. July 11, 2005) ...........................4, 6

Gagliardi v. Clark, 2006 WL 2847409, at *7 n.7 (W.D. Pa. Sept. 28, 2006) ................................11

Hamilton Life Ins. Co. of New York v. Republic Nat. Life Ins. Co., 291 F.Supp. 225 (D.C. N.Y. 1968) ........................................................................................5

Hedges v. Musco, 204 F.3d 109, 122-24 (3d Cir. 2000) ...............................................................12

Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) ....................................................................10

Holmes v. Sopuch, 639 F.2d 431 (8th Cir. 1981) ...........................................................................4

Houlihan v. Offerman & Co., Inc., 31 F.3d 692 (8th Cir. 1994) ......................................................5

Huffco Petroleum Corp. v. Transcontinental Gas Pipe Line Corp., 681 F.Supp. 400 (S.D. Tex. 1988) ..........................................................................................5

In Re Corestates Trust Fee Litig., 837 F. Supp. 104, 105 (E.D.Pa. 1993) .......................................3

International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) ....................................................9

Krasnov v. Dinan, 465 F.2d 1298, 1300 (3d Cir. 1972) ..................................................................4

McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 186, 56 S. Ct. 780, 784 (1936) ...........................................................................................................4

Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906-09 (3d Cir. 1997) ....................................10

Pawgan v. Silverstein, 265 F.Supp. 898 (S.D.N.Y. 1967) .................................................5

Pennoyer v. Neff, 95 U.S. 714, 720-22 (1877) ..............................................................6

Saxton v. Cent. Pa. Teamsters Pension Fund, No. Civ. A. 02-CV-986. 2003 WL
      22952101, at *3 (E.D. Pa. Dec. 9, 2003) ......................................................10, 11

Siglar v. Hightower, 112 F.3d 191 (5th Cir. 1997)...........................................................6

Smith v. Delaware First Fed. Credit Union, 395 F. Supp. 2d 127, 131 (D. Del.
      2005) .......................................................................................................3, 6

Thomas v. Zinkel, 514 F.2d 971, 975 n.6 (E.D. Pa. 2001) .............................................12

Tunnel v. Wiley, 514 F.2d 971, 975 n.6 (3d Cir. 1975) ................................................10

Turicentro, S.A. v. American Airlines Inc., 303 F.3d 293, 300 (3d Cir.2002)................3

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559,
      567, 62 L. Ed. 2d 490 (1980) ..............................................................................9

## FEDERAL STATUTES

9 U.S.C. § 1 ...............................................................................................................1, 5

9 U.S.C. § 2................................................................................................................1, 5

28 U.S.C. § 1331.........................................................................................................7

28 U.S.C. § 1332(a).....................................................................................................4

28 U.S.C. § 1332(c)(1).................................................................................................4

28 U.S.C. § 1391(b)...................................................................................................10

42 U.S.C. § 1983 ..................................................................................................5, 6, 12

## STATE STATUTES

10 Del. C. § 3104(c)..................................................................................................7, 8

10 Del. C. § 3104(j) .....................................................................................................8

## RULES

Fed. R. Civ. P. 12(b)(1)...............................................................................................................1

Fed. R. Civ. P. 12(b)(2)...............................................................................................................1

Fed. R. Civ. P. 12(b)(3)...........................................................................................................1, 5

Fed. R. Civ. P. 12(b)(6).........................................................................................................1, 11

## NATURE AND STAGE OF THE PROCEEDINGS

James Coppedge ("Plaintiff" or "Mr. Coppedge") filed his Complaint in the United States District Court for the District of Delaware on October 30, 2007. (D.I. 1.) Although Mr. Coppedge does not affirmatively state the basis of invoking the jurisdiction of a federal court, he indicates that he lives in Philadelphia, Pennsylvania, that the nature of the federal question is an "Affidavit of Maritime Commercial Contract enforcement under Title 9 Sec. 1 & 2" and that he is suing for the enforcement of a contract. Defendant City of Philadelphia, a municipal corporation of the Commonwealth of Pennsylvania (the "City"), was served with a Summons and copy of the Complaint against it on December 4, 2007. (D.I. 12).

Contemporaneously herewith, the City is filing its Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6) (hereinafter "Rule 12(b)(1)", "Rule 12(b)(2)", "Rule 12(b)(3)", and "Rule 12(b)(6)", respectively). This is the City's Opening Brief in Support of its Motion.

## STATEMENT OF RELEVANT FACTS

Mr. Coppedge lives and does business in the City of Philadelphia, in the Commonwealth of Pennsylvania. A quick check of Delaware's Secretary of State web page reveals that Coppedge Real Estate, LLC is not a chartered Delaware business entity nor is it even registered to do business in the State of Delaware.[1] The City of Philadelphia is a municipal corporation of the Commonwealth of Pennsylvania.

The controversy between the City and Mr. Coppedge appears to have begun earlier this year as a dispute between Mr. Coppedge and the City's Board of License and Inspection ("Zoning Board"). As a result of such dispute, Mr. Coppedge submitted an Affidavit of Specific Negative Averment and Bill of Peace (both attached to the Complaint) purportedly to secure the admission that the City somehow did not have jurisdiction over him and his property because it used capital letters when filling out its forms and that, in fact, the City and Zoning Board did not legally exist because they wrote their own names in capital letters. As a result of the City's failure to respond to this Affidavit and Bill, Mr. Coppedge attempted to file a UCC-1 against the City claiming it owed him One Hundred Billion Dollars.[2] Now, Mr. Coppedge has brought this lawsuit attempting to receive over $10,000,000 from the City for the actions of the Zoning Board in claiming jurisdiction over him, and with the filing of his UCC-1.

---

[1]    In deciding a motion to dismiss, a Court may consider "items subject to judicial notice [and] matters of public record." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).

[2]    In fact, the UCC-1 filing did occur, which resulted in the City's instigation of proceedings to delete the UCC-1 from its records – a proceeding that is the subject of the lawsuit Mr. Coppedge has brought against Gerald Leatherman in this same Court. See Coppedge v. Leatherman, C.A. No. 7-763-***MPT.

## ARGUMENT

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." In Re Corestates Trust Fee Litig., 837 F. Supp. 104, 105 (E.D.Pa. 1993), aff'd 39 F.3d 61 (3d Cir.1994). This City brings this motion pursuant to Rule 12(b)(1) as well as other rules. The Court should address the issue of standing first. Buckley v. O'Hanlon, 2007 WL 956947, at *2 (D. Del. Mar. 30, 2008).[3]  Under any of the standards, however, this case should be dismissed.

## I.    THE COMPLAINT MUST BE DISMISSED BECAUSE THIS COURT LACKS SUBJECT MATTER JURISDICTION.

Under a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court "review[s] only whether the allegations on the face of the [C]omplaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court." Turicentro, S.A. v. American Airlines Inc., 303 F.3d 293, 300 (3d Cir.2002) (quoting Licata v. United States Postal Serv., 33 F.3d 259, 260 (3d Cir.1994)).

"There are two primary ways in which a plaintiff may allege subject matter jurisdiction: diversity and federal question." Smith v. Delaware First Fed. Credit Union, 395 F. Supp. 2d 127, 131 (D. Del. 2005). Mr. Coppedge's allegations fail to sufficiently allege either basis for this Court's jurisdiction, and, thus, his complaint against the City must be dismissed.

---

[3]    A copy of unreported decisions are alphabetically attached hereto as Exhibit A.

A.    **Diversity Does Not Exist as Plaintiff and Defendant Are Citizens of the Same State.**

Diversity jurisdiction is implicated when the matter in controversy exceeds $75,000 and the dispute involves a diversity of citizenship between the plaintiff on one side and the defendants on the other. See Floyd v. Saturn of Newark, 2005 WL 1657119, at *2 (D. Del. July 11, 2005). Plaintiff has failed to plead that this Court has subject matter jurisdiction over this matter due to the diversity of citizenship among the parties. See McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 186, 56 S. Ct. 780, 784 (1936) (the burden is on the plaintiff to plead and prove jurisdictional facts). Federal diversity jurisdiction requires that all parties to an action be citizens of different states. 28 U.S.C. § 1332(a). Corporations are deemed to be citizens of the state in which they are incorporated. 28 U.S.C. § 1332(c)(1). The City of Philadelphia is incorporated in the Commonwealth of Pennsylvania, and, thus, is a citizen of Pennsylvania.

The test for citizenship of natural persons is the site of domicile for that person. Holmes v. Sopuch, 639 F.2d 431 (8th Cir. 1981). The domicile of the parties is to be determined at the time a complaint is filed. See Krasnov v. Dinan, 465 F.2d 1298, 1300 (3d Cir. 1972). A party's residence is "prima facie" evidence of domicile. Id. In the complaint, Mr. Coppedge indicates that his residence is on 18th Street in Philadelphia, Pennsylvania. He provides no other basis on which the Court may determine his domicile other than this reference. Thus, Mr. Coppedge is also a citizen of Pennsylvania. As there is no diversity of citizenship between the City and Mr. Coppedge, Mr. Coppedge has failed to avail himself of the diversity jurisdiction of this Court.

**B.    Plaintiff Fails to Properly Invoke a Federal Law or Other Constitutional Basis.**

Mr. Coppedge states in his Petition that he is bringing this action as a "Petition to compel arbitration by Affidavit of Maritime Commercial Contract enforcement under Title 9 Sec. 1 & 2" [the "Federal Arbitration Act".].  (D.I. 1 at 1).  The Federal Arbitration Act, however, is not an independent source of federal question subject matter jurisdiction.  Huffco Petroleum Corp. v. Transcontinental Gas Pipe Line Corp., 681 F.Supp. 400 (S.D. Tex. 1988); Hamilton Life Ins. Co. of New York v. Republic Nat. Life Ins. Co., 291 F.Supp. 225 (D.C. N.Y. 1968), aff'd, 408 F.2d 606.  Nor has Mr. Coppedge pled the existence of a valid agreement to arbitrate between the parties hereto sufficient to invoke this Court's jurisdiction.  Houlihan v. Offerman & Co., Inc., 31 F.3d 692 (8th Cir. 1994).  Additionally, Mr. Coppedge has failed to plead the existence of interstate commerce – another prerequisite for the existence of the application of the Federal Arbitration Act.  Pawgan v. Silverstein, 265 F.Supp. 898 (S.D.N.Y. 1967).  Thus, jurisdiction based on a federal questions must be based on some other law or the United States Constitution.

To the extent that the Complaint can be read to be based on the City's deprivation of Mr. Coppedge's civil rights, it similarly fails to adequately plead the existence of a federal question.  Section 1983 of Title 42 of the United States Code creates a cause of action against anyone who, acting "under color of any statute, ordinance, regulation, custom, or usage, of any State," deprives an individual of rights secured by the Constitution or by federal statute.  See 42 U.S.C. § 1983.  In order to state a claim under Section 1983, a plaintiff must plead more than conclusory allegations arising from state

proceedings showing his frustration and reiterating his grievances with such state

proceedings.  See Collins v. Johnson County, KS, 2003 WL 42164 (8th Cir. 2002).

For this Court "to assert jurisdiction over a case based on federal question, the

Constitution, laws or treaties of the United States must supply an essential element of the

plaintiff's cause of action."  County of Delaware v. Gov't Systems, Inc., 230 F. Supp. 2d

592, 596 (E.D. Pa. 2002), citing Gully v. First Nat. Bank in Meridian, 299 U.S. 109, 112,

57 S. Ct. 96, 81 L. Ed. 70 (1936).

Mr. Coppedge's allegations, in fact, sound in contract law.  Questions regarding

breach of contract are quintessential state court matters.  See Floyd, 2005 WL 1657119,

at *6-7; Smith, 395 F. Supp. 2d at 131-32.  A breach of contract claim, in fact, provides

"*no basis* for federal court jurisdiction."  County of Delaware, 230 F. Supp. 2d at 598

(emphasis added).  Thus, Mr. Coppedge has failed to properly invoke this Court's

jurisdiction under 28 U.S.C. § 1331.  Because of its frivolous nature, Mr. Coppedge's

complaint should be dismissed.  Siglar v. Hightower, 112 F.3d 191 (5th Cir. 1997).

## II.    THIS ACTION MUST BE DISMISSED BECAUSE THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE CITY OF PHILADELPHIA.

As Mr. Coppedge is seeking a judgment of money damages against the City, this

Court must have personal jurisdiction over the City in order to decide the present

controversy.  Pennoyer v. Neff, 95 U.S. 714, 720-22 (1877).  The starting point for the

analysis of personal jurisdiction in federal cases is the "long arm" statute in effect in

which the Court is located.  Dalton v. R & W Marine, Inc., 897 F.2d 1359, 1361 (5th Cir.

1990).  In this case, Plaintiff has not alleged any basis for this Court to exercise personal

jurisdiction over the non-resident defendant City.  Delaware's long-arm statute provides,

in relevant part:

(c)     As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1)    Transacts any business or performs any character of work or service in the State;

(2)    Contracts to supply services or things in this State;

(3)    Causes tortious injury in the State by an act or omission in this State;

(4)    Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

(5)    Has an interest in, uses or possesses real property in the State; or

(6)    Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

*   *   *

(j)     When jurisdiction over a person is based solely upon this section, only a cause of action arising from any act enumerated in this section may be asserted against the person.

10 Del. C. § 3104(c). Thus, to exercise long-arm jurisdiction, a plaintiff must satisfy one of the enumerated provisions under section 3104(c), and jurisdiction is effective only as to a "cause of action arising from" those enumerated acts.

Given that the Complaint is completely barren of any reference to how this Court is authorized to assert personal jurisdiction over non-resident defendant City, the Complaint cannot establish personal jurisdiction under *any* of the afore-quoted enumerated acts. Indeed, the Complaint ignores the fact that the City is not a resident of Delaware (notwithstanding the fact Mr. Coppedge served the City in Pennsylvania).

Put simply, Plaintiff does not allege that the City is (or has ever been) a resident of Delaware; has entered Delaware for purposes of this litigation; transacts business or performs services in Delaware; contracts to supply services in the State; owns property in Delaware giving rise to this litigation; insures property within the State, and regularly does or solicits business or engage in any other persistent course of conduct in Delaware or derive substantial revenue from services, or things used or consumed in the State. Nor has Mr. Coppedge alleged that the City committed any tort in Delaware causing injury within the State, or that the City committed a tort outside of Delaware but caused injury in Delaware and "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State." 10 Del. C. § 3104(c). Moreover, Plaintiff does not even attempt to connect his claims to any of the enumerated acts under § 3104(c) as required by section 3104(j).

Even assuming *arguendo* that there is some basis to assert jurisdiction over the City, the exercise of that jurisdiction would violate due process. Under the due process clause of the United States Constitution, this Court may exercise jurisdiction over an out-of-state defendant only if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and

substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The focus of this inquiry is on the relationship between the defendant, the forum and the litigation, and this Court must determine whether the City engaged in sufficient "minimum contacts" with Delaware to require it to defend itself in the courts of this State consistent with traditional notions of fair play and justice. Generally, a defendant's contacts with the forum State must rise to such a level that she should "reasonably anticipate" being required to defend herself in the courts of that State. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980).

Given that the four-corners of the Complaint provides no basis for jurisdiction over the City, it is impossible to fathom how notions of fair play and substantial justice would counsel in favor of calling non-resident City into a court in Delaware in this case, or how any conduct allegedly undertaken by the City put it on notice that it should "reasonably anticipate" being required to defend itself in a court in Delaware.

Accordingly, this Court should dismiss the Complaint against the City.

## III.    THIS ACTION MUST BE DISMISSED BECAUSE THE DISTRICT OF DELAWARE IS AN IMPROPER VENUE FOR A CONTROVERSY BETWEEN THE CITY OF PHILADELPHIA AND ONE OF ITS CITIZENS.

This action must be dismissed as the District of Delaware is the improper venue to review a controversy between the City of Philadelphia, Pennsylvania, and one of its citizens. Venue in cases based upon federal questions is proper in the following judicial districts (and no others): (i) if all defendants reside in the same state, a district where any defendant resides, or (ii) a district in which a "substantial part of the events or omissions" on which the claim is based occurred, or a "substantial part of the property" that is the

subject of the action is located., or (iii) if there is no district in which the action may otherwise be brought, the district "in which any defendant may be found." 28 U.S.C. § 1391(b). The Eastern District of Pennsylvania meets the criteria of each of these tests. There are no other districts that meet any of these tests, including the District of Delaware. Thus, venue in this District is improper.

Mr. Coppedge states that a venue change from the existence of a "perceived conspiracy by the City of Philadelphia via its agents and attorneys." (D.I. at 1). This single, conclusory allegation without any allegation of fact in support of such conspiracy is far too vague to meet the minimal pleading requirements and heightened pleading standard for governmental conspiracy claims, and, thus, should be ignored. Burt v. Barry, 962 F.Supp. 185 (D.D.C. 1997), appeal dismissed, 1997 WL 573477. Thus, without more, there is no reason for this Court to accept that it is the proper venue to decide this controversy.

## IV.    THE COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a Complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The facts of the Complaint should be viewed in a light most favorable to the Plaintiff. See Tunnel v. Wiley, 514 F.2d 971, 975 n.6 (3d Cir. 1975). Those facts must be accepted as true. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). However, the court need not accept "a complaint's bald assertions or legal conclusions," Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997), or unsubstantiated conclusions or factual inferences that are unwarranted. Saxton v. Cent. Pa. Teamsters

Pension Fund, No. Civ. A. 02-CV-986, 2003 WL 22952101, at *3 (E.D. Pa. Dec. 9,

2003).

Finally, while *pro se* litigants are not held to as stringent a pleading standard as

those represented by counsel, a *pro se* plaintiff "must still plead the essential elements of

his or her claim and is not excused from conforming to the standard rules of civil

procedure." Gagliardi v. Clark, 2006 WL 2847409, at *3 (W.D. Pa. Sept. 28, 2006)

(citing McNeil v. United States, 508 U.S. 106, 113 (1993)). In fact, where a *pro se*

plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out

of luck – he has pleaded himself out of court." Gagliardi, 2006 WL 2847409, at *4

(quoting Jefferson v. Ambroz, 90 F.3d 1291, 1296 (7th Cir. 1996)). Moreover, "if the

plaintiff's complaint does plead specific facts, those facts, taken as true for purposes of

deciding the motion to dismiss, may create a defense to his claim." Id. (citing Camero v.

Kostos, 253 F. Supp. 331, 338 (D.N.J. 1966)).

Plaintiff has alleged in a single paragraph of his Complaint that the City has been

harassing him, but offers no facts or explanation of such alleged harassment. Such

conclusory allegations are insufficient to state a claim under Section 1983. Plaintiff also

attempts to state that the City is a judgment creditor assumably based on some kind of

contractual relationship with the Plaintiff. Plaintiff fails, however, to plead the requisite

terms of the contract that supposedly exists between the City and himself. Assuming that

such contract allegations sound in state law, it likely be under the laws of the

Commonwealth of Pennsylvania. This Court should not have to piece together some kind

of theory for the case to support Mr. Coppedge's theories relating to Affidavit of Specific

Negative Averment and Bill of Peace. Considerations of judicial economy, convenience

and fairness to the parties do not dictate otherwise, and as such, Plaintiff's pendent state law claims are properly dismissed by the Court. See, e.g., Thomas v. Zinkel, 155 F. Supp. 2d 408, 412 (E.D. Pa. 2001) (declining to exercise supplemental jurisdiction over prisoner's potential state law claims where all § 1983 claims were dismissed).

Even if the Court were to find against the City on its jurisdiction and venue arguments, it should nevertheless decline to address Mr. Coppedge's state law claims – whether under the laws of the Commonwealth of Pennsylvania or the State of Delaware – Specifically, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995); see Hedges v. Musco, 204 F.3d 109, 122-24 (3d Cir. 2000).

## CONCLUSION

For the foregoing reasons, Defendant City of Philadelphia respectfully requests that the Court grant its motion to dismiss the Complaint with prejudice. Plaintiff has failed to carry its burden to invoke the jurisdiction of this Court as: (i) all parties are citizens of the same state – Pennsylvania; (ii) he has presented no allegations supporting a federal question; (iii) the City is not subject to Delaware's long-arm statute or Constitutionally able to be brought to suit in a court in Delaware; and (iv) this District is not the proper venue for the present controversy. Further, for the reasons stated in herein, Mr. Coppedge has failed to state a claim upon which relief can be granted by this Court as Mr. Coppedge has failed to state a claim under Section 1983 or state contract law.

Dated:  December 31, 2007

**SAUL EWING LLP**


/s/ Michael R. Robinson
Michael R. Robinson (Bar No. 4452)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899-1266
Telephone:      (302) 421-6800
Facsimile:      (302) 421-6813
Email: mrobinson@saul.com
*Counsel for Defendant City of*
*Philadelphia.*

# Exhibit A

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2007 WL 956947 (D.Del.)
(Cite as: Slip Copy)

**c**
Buckley v. O'Hanlon
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Dennis J. BUCKLEY, as Trustee of the DVI
Liquidating Trust Plaintiff,
v.
Michael A. O'HANLON, Steven R. Garfinkel,
Richard E. Miller, John P. Boyle, Anthony J. Turek,
Raymond D. Fear, William S. Goldberg, Gerald D.
Cohn, John E. McHugh, Harry T.J. Roberts, and
Nathan Shapiro, Defendants.
No. 04-955GMS.

March 28, 2007.

Francis A. Monaco, Jr., Joseph J. Bodnar, Monzack
& Monaco, P.A., Wilmington, DE, for Plaintiff.
Dennis J. Buckley, pro se.
David E. Brand, Prickett, Jones & Elliott, P.A.,
David A. Felice, Cozen O'Connor, Arthur G.
Connolly, Jr., Connolly, Bove, Lodge & Hutz,
Joanne Ceballos, Adam L. Balick, Bifferato
Gentilotti Biden & Balick, Martin James Weis,
Dilworth Paxson LLP, Wilmington, DE, Gregory P.
Miller, Michael A. Morse, Miller, Alfano &
Raspanti, P.C., Philadelphia, PA, for Defendants.

*MEMORANDUM*
SLEET, J.

## I. INTRODUCTION

*1 The Official Committee of Unsecured Creditors
of DVI, Inc. (the "Committee") filed this action on
August 19, 2004. The Committee was dissolved,
and Dennis J. Buckley was appointed as Trustee for
the DVI Liquidating Trust ("Buckley") by order of
the United States Bankruptcy Court for the District
of Delaware (the "Bankruptcy Court") on
November 24, 2004. Buckley was substituted as
plaintiff in this action in this court's Order of April

6, 2006. The complaint states claims for breach of
fiduciary duty and deepening insolvency as to the
officer defendants (Michael A. O'Hanlon, Steven R.
Garfinkel, Richard E. Miller, John P. Boyle,
Anthony J. Turek, and Raymond D. Fear) and the
director defendants/audit committee members
(O'Hanlon, William S. Goldberg, Gerald D. Cohn,
John E. McHugh, Harry T.J. Roberts, and Nathan
Shapiro). The complaint also includes a claim for
fraud as to O'Hanlon, Garfinkel, and Miller.
Presently before the court are eight motions to
dismiss.

## II. LEGAL STANDARD

Pursuant to the motion of a party, a court may
dismiss a complaint for failure to state a claim upon
which relief can be granted. Fed.R.Civ.P. 12(b)(6).
In making this determination, the court must accept
as true all allegations in the complaint, and must
draw all reasonable inferences in the light most
favorable to the plaintiff. *Trump Hotels & Casino
Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478,
483 (3d Cir.1998). The defendant must show "
beyond doubt" that the plaintiff can prove no set of
facts which would entitle him to relief. *Conley v.
Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d
80 (1957).

## III. BACKGROUND [FN1]

FN1. This section is a summary of facts,
taken from the pleadings, and do not
constitute findings of fact.

DVI and its subsidiaries are Delaware corporations
with principal places of business in Pennsylvania.
(D.I.1, ¶ 11.) Prior to filing for bankruptcy, DVI
extended lease and loan financing to healthcare
providers to facilitate the purchase of sophisticated
medical equipment, and extended revolving lines of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

credit that were secured by liens on accounts receivable generated by that provider's operations. (D.I.1, ¶¶ 13-15.) To raise capital and maintain their lines of credit, DVI used a securitization system, through which financial contracts were pledged as collateral to lenders. (D.I.1, ¶ 33.) Recognizing losses or establishing reserves on underperforming contracts would have negatively affected the securitization system, so although the payment histories of impaired leases and loans worsened in the years leading up to filing, DVI's loss reserves and level of write-offs for bad credit remained fairly static. (D.I.1, ¶ 39.) By 1999, DVI began experiencing shortages of capital, so the defendants used irregular financial practices to make ends meet while at the same time investing large amounts of cash in ill-performing markets and non-core businesses. (D.I.1, ¶ 54.) Defendants O'Hanlon, Garfinkel, and Miller were allegedly the first to implement such practices, as they had access to DVI's record keeping software. Apparently, the other defendants discovered, ignored, or participated in the practices. (D.I.1, ¶¶ 92-100.)

*2 The plaintiff alleges that, to maintain the appearance of solvency, the defendants injured DVI and its creditors by repurchasing delinquent loans and leases without receiving commensurate value, and transferring funds within DVI's subsidiaries and among select borrowers to disguise underperforming accounts. (D.I.1, ¶¶ 60-68.) Other irregular practices that the defendants are alleged to have committed include investing substantial amounts of money in consistently unprofitable or non-core businesses, obtaining otherwise-unavailable lines of credit by pledging the same collateral to several lenders, ignoring internal controls and reporting procedures, and disregarding numerous warnings from DVI's outside auditor and the SEC. (*Id.*)The independent auditor resigned in June 2003 after refusing to approve DVI's Form 10-Q for the quarterly period ending March 31, 2003. DVI also began defaulting on its loans in June 2003, and ultimately filed for bankruptcy on August 25, 2003. (D.I.1, ¶ 57.)

## IV. DISCUSSION

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot."*In Re Corestates Trust Fee Litig.,* 837 F.Supp. 104, 105 (E.D.Pa.1993), *aff'd*39 F.3d 61 (3d Cir.1994)." Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation."*National Org. for Women v. Scheidler,* 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). Therefore, the court will address the issue of standing first.

### A. Standing

Defendant Roberts posits that the causes of action pursued in the complaint are beyond the scope of the remedies contemplated by the statutory predicates cited in the Motion to Authorize Official Committee of Unsecured Creditors to Investigate and Pursue Causes of Action Against Pre-Petition Officers and Directors. In the May 10, 2004 Order approving that motion, however, the Bankruptcy Court authorized the Debtors to "investigate, and, if appropriate, pursue, *any causes of action* of the Debtors' estates against the Defendants."(D.I.27, Ex. A) (emphasis added). Whether this Order granted to the Committee greater authority than the Committee requested is immaterial; the court had the power to do so. The plain language of the Bankruptcy Court's Order makes clear that Buckley has standing to assert claims on behalf of DVI's debtors.

Other defendants argue that Buckley cannot bring claims on behalf of the creditors because the Committee had standing as to the debtors only. In support of their argument, the defendants rely on the Supreme Court's decision in *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), wherein the Court held that a trustee in bankruptcy does not have standing to pursue claims on behalf of creditors of the debtor company's estate. In response, Buckley argues that, as trustee, it is empowered to pursue claims on behalf of the debtors' creditors because the Bankruptcy Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

confirmed the assignment of the creditors' claims to the trustee under the provisions of the Plan and Confirmation Order, dated November 24, 2004.

**\*3** While the court acknowledges that, in theory, a bankruptcy trustee can pursue claims that the debtors' creditors assigned to it, a plaintiff must have standing to pursue its claims at the time of filing. *See Minneapolis & St. Louis R.R. Co. v. Peoria & Pekin Union Ry. Co.,* 270 U.S. 580, 586, 46 S.Ct. 402, 70 L.Ed. 743 (1926) ("The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought."). Here, the complaint was filed in August 2004 but the trustee did not obtain an assignment of rights from a subset of creditors until four months later, in December 2004, when the Bankruptcy Court's Plan and Confirmation Order became effective. Moreover, since that Order, Buckley has not sought to supplement the existing complaint.

The court will not proceed with claims for which the plaintiff obtained standing after the lawsuit was filed. As Judge Longobardi so aptly stated in *Procter & Gamble Co. v. Paragon Trade Brands, Inc.:*
As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

917 F.Supp. 305, 310 (D.Del.1995) (*quoted in Gaia Technologies, Inc. v. Reconversion Technologies, Inc.,* 93 F.3d 774, 780 (Fed.Cir.1996), *as amended on rehearing,* 104 F.3d 1296 (Fed.Cir.1996)). The court will dismiss, without prejudice, any claims Buckley asserts on behalf of the debtors' creditors.

**B. Breach of Fiduciary Duty Claim**

Delaware law provides that corporate officers and directors owe the corporation a triad of fiduciary duties: loyalty, good faith, and due care.*McMullin v. Beran,* 765 A.2d 910, 917 (Del.2000). To state a claim for breach of fiduciary duty, a plaintiff may allege that the officers and directors of a company knew or should have known that violations of the law were occurring, that they took no good faith steps to ameliorate the situation, and that the company suffered losses as a result.[FN2]*In re Caremark Intern. Inc. Deriv. Lit.,* 698 A.2d 959, 971 (Del.Ch.1996) (stating that liability may be based upon either an ill-advised or negligent decision, or an unconsidered failure to act when due attention would arguably have prevented the loss). The Court of Chancery later elaborated on what constitutes such an ill-advised decision in *Guttman v. Huang,* 823 A.2d 492, 507 (Del.Ch.2003) (listing as an example "that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation").

> FN2. Delaware law provides that fiduciary duties are owed to a corporation by both officers and directors. *Arnold v. Soc'y for Savings Bancorp, Inc.,* 678 A.2d 533, 539 (Del.1996). Therefore, to the extent that cases cited in this memorandum refer only to one of these groups, the court will consider them as applicable to both.

**\*4** Buckley alleges that the defendants either knew or should have known that violations of law were occurring, that they took no good faith steps to ameliorate the situation, and that DVI and its creditors suffered damages. Buckley also alleges that the officer defendants perpetuated an array of irregular accounting practices, of which the director defendants were aware, and which they ignored. All of the director defendants were alleged to be members of DVI's audit committee. Buckley's complaint is consistent with the *Guttman* pleading example, in that it alleges that the officer defendants eliminated the Criticized Asset Reporting system and manipulated delinquent loans and leases to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

make them appear profitable. Also, as in *Guttman,* Buckley alleges that the audit committee received eleven warning letters over eight years from their independent auditor, and that the auditor resigned after no action was taken in response to the alert. Buckley further avers that a series of inquiries from the SEC were also ignored by both the audit committee and the board of directors.

Several of the defendants have attempted to analogize the facts in this case to those in *Guttman* because the Court of Chancery viewed that plaintiff's allegations as overly conclusory. In *Guttman,* however, the complaint made sweeping accusations regarding accounting irregularities without discussing how management was expected to be aware of the problem, or even the presence of an audit committee. Here, the court finds that the contents of Buckley's complaint dictate a different result.

The defendants also challenge Buckley's claim for breach of fiduciary duty by disputing many of the substantive contentions. For example, several state that they lacked knowledge or notice of the accounting irregularities, that they held their relevant positions for only a portion of the time in which DVI allegedly was put on notice of the irregularities, that they immediately attempted to rectify the situation upon learning of the problem, that the letters sent by DVI's outside auditor or the SEC could not be expected to alert them to the problems, or that the Examiner's Report painted a different picture of the internal workings of DVI. These responses address, however, the substantive merits of Buckley's claim. Because Buckley's allegations are accepted as true for the purposes of these motions, such factual disputes are not appropriately resolved on motions to dismiss. Rather, the court must focus its consideration on the sufficiency of the complaint.

### 1. Sufficiency of Pleading

Several of the defendants insist that, because they are not mentioned individually in many of Buckley's allegations, the claims are too broad to proceed. " When group pleading is utilized by a plaintiff 'the

identification of the individual sources of statements is unnecessary when the fraud allegations arise from the misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statements, press releases or other group-published information that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation. " ' *Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42, 85 (D.Del.2002) (citations and internal quotations omitted). Therefore, group pleading may be sufficient in some circumstances.

**\*5** Defendant Roberts argues that breach of fiduciary duty claims must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). Such an assertion is correct when the allegations of breach of fiduciary duty sound in fraud. *ePlus Group v. Panoramic Communications, Inc.,* No. 02-7992, 2003 WL 21512229 at \*2 (S.D.N.Y. July 2, 2003). However, in the absence of such allegations, Rule 9(b) does not apply. *In re Fruehauf Trailer Corp.,* 250 B.R. 168, 197 (D.Del.2000) (stating that the heightened pleading requirement generally does not apply to state law claims for breach of fiduciary duty). In *Fruehauf,* Rule 9(b) was not triggered even in the presence of multiple allegations that the defendant knew or should have known that certain representations were false and misleading. Neither was particularized pleading required when the plaintiff's complaint included such statements as "knew or should have known the financial statements ... misrepresented to System One the Division's financial condition."*In re InaCom Corp.,* No. 00-2426, 2001 WL 1819987 at \*3 (Bankr.D.Del. Aug.7, 2001) (finding the claim did not sound in fraud).

While not all of Buckley's allegations name the involved defendants individually, Buckley did separate the list of defendants into smaller groups who worked together on various committees and boards. Although Buckley frequently refers simply to "defendants" in the body of the complaint, the parties involved in each alleged practice of bad-faith were identified expressly in the introductory paragraphs of Buckley's complaint, and later, in his factual allegations and claims. (D.I.1, ¶¶ 16-28.) The court accepts that Buckley

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

uses the categories of officers and directors merely as substitutes for listing names, rather than using them as sweeping terms to avoid having to associate specific parties to particularized conduct. Wherein much of the alleged conduct involved collective action and decision making, Buckley has sufficiently identified the small groups within DVI and their roles in approving or participating in each alleged bad-faith practice.

The court rejects Defendant Roberts' assertion that Buckley's allegations sound in fraud. Granted, Buckley describes much of the defendants' conduct as intentional or knowing, however, Buckley's choice of terms, which are also seen in fraud claims, do not transform claims for breach of fiduciary duty into claims based in fraud. In fact, the fiduciary duty claims in Buckley's complaint are very similar in structure to what were deemed acceptable fiduciary duty claims in *Fruehauf* and *InaCom.* Buckley's allegations for breach of fiduciary duty, while they must not be conclusory, need not be pled with the particularity required of fraud claims.

### 2. Applicability of Business Judgment Rule

The business judgment rule is a presumption that a board's actions are entitled to deference, because it would be overly harsh to condemn such a decision that only in hindsight was poorly conceived. This presumption is rebutted, however, when a plaintiff pleads particularized facts sufficient to raise a reason to doubt that the action was taken in good faith or on an informed basis. *In re The Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 286 (Del.Ch.2003). Such doubt is raised when officers and directors fail to be "active monitors of corporate performance," *Caremark,* 698 A.2d at 968 (providing as an example the replacement of a board of directors following the discovery of large losses caused by phantom trades by a prominent insider). Nor may officers and directors consciously disregard visible " red flags." *See Rattner v. Bidzos,* No. 19700, 2003 WL 22284323 at *13 (Del.Ch. Sept.30, 2003). Neither may officers and directors make decisions " so egregious as to constitute corporate waste."*In re Tower Air, Inc. .,* 416 F.3d 229, 238 (3d Cir.2005). The standard for holding officers and directors

liable is one of gross negligence. *Smith v. Van Gorkom,* 488 A.2d 858, 873 (Del.1985).

*6 In *Smith,* the decision to approve a proposed merger met that standard because it was made solely on the basis of a twenty-minute presentation. On the other end of the spectrum, gross negligence was not found when directors recommended a merger after consulting financial advisors, meeting several times over a six-week period, and reviewing challenges to the idea. *Rabkin v. Philip A. Hunt Chem. Corp.,* 547 A.2d 963, 970 (Del.Ch.1986) (defining gross negligence as reckless indifference to, or a deliberate disregard of, the stockholders).

Buckley used language similar to that in the above cases in describing defendants' alleged conduct and its results, including allegations of wasting corporate assets, willfully disregarding warnings, and ceasing to review delinquent accounts. Buckley alleges that DVI's officers and directors acted in bad faith, disguising poorly-performing accounts and ignoring the advice of its outside auditor and the inquiries of the SEC. Buckley has satisfied the *Disney* requirement by pleading particularized facts that raise doubts as to whether the officers and directors were acting in good faith.

### 3. Effect of Exculpatory Clause

Several defendants argue that the exculpatory clause in DVI's Certificate of Incorporation, which is based on section 102(b)(7) of the Delaware General Corporation Law, bars the claims against them because it states that no director shall be personally liable to DVI or its stockholders. However, the clause contains exceptions to this protection when a director breaches his duty of loyalty to DVI, or for acts not taken in good faith, involving intentional misconduct, or a knowing violation of law. For example, in *Official Committee of Unsecured Creditors of Integrated Health Serv., Inc. v. Elkins,* such a provision was found not to insulate the directors from liability when they acted with knowing and deliberate indifference by approving a loan program without consideration, deliberation, or advice from an expert. No. 20228, 2004 WL 1949290 at *15 (Del.Ch. Aug.24, 2004). Similarly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 956947 (D.Del.)
(Cite as: Slip Copy)

Page 6

in *McCall v. Scott,* defendants were not protected by the exculpatory clause when they acted in bad faith by intentionally ignoring "red flags." 250 F.3d 997, 1001 (6th Cir.2001) (finding allegations of " conscious disregard of known risks" to necessarily be conduct undertaken in bad faith).

Buckley's allegations fall into the "bad faith" exception to DVI's Certificate of Incorporation exculpatory clause. Buckley alleges that the defendants here, as was alleged in *Elkins,* acted with "knowing and deliberate indifference," when they stopped examining delinquent accounts. Further, Buckley alleges that the defendants consciously disregarded "red flags," as in *McCall,* when the defendants paid no attention to the warnings allegedly contained in the auditor's and SEC's letters. Buckley has sufficiently pled breach of the duties of loyalty and good faith. As a result, the Certificate of Incorporation cannot operate to insulate the defendants from a breach of fiduciary duty claim. Consequently, the claim will proceed on the merits.

## C. Deepening Insolvency Claim

*7 To plead insolvency, a plaintiff must aver facts that establish, for pleading purposes, that the corporation had a deficiency of assets below liabilities with no reasonable prospect that the business will succeed, or that it was unable to meet maturing obligations as they fell due in the ordinary course of business. *Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 782 (Del.Ch.2004).

Buckley alleges that financial practices similar to those employed by the debtors in *Production Resources* occurred at DVI. *Id.* at 783-4.Specifically, the complaint avers that DVI had great difficulty raising capital, shuffled delinquent accounts to make them appear healthy, and could only obtain advances from its line of credit by erroneously certifying impaired loans and leases. Buckley expressly alleged that DVI became insolvent in June 2003, when it began defaulting on its loan obligations. Again, here, as in *Production Resources,* it can be reasonably inferred that the

officers' and directors' alleged conduct caused the insolvency. The court thus concludes that Buckley has sufficiently pled that DVI was in the "zone of insolvency."

### 1. Recognition of Deepening Insolvency Claim

The U.S. Bankruptcy Court for the District of Delaware predicted that, in the absence of an opinion by the Delaware Supreme Court and given the Third Circuit's analysis in *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* Delaware law would likely recognize a claim for deepening insolvency. *In re Oakwood Homes Corp.,* 340 B.R. 510, 531 (Bankr.D.Del.2006). Although the elements of such a claim have yet to be enunciated, the Third Circuit acknowledged such a claim when a plaintiff alleges "fraudulent expansion of corporate debt and prolongation of corporate life. "*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 347 (3d Cir.2001). A successful claim for deepening insolvency requires a showing of harm to the corporation because of such fraud. *Oakwood Homes,* 340 B.R. at 534 (also explaining that fraud requires a representation of material fact, falsity, scienter, reliance, and injury). In *Oakwood Homes,* fraud was found when the defendants, acting as the debtors' fiduciaries, misrepresented the sustainability of the company's finances with the intent to induce the debtors into maintaining the *status quo,* because it could be inferred from the complaint that such misrepresentation was with knowledge.

Here, as in *Oakwood Homes,* Buckley pled that the defendants, placed in positions of trust and control within DVI, knowingly misrepresented the state of DVI's financial health with the intent to cause DVI to continue incurring more liabilities than it could repay. The defendants allegedly disguised failing accounts and misrepresented DVI's creditworthiness without justification. Rather than constituting a valid attempt to restore DVI to solvency, the defendants' conduct is alleged to have fraudulently expanded DVI's corporate debt and prolonged DVI's life. These allegations, as framed, satisfy the pleading standard observed in *Lafferty.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

### 2. Applicability of *In Pari Delicto* Doctrine

**\*8** The doctrine of *in pari delicto*[FN3] provides that "a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in."*Lafferty,* 267 F.3d at 354 (citations omitted). Under this equitable doctrine, when a plaintiff is "standing in the shoes" of the bankrupt corporation, its claim is barred if the defendants' purported wrongdoing is imputed on the bankrupt corporation itself. *Id.* at 354, 358-59.

> FN3.*In pari delicto* is Latin for "in equal fault." *Black's Law Dictionary* 806 (8th ed.2004).

Whether the *in pari delicto* doctrine applies in this case depends on whether the defendants' conduct can be imputed to the debtors and hence to the Trust, which, under bankruptcy law, stands in the shoes of the debtors. Imputation refers to the attribution of one person's wrongdoing to another person. Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of corporation. *Id.* at 358.

The defendants' argue that *in pari delicto* serves as a bar to Buckley's deepening insolvency claim because Buckley stands in the shoes of the debtor corporations, seeking relief from the defendants for damages purportedly caused by the debtors' allegedly fraudulent conduct. (D.I.29.) To support this argument, Defendants Boyle and Fear state that the allegations buttressing Buckley's deepening insolvency claim satisfy both prongs of the imputation test. In response, Buckley argues that because the *in pari delicto* doctrine is an affirmative defense, the court should not consider the issue on a motion to dismiss. Further, Buckley contends that if the court reached the merits of whether *in pari delicto* is applicable, the court should find imputation inappropriate because the second prong of the imputation test is not met.

It is generally true that an affirmative defense should not be used to dismiss a plaintiff's complaint under Rule 12(b)(6).*In re Adams Golf, Inc. Sec. Litig.,* 381 F.3d 267, 277 (3d Cir.2004). That being said, in *Lafferty,* the Third Circuit did affirm a district court's dismissal of a deepening insolvency claim on the basis of the *in pari delicto* doctrine, which the Circuit acknowledged as an affirmative defense. *Lafferty* and *Adams Golf,* however, are not necessarily in conflict. Indeed, dismissal is only appropriate when the plaintiff can prove *no set of facts* that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added). In this case, Buckley disputes that the criteria for imputation is met. Specifically, Buckley invokes the adverse interest exception, which provides that fraudulent conduct will not be imputed to the corporation if the fraud was not "for the benefit of the corporation."*Lafferty,* 267 F.3d at 359. As Judge Cowen observed in his *Lafferty* dissent, "an equitable doctrine like *in pari delicto* is highly sensitive to the facts and readily adapted to achieve equitable results."*Lafferty,* 267 F.3d at 362. Simply put, the court finds it premature to bar Buckley's deepening insolvency claim on *in pari delicto* grounds. While it may eventually come to pass that the defense will prevail, the determination will be made on further development of the facts. After considering the pleadings and the positions of the parties, the court is not satisfied that Buckley is unable to prove any facts that would entitle the DVI Liquidating Trust to relief for deepening insolvency.

### 3. Applicability of the Business Judgment Rule

**\*9** In Delaware, there is no general duty to liquidate an insolvent company. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168 (Del.Ch.2004) . Similar to the application of the business judgment rule in the fiduciary duty context discussed earlier, it would be harsh to judge the actions of corporate officers and directors, in hindsight, for a failed good-faith attempt to bring a company out of insolvency. Allegations of bad faith, however, also make recovery for deepening insolvency possible under Delaware law. *In re RSL COM PRIMECALL USA, Inc.,* Nos. 01-11457 through 01-11469, 03-2176, 2003 WL 22989669 at *8 (Bankr.S.D.N.Y. December 11, 2003). If bad faith

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 8

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

is alleged, prolongation of operations would "smack of self-dealing, constitute a breach of fiduciary duty, and open up recovery under the theory of deepening insolvency."*In re Global Service Group LLC,* 316 B.R. 451, 465 (Bankr.S.D.N.Y.2004) (requiring a complaint to allege bad faith or fraudulent intent as opposed to mere bad judgment).

As the court has already concluded, Buckley's complaint makes sufficient allegations of bad faith. Buckley stated that, rather than attempting in good faith to revive DVI and avoid liquidation, the defendants disguised the true nature of DVI's finances to obtain more funding with no expectation that such funding would restore DVI to solvency. (D.I.1, ¶ 68.) One can reasonably infer that such activities extend beyond the mere exercise of poor judgment, deemed insufficient in *Global Service.* The court finds that, based on the pleadings, the business judgment rule does not preclude a deepening insolvency claim against the defendants.

### D. Fraud Claim

To state a claim for fraud, a plaintiff must allege that a defendant made a false statement, knowing or recklessly assuming it to be true, with the intent that plaintiff act or refrain from acting in reliance, that plaintiff justifiably relied, and that plaintiff suffered damages. *Kronenberg v. Katz,* 872 A.2d 568, 585 n. 25 (Del.Ch.2004). Allegations of fraud must be pled with particularity. Fed.R.Civ.P. 9(b). Provided that a plaintiff alleges sufficiently particularized allegations, there is no *per se* rule that group pleading cannot satisfy Rule 9(b); otherwise, " sophisticated defrauders" could easily conceal their wrongdoing. *MBIA Ins. Corp. v. Royal Indem. Co.,* 221 F.R.D. 419, 421 (D.Del.2004). The Third Circuit has stated that plaintiffs must plead the circumstances of the alleged fraud such that defendants may be placed on notice; although stating the "date, place, and time" clearly fulfills this requirement, plaintiffs may use any alternative method of "injecting precision and some measure of substantiation" into the allegations of fraud.*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984).

In *Asbestemps, Inc. v. Diversified Energy Group, Inc.,* allegations that defendants represented a corporation as fiscally sound to persuade another company to provide labor were not made verbatim, nor were the time and place identified, but the court found that fraud was properly pled. No. 87-2623, 1987 WL 16662 (E.D.Pa. Sept.9, 1987). Plaintiffs need only provide sufficient factual specificity to provide assurance that they have investigated the alleged fraud and reasonably believe that a wrong has occurred. *Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42, 54 (D.Del.2002). For example, even absent allegations with respect to the exact factual context or words, a description of the nature and subject matter of the representation was found to be enough in *CFTC v. American Metal Exch.,* 693 F.Supp. 168, 190 (D.N.J.1988).

**\*10** Buckley sufficiently alleges the elements of fraud: that defendants O'Hanlon, Garfinkel, and Miller knowingly misrepresented DVI's financial situation, with the intent to obtain unjustifiable credit, that DVI and its creditors relied on this misinformation, and that it suffered damages to the extent of bankruptcy. As in *CFTC,* Buckley's complaint describes the nature and subject matter of the alleged fraud by asserting that the three defendants intentionally concealed a number of improper accounting practices, ceased normal account monitoring practices, and diverted millions of dollars from DVI when DVI could least afford it. Although Buckley does not state specific dates and places regarding the allegedly fraudulent actions, as in *Asbestemps,* Buckley sufficiently explained the role each defendant (or in some instances, the three defendants acting together) played in each allegedly fraudulent practice in enough detail to satisfy the " injecting precision" standard enunciated in *Seville.*

### V. CONCLUSION

Buckley does not have standing to pursue any claims on behalf of the creditors. As such the court will grant the defendants' motions to dismiss to the extent that they seek relief on behalf of the creditors. The court will deny the defendants' motions to dismiss claims brought on behalf of the debtors.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 956947 (D.Del.)
**(Cite as: Slip Copy)**

### ORDER

For the reasons set forth in the court's memorandum issued contemporaneously herewith, IT IS HEREBY ORDERED that:

1. The Defendants' Motions to Dismiss (D.I. 23, 25, 26, 28, 30, 32, 34, and 36) are hereby GRANTED IN PART and DENIED IN PART.

2. The Plaintiff's Motion for Leave to File an Omnibus Brief (D.I.48) is GRANTED.

D.Del.,2007.
Buckley v. O'Hanlon
Slip Copy, 2007 WL 956947 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

56 Fed.Appx. 852                                                     Page 1

56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
(Cite as: 56 Fed.Appx. 852)

**H**
Collins v. Johnson County, KS
C.A.10 (Kan.),2002.
This case was not selected for publication in the
Federal Reporter.Please use FIND to look at the
applicable circuit court rule before citing this
opinion. Tenth Circuit Rule 36.3. (FIND CTA10
Rule 36.3.)
United States Court of Appeals,Tenth Circuit.
William P. COLLINS, Plaintiff-Appellant,
v.
JOHNSON COUNTY, KANSAS; State of Kansas;
City of Overland Park, Kansas; Charles Harvey;
Judge Taylor; Melinda Whitman; Kurt Hoover;
Paul Morrison; Judge Mcanany; Brian Porch;
Adrian Gilby, Individually; Johnson County
District Attorney's Office, Defendants-Appellees.
William P. COLLINS, Plaintiff-Appellant,
v.
Johnson County, Kansas; State of Kansas; S.M.
School District; Kansas Supreme Court; City of
Olathe, Kansas; Olathe Police Department, Kansas;
Crista Collins; Dick Bryant; Brian Porch; Janet
Sutton; Judge Russell; Johnson County District
Attorney's Office; Judge Harmon; Linda Voyles;
City of Overland Park, Kansas; Carolyn Bartlett,
Johnson County Court Services, Probation Officer;
Lori Blake, Johnson County Court Services, Child
Services Officer, Defendants-Appellees.
William P. COLLINS, Plaintiff-Appellant,
v.
Larry McClain; Crista Collins; Neysa Day; Vance
Preman; Diane Lund; Bruce Beyes; John Gerstle;
Vincent Bates; Paul Morrison; Gary Rulon; Jerry
Elliott; Robert Gernon; Robert Lewis; Joseph
Perron; Henry Green; Christel Marquardt; David
Knudson; Carol Beyer; Lee Johnson; Richard
David; Marshall Whitt; Stanley Bier; Chuck
Elliott; Linda Voyles; City of Overland Park,
Kansas; Overland Park Police Department;
Johnson County District Attorney'S Office,
Defendants-Appellees.
William P. COLLINS, Plaintiff-Appellant,
v.

Paul Morrison; Crista Collins; Neysa Day; Vance
Preman; Erica Froetschner; Vincent Bates; James
Vano; Steve Tatum; City of Overland Park,
Kansas; Overland Park Police Department;
Christopher Redmond; Johnson County District
Attorney's Office, Defendants-Appellees.
**Nos. 01-3336, 02-3049, 02-3212, 02-3250.**

Dec. 16, 2002.

Pro se plaintiff brought several actions, arising from
state court domestic proceedings, against various
governmental entities and individuals. The United
States District Court for the District of Kansas
dismissed actions. Plaintiff appealed. The Court of
Appeals, O'Brien, Circuit Judge, held that: (1)
judicial immunity barred § 1983 claims against
judges; (2) prosecutorial immunity prohibited §
1983 claims against individual district attorneys;
and (3) Eleventh Amendment barred claims against
state.

Affirmed.
West Headnotes
**[1] Civil Rights 78 ⚖1376(8)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
           78k1376 Government Agencies and
Officers
              78k1376(8) k. Judges, Courts, and
Judicial Officers. Most Cited Cases
    (Formerly 78k214(8))
Judicial immunity barred § 1983 claims, arising
from state court domestic proceedings, against state
court judges who were acting with jurisdiction. 42
U.S.C.A. § 1983.

**[2] Civil Rights 78 ⚖1376(9)**

78 Civil Rights
    78III Federal Remedies in General

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 Fed.Appx. 852

Page 2

56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
**(Cite as: 56 Fed.Appx. 852)**

78k1372 Privilege or Immunity; Good Faith and Probable Cause
    78k1376 Government Agencies and Officers
        78k1376(9) k. Attorney General and Prosecuting Attorneys. Most Cited Cases
    (Formerly 78k214(9))
Prosecutorial immunity prohibited § 1983 claims, arising from state court domestic proceedings, against individual district attorneys for alleged false and malicious prosecution and other similar acts. 42 U.S.C.A. § 1983.

**[3] Federal Courts 170B ☜265**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk264 Suits Against States
                170Bk265 k. Eleventh Amendment in General; Immunity. Most Cited Cases

**Federal Courts 170B ☜269**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk268 What Are Suits Against States
                170Bk269 k. State Officers or Agencies, Actions Against. Most Cited Cases
Claims under § 1983 against state and its instrumentalities or alter egos, arising from state court domestic proceedings, fell within Eleventh Amendment's bar of actions for damages against state in federal court. U.S.C.A. Const.Amend. 11; 42 U.S.C.A. § 1983.

**[4] Federal Civil Procedure 170A ☜657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In General. Most Cited Cases

**Federal Civil Procedure 170A ☜1811**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)4 Particular Actions, Insufficiency of Pleadings in
                170Ak1811 k. Tort Actions in General. Most Cited Cases
Dismissal, for failure to state claim, of claims of slander, kidnaping, defamation, unethical behavior, and fraud arising from state court domestic proceedings was appropriate, where pro se plaintiff made no attempt to comply with local rules and court order intended to insure orderly progress. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☜657.5(2)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(2) k. Civil Rights Proceedings in General. Most Cited Cases

**Federal Civil Procedure 170A ☜1788.6**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)4 Particular Actions, Insufficiency of Pleadings in
                170Ak1788.5 Civil Rights Actions
                    170Ak1788.6 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ☜1838**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1837 Effect
                    170Ak1838 k. Pleading Over. Most Cited Cases
Dismissal, for failure to state claim, of pro se plaintiff's § 1983 claims arising from state court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 Fed.Appx. 852

56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
**(Cite as: 56 Fed.Appx. 852)**

Page 3

domestic proceedings was appropriate, where it was patently obvious plaintiff could not prevail on facts alleged, as his conclusory allegations merely reflected his frustration and reiterated his grievances, and plaintiff's litigation history indicated that allowing him to amend his complaint would have been futile. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**\*853** Cynthia K. Wallace, The O'Connor Law Firm, P.C., Kansas City, MO, William P. Collins, Overland Park, KS, for Plaintiff-Appellant.
M.J. Willoughby, Scott Bradley Poor, Topeka, KS, Daniel B. Denk, Ryan B. Denk, McAnany, Van Cleave & Phillips, Kansas City, KS, Charles Harvey, Ernest C. Ballweg, Cooke, Johnson, Ballweg, Christlieb, Tuley & Moore, Curtis L. Tideman, Tammy M. Somogye, Lathrop & Gage, Richard T. Merker, Rebecca S. McGinley, Wallace, Saunders, Austin, Brown & Enochs, Crista Collins, Overland Park, KS, James H. Ensz, Ensz & Jester, Kansas City, MO, David P. Madden, Michelle R. Stewart, Fisher, Patterson, Sayler & Smith, Overland Park, KS, Charles H. Stitt, Richard F. Lombardo, Shaffer, Lombardo & Shurin, Kansas City, MO, Neysa L. Day, Kansas City, MO, Vance C. Preman, Shawnee Mission, KS, Stephen S. Brown, Matthew M. Merrill, Niewald, Waldeck & Brown, William Clayton Crawford, Jr., Kirk J. McCabe, Jack W. Green, Jr., Foland & Wickens, Kansas City, MO, for Defendants-Appellees.

Before EBEL, LUCERO, and O'BRIEN, Circuit Judges.

### ORDER AND JUDGMENT[FN*]

FN* This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.O'BRIEN, Circuit Judge.
**\*\*1** After examining the briefs and appellate

records, this panel has determined unanimously that oral argument would not materially assist the determination of these appeals. SeeFed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The cases are therefore ordered submitted without oral argument.

**\*854** Based on his apparent unhappiness with the outcome and circumstances surrounding his state court domestic proceedings, the Appellant, Mr. William P. Collins, has filed four separate appeals, each arising from the district court's dismissal of the seemingly endless array of pro se filings made by Mr. Collins against various governmental entities and individuals. Mr. Collins now appeals the four district court decisions dismissing his complaints under Fed.R.Civ.P. 12(b)(6). We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

We review *de novo* the district court's grant of a Rule 12(b)(6) motion to dismiss, applying the same standard as the district court. *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999). "[A]ll well-pleaded factual allegations in the ... complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Id.*"A complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Yousef v. Reno,* 254 F.3d 1214, 1219 (10th Cir.2001) (quotation marks and citation omitted).

### *Case No. 01-3336:*

Appeal number 01-3336 arises from Mr. Collins's 42 U.S.C. § 1983 claims and various state law claims alleging unlawful arrest, false and malicious prosecution, unethical behavior, and malpractice against numerous entities and individuals, including: Johnson County Kansas; the State of Kansas; the City of Overland Park, Kansas; the Johnson County District Attorney's Office; two state court judges; and various individuals, both public and private. The district court granted defendants' motions to dismiss, finding Mr. Collins lacked standing to bring suit because he had filed for bankruptcy and this action had not been

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
**(Cite as: 56 Fed.Appx. 852)**

abandoned by the bankruptcy trustee. In the alternative, the district court dismissed this complaint on the basis of judicial, prosecutorial, and Eleventh Amendment immunity, as well as Mr. Collins's failure to state a claim against the remaining individual defendants.

[1][2] After reviewing the record and applicable law, we find the district court's alternative reasons for dismissal were correct.[FN1] First, judicial immunity bars Mr. Collins's claims against the state court judges who were acting with jurisdiction. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman,* 435 U.S. 349, 356-57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (quotation marks and citation omitted). Second, prosecutorial immunity prohibits Mr. Collins's claim against the individual district attorneys for alleged false and malicious prosecution and other similar acts.

> FN1. Because the district court's alternative bases are persuasive and unarguably correct, we see no need to address its ruling that Mr. Collins lacked standing because of his pending bankruptcy.

**\*\*2** It is well established that prosecutors are absolutely immune from suit under section 1983 concerning activities "intimately associated with the judicial ... process," such as initiating and pursuing criminal prosecutions. It is also well established that this absolute prosecutorial immunity extends to state attorneys and agency officials who perform functions analogous to those of a prosecutor in initiating and pursuing civil and administrative enforcement proceedings.
**\*855** *Pfeiffer v. Hartford Fire Ins. Co.,* 929 F.2d 1484, 1489 (10th Cir.1991) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

[3] Third, Mr. Collins's claims against the State of Kansas and its instrumentalities or alter egos are

clearly within the Eleventh Amendment's bar of actions for damages "against a state in federal court, even by its own citizens, unless the state waives that immunity." *Sturdevant v. Paulsen,* 218 F.3d 1160, 1164 (10th Cir.2000). This Eleventh Amendment immunity also applies to entities created by state governments which operate as alter egos or instrumentalities of the states. *Id.*

Finally, Mr. Collins's remaining claims were properly dismissed for failure to state a claim upon which relief could be granted. He has failed to show that the private defendants acted under the color of state law[FN2] or sufficiently allege the actions of the remaining defendants amounted to a cognizable claim under state or federal law.[FN3]

> FN2. "Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (citing 42 U.S.C. § 1983).

> FN3. In August 2002, Ms. Cynthia K. Wallace, Esq., made an appearance for Mr. Collins and requested leave to supplement his original brief. Mr. Collins filed his Notice of Appeal in October 2001, and the matter was fully briefed in March 2002. We find that this motion is untimely. We note that Mr. Collins could have retained counsel much earlier in the process, and the motion to supplement states no excuse for his delay in obtaining counsel. Further, we find the district court's decision was correct, and additional briefing would be of little assistance.

### *Case No. 02-3049:*

[4] In appeal number 02-3049, Mr. Collins continues to demonstrate his frustration and displeasure with his state domestic proceedings. He has filed claims for slander, kidnaping, defamation, unethical behavior, and fraud against a wide range of defendants, including: Johnson

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 Fed.Appx. 852

Page 5

56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))
**(Cite as: 56 Fed.Appx. 852)**

County; the State of Kansas; the school district; the Kansas Supreme Court; two state court judges; the police department; various other entities; and private and public individuals. The district court granted defendants' motions to dismiss based on Mr. Collins's failure to timely respond to defendants' motions to dismiss, his failure to show cause for failing to timely respond to defendant Crista Collins's motion to dismiss, and the lack of personal and subject matter jurisdiction over defendant Janet Sutton. In this appeal, Mr. Collins merely reiterates his litany of conclusory allegations against these defendants.

After careful review of the record and applicable law, we conclude the district court properly dismissed this case. The district court is not required to continue to manage a case on its docket in which Mr. Collins has made no attempt to comply with the local rules and court order intended to insure orderly progress. The court correctly found further delay would prejudice the defendants. Finally, the district court properly found it lacked jurisdiction over defendant Sutton.

*Case No. 02-3212:*

Appeal number 02-3212 involves Mr. Collins's § 1983 claims against various governmental entities and public and private individuals, including numerous state court judges and prosecutors. The district court granted defendants' motions to dismiss for the same reasons stated in its order dismissing the complaint forming the basis of appeal number 01-3336, namely, that judicial and prosecutorial immunity barred suit, and Mr. Collins failed to state *856 a claim upon which relief could be granted (he failed to allege the private defendants acted under color of state law and failed to allege a violation of a constitutional or federal right). Therefore, we find appeal 02-3212 without merit for substantially the same reasons as stated for appeal number 01-3336.

*Case No. 02-3250:*

**3 [5] Appeal number 02-3250 also comes to us

from a dismissal of Mr. Collins's § 1983 claims against various public and private individuals and governmental entities, again resulting from his state court domestic proceedings. Acting *sua sponte,* the district court found it patently obvious that Mr. Collins could not prevail on the facts alleged and dismissed this complaint for failure to state a claim. We recognize that a pro se litigant's pleadings are to be construed liberally. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991). However, it is not the district court's function "to assume the role of advocate for the pro se litigant"; in fact, the district court may dismiss the complaint "sua sponte when it is patently obvious that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile." *Id.* (quotation marks and citation omitted).

Here, it is patently obvious Mr. Collins could not prevail on the facts alleged, as his conclusory allegations merely reflect his frustration and reiterate his grievances; they fail to even arguably state a violation of federal rights. Guided by history, we conclude that allowing Mr. Collins to amend his complaint would have been futile and a complete waste of time. In each of the four cases, the district court clearly and patiently explained why Mr. Collins could not bring these types of claims against these types of defendants. The courts should not be expected to bear "the spurns [t]hat patient merit of th' unworthy takes...." WILLIAM SHAKESPEARE, HAMLET act 3, sc. 1. When reason fails, chaos reigns.

As explained, each of Mr. Collins's four appeals are unfounded, unsupported, and without merit. The district court properly applied the law in dismissing each of these cases. Therefore, we **AFFIRM.** Accordingly, all pending motions are denied as moot.

C.A.10 (Kan.),2002.
Collins v. Johnson County, KS
56 Fed.Appx. 852, 2003 WL 42164 (C.A.10 (Kan.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                Page 1

Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Floyd v. Saturn of Newark
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Robert T. FLOYD Plaintiff,
v.
SATURN OF NEWARK and General Motors
Acceptance Corporation, Defendants.
No. Civ.A. 04-944 JJF.

July 11, 2005.

Robert T. Floyd, Darby, Pennsylvania, Plaintiff, pro se.
Linda Richenderfer, of Saul Ewing, LLP, Wilmington, Delaware, Kimberly A. Manuelides, and Stacey L. Marktin, of Saul Ewing, LLP, Baltimore, Maryland, for Defendant General Motors Acceptance Corporation, of Counsel.
Danielle Yearick, of Tybout, Redfearn & Pell, Wilmington, Delaware, for Defendant Saturn of Newark.

*MEMORANDUM OPINION*
FARNAN, J.
*1 Presently before the Court is the Renewed Motion To Dismiss (D.I.8) filed by Defendant General Motors Acceptance Corporation ("GMAC" ). For the reasons discussed, the motion will be granted.

### BACKGROUND

#### I. Factual Background

This lawsuit arises from an automobile lease that Plaintiff Robert T. Floyd entered into in May 2001 with Defendant GMAC, and his subsequent purchase of two automobiles from Defendant Saturn of Newark.

In May 2001, Mr. Floyd leased a red 2001 Saturn automobile from Saturn of Newark, a car dealership located in Newark, Delaware. Mr. Floyd entered into a lease agreement with GMAC, which financed the lease. Pursuant to the terms of the lease agreement, the lease was scheduled to terminate in August 2004 and Mr. Floyd would have an option to purchase the vehicle at that time. Mr. Floyd alleges that, in February 2004, he approached a sales agent at Saturn of Newark with regard to exercising his right to purchase the leased vehicle. The sales agent allegedly told Mr. Floyd that the price was too high. Further, the sales agent allegedly told Mr. Floyd that, when there were five remaining months on the lease, GMAC would send Mr. Floyd a letter excusing the final five lease payments should Mr. Floyd purchase a new automobile. Mr. Floyd further alleges that the sales agent told him that he would not have to worry about paying for excess mileage on the leased vehicle.

On May 27, 2004, Mr. Floyd returned to Saturn of Newark allegedly because only four payments remained on the lease, yet Mr. Floyd had not received the letter from GMAC the sales agent promised. During the May 27 visit, the sales agent convinced Mr. Floyd to purchase a gold 2004 Saturn automobile, which Mr. Floyd financed through a loan with Sun Trust bank. Mr. Floyd turned in the leased 2001 Saturn to Saturn of Newark at that time. The sales agent then told Mr. Floyd that he may have to pay for excess mileage on the leased vehicle.

GMAC subsequently billed Mr. Floyd $3,047 for excess mileage on the leased vehicle. On June 2, 2004, Mr. Floyd sent a letter to GMAC indicating his desire to re-acquire the 2001 leased vehicle and to purchase it at the end of the lease term. On June 3, 2004, Mr. Floyd again wrote to GMAC stating his belief that he had a legal right to possess the leased vehicle until August 2004. On June 10, 2004, GMAC allegedly sent a letter to Mr. Floyd stating

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

that the vehicle had been sold. (D.I. 7 at 3.)

On June 10, 2004, Mr. Floyd returned the gold 2004 automobile to Saturn of Newark. Mr. Floyd alleges that he was subsequently denied credit by other dealerships because the new car loan from Sun Trust bank appeared on his credit report. On June 14, 2004, Mr. Floyd returned to Saturn of Newark and purchased a red 2004 Saturn automobile, again financing it through Sun Trust bank. Mr. Floyd alleges that both Sun Trust loans ran concurrently until the loan for the gold 2004 Saturn "fell into late status," damaging Mr. Floyd's credit rating. (D.I. 7 at 3.)

### II. Procedural History

**\*2** On August 16, 2004, Mr. Floyd filed a *pro se* lawsuit against GMAC and Saturn of Newark. The Court construes Mr. Floyd's Complaint (D.I.1) to allege violations of the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.,* the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.,* breach of contract, and common law fraud.

On September 7, 2004, GMAC filed a Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (D.I.4). On September 10, 2004, Mr. Floyd filed a "More Definite Statement" (D.I.7) to clarify his claims. In the Statement, Mr. Floyd contends that GMAC is liable to him for breach of contract and fraud, and that Saturn of Network is liable to him for the alleged fraudulent conduct of its sales agent. Mr. Floyd seeks damages of $20,000.

In response to Mr. Floyd's Statement, GMAC filed a Renewed Motion To Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### PARTIES' CONTENTIONS

By its motion, GMAC contends that this lawsuit should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because the court lacks subject matter jurisdiction to hear it. Specifically, GMAC contends that the Court lacks subject matter

jurisdiction based on diversity of citizenship because the amount in controversy is less than $75,000. Further, GMAC contends that the Complaint fails to state a claim under either the Truth in Lending Act or the Equal Credit Opportunity Act and, therefore, the Court lacks federal question subject matter jurisdiction over this matter. GMAC further contends that Mr. Floyd has alleged no facts upon which a claim of fraud may be lodged against GMAC and that the common law fraud claim against it should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Mr. Floyd did not file a response to GMAC's motion.

### DISCUSSION

#### I. Legal Standard

GMAC moves the Court to dismiss Mr. Floyd's claims against it pursuant to Federal Rules 12(b)(1) and 12(b)(6).

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint. The motion should be granted where the asserted claim is "insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy."*Coxson v. Comm. of Pennsylvania,* 935 F.Supp. 624, 626 (W.D.Pa.1996) (citations omitted). Additionally, a motion to dismiss under 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan,* 549 F.2d 884, 891 (3d Cir.1977). The instant case presents a facial challenge because GMAC does not dispute the existence of the jurisdictional facts alleged in the Complaint. Therefore, the Court must accept the facts alleged in the Complaint as true, and draw all reasonable inferences in favor of Mr. Floyd. *See Zinermon v. Burch,* 494 U.S. 113, 118 (1990); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990).

**\*3** The purpose of a motion to dismiss pursuant to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3

Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Rule 12(b)(6) is to test the legal sufficiency of a complaint. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Strum v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). In reviewing a motion to dismiss for failure to state a claim, "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party."*Strum,* 835 F.2d at 1011;*see also Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). A court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Jordan,* 20 F.3d at 1261.

## II. Whether The Court Has Subject Matter Jurisdiction

### A. *Diversity Of Citizenship*

A federal court has subject matter jurisdiction based on diversity of citizenship when "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States."28 U.S.C. § 1332 (2005)
.

In his Complaint (D.I.1), Mr. Floyd alleges that he is a citizen of Pennsylvania, Saturn of Newark is a citizen of Delaware, and GMAC is a citizen of Michigan. GMAC does not dispute Mr. Floyd's allegations with regard to the parties' citizenship. Rather, GMAC contends that the Court lacks diversity jurisdiction because the amount in controversy is less than $75,000.

Accepting the facts alleged in the Complaint as true and drawing all reasonable inferences in favor of Mr. Floyd, as the Court must when analyzing a motion to dismiss, the Court concludes that Mr. Floyd has established diversity of citizenship among the parties. However, Mr. Floyd has not satisfied the jurisdictional amount in controversy. In determining the jurisdictional amount, "the sum claimed by plaintiff controls if the claim is

apparently made in good faith."*St. Paul Mercury Indemnification Co. v. Red Cab Co.,* 303 U.S. 283, 288 (1938). Dismissal is only appropriate if the court is certain that the jurisdictional amount cannot be met and the claims are insubstantial on their face. *In re LifeUSA Holding Inc.,* 242 F.3d 136, 143 (3d Cir.2001). Once the defendant challenges the plaintiff's allegations regarding the amount in controversy, the plaintiff must produce sufficient evidence to satisfy his or her claims related to the jurisdictional amount. *Suber v. Chrysler Corp.,* 104 F.3d 578, 583 (3d Cir.1997).

In this case, Mr. Floyd alleges that he is entitled to $20,000 in damages. (D.I.7.) Thus, Mr. Floyd has not satisfied the $75,000 threshold to support the exercise of diversity jurisdiction. Further, Mr. Floyd has not responded to GMAC's Renewed Motion To Dismiss, and thus, has failed to come forward with facts necessary to support diversity jurisdiction. Accordingly, the Court concludes that Mr. Floyd's allegations fail to support diversity jurisdiction.

### B. *Federal Question*

*4 Pursuant to 28 U.S.C. § 1331, federal courts have federal question jurisdiction over "cases in which a well pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 27-28 (1983).

### 1. Truth In Lending Act

In his Complaint, Mr. Floyd alleges that "[g]oods leased to consumers are covered by chapter 5 of the Truth In Lending Act and FTC's regulation M...." (D.I. 1 at 2.)

The Consumer Leasing Act ("CLA") was enacted in 1976 as an amendment to the Truth In Lending Act ( "TLA"), 15 U.S.C. § 1601. The CLA extends the TLA's credit disclosure requirements to consumer leases; its primary purpose is to "assure a meaningful disclosure of the terms of leases ... so as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4

Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

to enable the lessee to compare more readily the various lease terms available to him."15 U.S.C. § 1601(b). Because lease financing had become an alternative to credit financing and installment sales contracts, Congress also intended CLA disclosure requirements to "enable comparison of lease terms with credit terms where appropriate."*Id.* The CLA thus requires lessors of personal property to make certain disclosures "in a clear and conspicuous manner" upon entering into a lease. 15 U.S.C. § 1667a. The CLA applies to all leases for the use of " personal property" having a term "exceeding four months" that have a "total contractual obligation not exceeding $25,000."15 U.S.C. § 1667(1). Neither party disputes that the CLA applies to Mr. Floyd's lease. The statute creates a private right of action against lessors who breach the disclosure requirements. *See*15 U.S.C. § 1667d; 15 U.S.C. § 1640.

In passing the CLA, Congress also delegated to the Federal Reserve Board authority "to issue regulations 'to update and clarify the requirements and definitions applicable to lease disclosures" ' and to publish "model disclosure forms to facilitate compliance with [the statute's] requirements." 15 U.S.C. § 1667f(a)(1), (b)(1). Those regulations, collectively referred to as "Regulation M", are codified at 12 C.F.R. § 213. Courts are to defer to these regulations and associated commentary when interpreting the TLA so long as they are "not irrational." *SeeFord Motor Credit Co. v. Milhollin,* 444 U.S. 555, 560 (1980).

In pertinent part, the CLA requires a lessor to disclose in writing at the inception of a lease:
(4) The amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessee shall be liable for the differential, if any, between the anticipated fair market value of the leased property and its appraised actual value at the termination of the lease, if the lessee has such liability;
(5) A statement of the amount or method of determining the amount of any liabilities the lease imposes upon the lessee at the end of the term and whether or not the lessee has the option to purchase the leased property and at what price and time;

*5 (11) A statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for delinquency, default, late payments, or early termination.

15 U.S.C. § 1667a.

Regulation M states in pertinent part that the lessor shall disclose the following information:
(d) Other charges. The total amount of other charges payable to the lessor, itemized by type and amount, that are not included in the periodic payments....
(g) Early termination-
(1) Conditions and disclosure of charges. A statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the lease term; and the amount or a description of the method for determining the amount of any penalty or other charge for early termination, which must be reasonable....
(h) Maintenance and repair-...
(2) Wear and use standard. A statement of the lessor's standards for wear and use (if any), which must be reasonable; and
(3) Notice of wear and use standard. In a motor-vehicle lease, a notice regarding wear and use substantially similar to the following: " Excessive Wear and Use. You may be charged for excessive wear based on our standards for normal use."The notice shall also specify the amount or method for determining any charge for excess mileage.
(i) Purchase option. A statement of whether or not the lessee has the option to purchase the leased property, and:
(1) End of lease term. If at the end of the lease term, the purchase price; and
(2) During lease term. If prior to the end of the lease term, the purchase price or the method for determining the price and when the lessee may exercise this option.

12 CFR § 213.4.

Viewing the Complaint (D.I.1) and the subsequent " More Definite Statement" (D.I.7) in view of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 5

Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

CLA and Regulation M, the Court concludes that Mr. Floyd has failed to state a claim pursuant to the TLA. Nowhere does Mr. Floyd allege that GMAC failed to disclose terms in the lease agreement at the time the parties entered into the lease for the 2001 Saturn. In fact, Mr. Floyd alleges that the lease agreement in Paragraph 20 states that he had a contractual right to purchase the 2001 vehicle "only at scheduled lease end." (D.I. 7 at 2.) The lease was scheduled to end in August 2004. Mr. Floyd alleges that he returned the leased vehicle to Saturn of Newark on May 27, 2004. On June 2, 2004, Mr. Floyd wrote to GMAC expressing his desire to re-acquire the leased vehicle and to purchase it at the end of the lease period. On June 10, 2004, GMAC notified Mr. Floyd that the leased vehicle had been sold. In his "More Definite Statement," Mr. Floyd claims that by selling the vehicle prior to the scheduled expiration of the lease agreement, GMAC breached its contract with Mr. Floyd. (D.I. 7 at 2.)

In the Court's view, Mr. Floyd's claim with regard to the purchase of the 2001 vehicle is contractual in nature. Mr. Floyd has alleged no facts whereby relief could be granted pursuant to the TLA or Regulation M under any set of facts that could be proved consistent with Mr. Floyd's allegations. Accordingly, the Court will dismiss the TLA claim pursuant to Federal Rule of Civil Procedure 12(b)(6)
.

### 2. Equal Credit Opportunity Act

**\*6** The Equal Credit Opportunity Act, 15 U.S.C. § 1691*etseq.* ("ECOA"), makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of race, color, religion, national origin, sex or marital status, or age."15 U.S.C. § 1691(a). To establish a *primafacie* case under ECOA the class members must show that (1) plaintiff was a member of a protected class; (2) plaintiff applied for credit from defendants; (3) plaintiff was qualified for the credit; and (4) despite qualification, plaintiff was denied credit. See*Chiang v. Veneman*, 385 F.3d 256, 259 (3d Cir.2004) (citations omitted).

It is not clear from Mr. Floyd's pleadings whether he is alleging an ECOA violation with regard to the lease agreement with GMAC that he executed in 2001, his attempt to purchase the 2001 vehicle from GMAC in 2004, or the loan transactions with Sun Trust Bank associated with the automobile purchases from Saturn of Newark in 2004. Therefore, the Court will analyze all three transactions.

With regard to the lease agreement that Mr. Floyd entered into with GMAC in 2001, the Court concludes that Mr. Floyd's claim is time barred. Affirmative claims under the ECOA are subject to a two year statute of limitations. See15 U.S.C. § 1691e(f). Mr. Floyd signed the lease agreement with GMAC in May 2001. Mr. Floyd filed his Complaint more than three years later, on August 16, 2004. Thus, the Court concludes that Mr. Floyd's ECOA claim with regard to the 2001 GMAC credit transaction is time barred.

With regard to the 2004 credit transactions with Sun Trust bank, the Court concludes that no relief could be granted pursuant to the ECOA under any set of facts that could be proved consistent with Mr. Floyd's allegations. Mr. Floyd does not allege that Sun Trust bank or Saturn of Newark denied him credit. To the contrary, Mr. Floyd alleges that Sun Trust financed the gold 2004 vehicle he purchased on May 27, 2004 and gave him a second loan for the red 2004 vehicle he purchased on June 14, 2004. The only mention of denial of credit in the pleadings is in reference to non-party automobile dealers that denied Mr. Floyd credit due to the presence on his credit report of the first Sun Trust loan. (D.I. 7 at 3.) Further, Sun Trust bank is not a party to this lawsuit. Thus, the Court concludes that no relief could be granted pursuant to the ECOA with regard to the 2004 financing transactions.

With regard to Mr. Floyd's attempt to purchase the 2001 leased vehicle from GMAC in 2004, the Court concludes that the ECOA is inapplicable. Mr. Floyd does not allege that he applied for any credit in 2004 with regard to the purchase of the 2001 vehicle or that he was denied credit based on his membership in a protected class. Rather, Mr. Floyd alleges that GMAC breached its 2001 contract with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 6

Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

him by selling the leased vehicle prior to the expiration of the lease agreement. Thus, the Court concludes that no relief could be granted pursuant to the ECOA with regard to Mr. Floyd's dealings with GMAC in 2004.

### CONCLUSION

*7 Because the Court concludes that it lacks subject matter jurisdiction to hear this lawsuit,[FN1] the Renewed Motion To Dismiss (D.I.8) filed by Defendant General Motors Acceptance Corporations will be granted and this lawsuit will be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

> FN1. Because the Court concludes that it lacks subject matter jurisdiction, the Court will not address GMAC's arguments with regard to the common law fraud claim.

An appropriate Order will be entered.

### ORDER

At Wilmington this *11* day of July 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the Renewed Motion To Dismiss (D.I.8) filed by Defendant General Motors Acceptance Corporation is *GRANTED.*

D.Del.,2005.
Floyd v. Saturn of Newark
Not Reported in F.Supp.2d, 2005 WL 1657119 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Gagliardi v. Clark
W.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,W.D. Pennsylvania.
John GAGLIARDI, Soon-Rye Vangelder, Plaintiffs,
v.
Richard CLARK, Borough Mgr.; Borough of
Jefferson Hills, a municipal corporation; Borough
of Jefferson Hills Sewer Authority; Pennsylvania
American Water Company, a Pennsylvania business
corporation; all parties sued in both their official
and private capacities, Defendants.
**Civil Action No. 06-20.**

Sept. 28, 2006.

John Gagliardi, Jefferson Hills, PA, pro se.
Soon-Rye Vangelder, Clairton, PA, pro se.
John M. Giunta, Rawle & Henderson, Alan T. Silko
, Edward I. Levicoff, Levicoff, Silko & Deemer,
Pittsburgh, PA, for Defendants.

*MEMORANDUM ORDER*
CONTI, District Judge.
**\*1** Plaintiffs John Gagliardi ("Gagliardi") and
Soon-Rye Vangelder ("Vangelder," and together
with Gagliardi, "plaintiffs") filed this civil action
alleging various federal constitutional claims under
42 U.S.C. § 1983, claims under the Fair Debt
Collection Practices Act, 15 U.S.C. § 1692, claims
under 18 U.S.C. §§ 1001 and 1341, state
constitutional claims under the Pennsylvania
Constitution, and contract and tort claims governed
by state law.

Pending before the court are motions filed pursuant
to Federal Rule of Civil Procedure 12(b)(6) by
defendants Richard Clark, Borough Manager ("
Clark"); the Borough of Jefferson Hills (the "
borough"); the Borough of Jefferson Hills Sewer
Authority (the "sewer authority") (collectively, the "
borough defendants") (Doc. No. 3) and by

defendant Pennsylvania American Water Company
(the "water company") (Doc. No. 10). Defendants
seek to dismiss plaintiffs' complaint in its entirety
for failure to state a claim. The court finds that with
respect to the federal claims, plaintiffs have failed
to state a claim upon which relief may be granted.
The court will dismiss some of these claims without
prejudice to plaintiffs' right to file an amended
complaint within thirty (30) days of the entry of this
order; provided, that plaintiffs can meet the
standards of Rule 8 of the Federal Rules of Civil
Procedure. Plaintiffs if they file an amended
complaint must allege facts sufficient to outline the
elements of their claims or to permit inferences to
be drawn that these elements exist and may not rely
upon mere "bald assertions" or "legal conclusions."
*See Morse v. Lower Merion School Dist.,* 132 F.3d
902, 906 (3d Cir.1997) ("[A] court need not credit a
complaint's 'bald assertions' or 'legal conclusions'
when deciding a motion to dismiss."). The court
will dismiss other claims with prejudice because
leave to amend with respect to those claims would
be futile. The court will not address the remaining
state law claims at this time because the court
declines to retain jurisdiction over those claims.

### *Facts Accepted as True for the Purpose of Deciding the Motion*

Plaintiff Gagliardi is a Pennsylvania citizen whose
address is located at 191 Wall Road in the USI
Industrial Park which he operates in Jefferson Hills
Borough, Allegheny County, Pennsylvania.
Plaintiffs' Complaint ("Comp.") ¶ 1.[FN1] Plaintiff
Vangelder is a permanent United States resident
alien of Korean ancestry who resides at 191 Wall
Road. *Id.* ¶ 2. Plaintiff Vangelder receives social
security benefits for her disabled condition. *Id.*
Defendant Clark is Manager for the borough, which
is a municipal corporation and a political
subdivision of the Commonwealth of Pennsylvania.
*Id.* ¶ 3. Clark, as Manager for the borough,
oversees the defendant sewer authority. *Id.* ¶ 4.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                  Page 2

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

The sewer authority is an administrative entity entirely directed by the Borough Municipal Corporation and thus subject to Clark's day-to-day managerial authority. *Id.* ¶ 19.Defendant water company is a private Pennsylvania business corporation. *Id.* ¶ 5.

> FN1. The complaint alleges that Gagliardi's address is at 191 Wall Road, but the complaint and the pleadings in the case do not make clear whether Gagliardi owns this property or the adjacent property at 141 Wall Road, or is otherwise responsible for these properties in some respect. Compl. ¶ 1 ("Gagliardi ... whose address is at 191 Wall Rd., in the USI Industrial Park which he operates...."); Compl. Exhibit ("Ex.")(Doc. No. 1-1) at 16. Indeed, the ownership, subdivision, transfer, and tax liabilities of that property and the adjacent parcel of land appear to be the subject of litigation which was pending, and may be ongoing, in the Allegheny Court of Common Pleas at the time this civil action was commenced. *See* Compl. Ex. (Doc. No. 1-1) at 19-21, 22-28.

**\*2** On December 30, 2005, the Allegheny Court of Common Pleas issued a memorandum opinion and order overruling preliminary objections and directing defendants to answer in a case commenced by Gagliardi against Allegheny County, the borough, and the School District of West Jefferson Hills, Docket No. GD03-3504, concerning certain property descriptions and tax assessments involving the property at issue in this case and the adjacent parcel. *Id.* ¶ 12; Compl., Ex. (Doc. No. 1-1) at 19-21 ("State Memorandum Order "). The state trial court indicated that sorting out the property description would be "cumbersome," and thus the issues in that case would be best addressed through discovery rather than by preliminary objections. State Memorandum Order at 19-21. Plaintiff alleges that within forty-eight hours of receiving the State Memorandum Order, the borough, acting through the sewer authority, caused water utility service to be terminated at 191 Wall Road without any warning or notice. *Id.* ¶ 13.FN2

> FN2. Plaintiffs allege that the water company was contractually obligated to follow the borough's directive. Compl. ¶ 28. The water company in its motion to dismiss agrees with this characterization, noting that it is contractually obligated pursuant to a contract between the water company and the borough which is recorded with and approved by the Pennsylvania Utility Commission pursuant to the laws of the Commonwealth of Pennsylvania. Water company's Mot. to. Dismiss at 2.

On Friday, January 6, 2006, Vangelder discovered that the water pressure flow was virtually non-existent in Gagliardi's apartment at 191 Wall Road. *Id.* ¶ 14.FN3After determining that the water flow problem was not attributable to problems at 191 Wall Road, plaintiffs notified the water company by telephone about the lack of water pressure and flow. *Id.*

> FN3. Plaintiffs allege that prior to this incident water pressure and flow had been diminishing for months at 191 Wall Road to the extent that it would take half of an hour to refill a flushed toilet. *Id.* ¶ 14.

A water company employee arrived at the property at 191 Wall Road and discovered that the valve controlling water service to the property was almost completely closed. *Id.* ¶ 15.When that water company employee opened the main service valve, the water pressure and flow returned at full force and volume. *Id.* ¶ 16.FN4Plaintiffs, however, allege that within twenty minutes of reporting to the water company that he had re-opened the valve, the employee telephoned Gagliardi and notified Gagliardi that he had been ordered by the water company to shut off the water again. *Id* . ¶ 17.

> FN4. Plaintiffs allege that comparable full force and volume had not been seen for months at 191 Wall Road. *Id.* ¶ 16.

Gagliardi was alarmed and called the water

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

company. *Id.* ¶ 18.Gagliardi learned that the sewer authority had ordered the water company to shut off the water flow. *Id.* The water company acknowledged to Gagliardi that it normally sent termination notices to its customers but that because the sewer authority had demanded that the water company immediately disconnect service the water company promptly complied without resorting to notice or other procedures.*Id.* ¶ 20.Plaintiffs allege that the crisis was timed to occur early on a Friday afternoon when borough officers, employees, and agents would not be available for meaningful contact by Gagliardi. *Id.* ¶ 21.Plaintiffs allege that Clark and the sewer authority historically have been aware of utility service issues at 191 Wall Road. *Id.* ¶ 22.Plaintiffs allege that Gagliardi learned from a person at the water company that same day that Clark personally had given the water company the order to turn off water service at 191 Wall Road and had ordered that the water service was to remain off. *Id.* ¶ 23.

*\*3* Plaintiffs allege that Gagliardi made several unsuccessful attempts to contact Clark by telephone concerning the shut-off order. *Id.* ¶ 24.Gagliardi similarly was unsuccessful in his attempts to speak to any other borough officials that day. *Id.* Gagliardi unsuccessfully attempted, for example, to reach the sewer authority manager, but was told the sewer authority manager was on vacation in Florida. *Id.*

Plaintiffs allege that Vangelder is a totally innocent third party to the impasse between Gagliardi, the sewer authority, and the water company; that she is responsible for none of the legal disputes between Gagliardi, the borough, the sewer authority, and the water company; and that she has suffered a total loss of water usage which has compounded her physical ailments. *Id.* ¶ 25.Moreover, both Gagliardi and Vangelder have suffered compound physical ailments including severe headache pain and somatic discomfort and Gagliardi is an elderly person beset with a variety of cardiac, diabetic, and arthritic conditions which are aggravated when accompanied by a denial of access to water. *Id.* ¶¶ 25-26, 51.

### *Standard of Review*

A motion to dismiss tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits. Rather, when considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. V. Higgins,* 281 F.3d 383, 388 (3d Cir.2002)."The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " *Kost,* 1 F.3d at 183 (quoting 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d. ed.1990)). A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if, accepting as true the facts alleged and all reasonable inferences that can be drawn therefrom, there is no reasonable reading upon which the plaintiff may be entitled to relief. *Vallies v. Sky Bank,* 432 F.3d 493, 494 (3d Cir.2006). Moreover, the court is under a duty to examine the complaint independently to determine if the factual allegations set forth could provide relief under any viable legal theory. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) .

While this court is mindful that *pro se* plaintiffs are not held to as high of a standard as litigants that are represented by counsel, a *pro se* plaintiff must still plead the essential elements of his or her claim and is not excused from conforming to the standard rules of civil procedure. *McNeil v. United States,* 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel...." ); *Haines v. Kerner,* 404 U.S. 519, 520 (1972). Thus, plaintiffs, even though they are *pro se,* must set forth sufficient information that would allow the court to infer that, accepting plaintiffs' allegations as true, defendants violated plaintiffs' federal rights. *Kost* 1, F.3d at 183.

*\*4* The Federal Rules of Civil Procedure do not require the plaintiff to set out in his complaint the specific facts that entitle him to relief, but rather only a "short and plain statement of the claim."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

FED. RULE CIV. P. 8(a)(2). "Bald assertions" or " legal conclusions," however, are not required to be credited in making the determination as to whether or not there is a set of facts on which to determine that a claim has been stated. *See Morse,* 132 F.3d at 906 ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss .").

Where the plaintiff's complaint pleads facts beyond the requirements of Rule 8, his claim may be subject to dismissal if the specific facts alleged fail to provide relief under any viable legal theory. *Camero v. Kostos,* 253 F.Supp. 331, 338 (D.N.J.1966) (granting motion to dismiss where plaintiff's complaint pled facts demonstrating defendant was subject to immunity). In addition, if the plaintiff's complaint does plead specific facts, those facts, taken as true for purposes of deciding the motion to dismiss, may create a defense to his claim. *Id.; see ALA, Inc. V. CCAir, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); 5 CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1226 (3d ed.2004). In fact, where the plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out of luck-he has pleaded himself out of court."*Jefferson v. Ambroz,* 90 F.3d 1291, 1296 (7th Cir.1996).

Exhibits may be considered in deciding the motion to dismiss because "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case ... may be considered by the district court without converting the motion into one for summary judgment."5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 376, 382-92 (3d ed.2004). Specifically, without converting the motion into a motion for summary judgment, the court may consider "documents which are attached to or submitted with the complaint, as well as legal arguments presented in memorandums or briefs and arguments of counsel,""documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading," and "[d]ocuments that the defendant attaches to the plaintiff's complaint and are central to the claim."*Pryor v. National Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002); *see U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002) ( "Although a district court may not consider matters extraneous to the pleadings, 'a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'") (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)).

### *Discussion*

### *I. Federal Constitutional Claims Under 42 U.S.C. § 1983*

*5 Plaintiffs assert multiple constitutional claims against defendants for violations of 42 U.S.C. § 1983. Section 1983 imposes civil liability upon any person who, while acting under color of state law, deprives another individual of rights, privileges and immunities secured by the Constitution or federal law. *Doe v. Delie,* 257 F.3d 309, 314 (3d Cir.2001). Section 1983"does not create any new substantive rights, but it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere."*Id.* (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). To prevail on a claim brought pursuant to section 1983, a plaintiff must show that (1) the defendant or defendants acted under color of law; and (2) their actions deprived the plaintiff of rights secured by the Constitution or federal statutes. *Anderson v. Davila,* 125 F.3d 148, 159 (3d Cir.1997) (citing *Kost v. Kozakiewicz,* 1 F.3d 176, 184 (3d Cir.1993)).[FN5]

> FN5. Plaintiffs additionally allege violations of several rights secured by the Pennsylvania Constitution and group these claims along with their federal constitutional claims. Section 1983 provides a remedy for the violation of a *federal* constitutional or statutory rights. *See*42 U.S.C. § 1983 ("Every person who,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...."); *see also Doe,* 257 F.3d at 314 (Section 1983" provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere"); *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir.2006)( "Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws.").

In this case, some defendants allege defendant-specific issues concerning the section 1983 claims. The water company, for example, argues that it is not a state actor and could not have acted under color of law and therefore plaintiffs cannot state a claim against it pursuant to section 1983. Clark argues that he is entitled to qualified immunity. The borough argues that it cannot be held liable under a theory of supervisory liability. The court first will address whether plaintiffs generally can state a claim under the various constitutional provisions asserted and the court only if necessary will reach defendant-specific issues such as state action and qualified immunity.[FN6]

FN6. If the court does not reach these issues because the court dismisses all of plaintiffs' federal constitutional claims on other grounds, the court is in no way expressing an opinion as to whether these immunities and defenses apply and whether they are meritorious. The court, instead, is seeking to address the multitude of claims and issues raised by plaintiffs' complaint and defendants' motions in the most efficient manner possible.

### A. The Procedural Due Process Claim

Plaintiffs argue that defendants violated their rights to due process secured by the Fifth and the Fourteenth Amendments to the United States Constitution by shutting off their water service

without fair notice and an opportunity to defend against the termination of water service. Compl. ¶ 34. Plaintiffs have plead facts showing that defendants are local government entities and officials and a private company. The Fifth Amendment's due process guarantee applies only to the actions of the federal government. Plaintiffs, therefore, cannot state a claim for a violation of procedural due process guaranteed by the Fifth Amendment. Plaintiffs' due process claim, however, can be analyzed pursuant to the Fourteenth Amendment. In response to this allegation of denial of procedural due process, both the borough defendants and the water company argue that plaintiffs cannot state a claim for failure to provide due process largely because plaintiffs failed to avail themselves of processes available under the law or make a showing that they are patently inadequate.

The Fourteenth Amendment to the United States Constitution forbids a state from depriving persons of life, liberty, or property without due process of law. *Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir.2000)(citing U.S. CONST. amend. XIV, § 1). To state a claim under section 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." *Hill v. Borough of Kutztown,* 455 F.3d 225, 233-34 (3d Cir.2006) (citing *Alvin,* 227 F.3d at 116).

*\*6* The United States Court of Appeals for the Third Circuit has made clear that "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate."*Alvin,* 227 F.3d at 116. "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them."*Id.* (quoting *Dusanek v. Hannon,* 677 F.2d 538, 543 (7th Cir.1982)(internal quotations omitted) and citing *Bohn v. County of Dakota,* 772 F.2d 1433, 1441 (8th Cir.1985))."A due process violation 'is not complete when the deprivation occurs; it is not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 6

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

complete unless and until the State fails to provide due process.' " *Id.* (quoting *Zinermon v. Burch,* 494 U.S. 113, 126 (1990)). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Id.* (citing *McDaniels v. Flick,* 59 F.3d 446, 460 (3d Cir.1995); *Dwyer v. Regan,* 777 F.2d 825, 834-35 (2d Cir.1985), *modified* on *other grounds,* 793 F.2d 457 (2d Cir.1986); *Riggins v. Board of Regents,* 790 F.2d 707, 711-12 (8th Cir.1986)); *see Hudson v. Palmer,* 468 U.S. 517, 533 (1984)(involved a prison inmate section 1983 lawsuit against a prison guard and held that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause if a meaningful postdeprivation remedy for the loss is available; extending a previous holding concerning negligent deprivations to intentional deprivations of property).

In *Alvin,* a tenured university professor and two pharmaceutical companies that he operated brought a civil action alleging, among other claims, violations of due process resulting from denial of the benefits of tenure-and ultimately severance of his tenure and transfer to another school within the university-as part of an effort to punish him for his entrepreneurial activity which competed with university-related commercial activities. *Alvin,* 227 F.3d at 110. The issues on appeal focused on the plaintiff's compliance with the university grievance process. *Id.* The plaintiff argued that he followed the grievance procedures laid out in the faculty handbook, but was never afforded a hearing. *Id.* The district court granted summary judgment in favor of defendants on the section 1983 procedural due process claim, concluding that the plaintiff had not demonstrated that he had been deprived of a property interest. *Id.* at 111.

The United States Court of Appeals for the Third Circuit did not reach that issue, but affirmed the district court's grant of summary judgment in favor of defendants, holding instead that the plaintiff could not make out a procedural due process violation because he had not taken advantage of the processes available to him, and had not shown them

to be patently inadequate. *Id.* at 111, 116-19.

*7 The court of appeals explained that this requirement that a plaintiff take advantage of processes made available to assert a claim of denial of procedural due process should be distinguished from exhaustion requirements that exist in other contexts. *See id* .The plaintiff in *Alvin* appeared to the court of appeals to conflate the two, and contended, as an alternative to his claim that he did attempt to use the available procedures, that he need not go through the processes available because of the general rule that there is no exhaustion requirement for section 1983 claims. *Id.* (citing *Patsy v. Board of Regents of Florida,* 457 U.S. 496, 516 (1982); *Hohe v. Casey,* 956 F.2d 399, 408 (3d Cir.1992)). The court of appeals rejected this argument:

However, exhaustion *simpliciter* is analytically distinct from the requirement that the harm alleged has occurred. Under the jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies.

*Id.* (citing *Zinermon,* 494 U.S. at 126). The court of appeals held that applying these principles to the plaintiff's case in *Alvin,* and viewing the facts in the light most favorable to the plaintiff in that case, the plaintiff did not avail himself of the procedures provided by the defendant university because he did not follow the university regulations regarding the use of the grievance procedure. *Id.*

In this case too, defendants argue that plaintiffs failed to avail themselves of the available post-deprivation administrative procedures. Defendants point out that the Pennsylvania legislature has provided a process for customers to follow concerning the termination of utility service. *See*66 PA. CONS. STAT. §§ 1401*et seq.*Section 1410 provides for the filing of a complaint with the Public Utility Commission (the "PUC").66 PA. CONS. STAT. § 1410. Prior to filing a complaint, the statute requires the customers to first contact the public utility to resolve the problem. 66 PA. CONS. STAT. § 1410(1)("The commission shall accept complaints only from customers who affirm that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 7

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

they have first contacted the public utility for the purpose of resolving the problem about which the customer wishes to file a complaint. If the customer has not contacted the public utility, the commission shall direct the customer to the public utility.").

Plaintiffs plead facts showing that, in addition to numerous unsuccessful attempts to contact the borough and Clark directly, they did contact the water company by telephone about the termination of water service at issue in this case. Compl. ¶ 14. Plaintiffs, however, plead facts showing that they did not avail themselves of the full extent of the grievance procedures available under Pennsylvania law, and in particular that they did not file a complaint with PUC as contemplated by the statute. In their response in opposition to the borough defendants' motion to dismiss (Doc. No. 5), plaintiffs "denied that aggrieved persons must avail themselves of whatever administrative framework exists before complaining of a denial of procedural due process...." Pl.'s Resp. ¶ 3; *see also id.* at ¶ 21-22 (concerning plaintiffs' First Amendment claim: "Merely because the Defendants allege that a Pennsylvania Public Utilities Commission complaint could provide a suitable or meaningful post-deprivation remedy does not obligate your Plaintiffs to pursue an administrative remedy for a problem that is judicial in nature....").[FN7]

> FN7. The court may consider the factual averments in plaintiffs' responses and the exhibits incorporated by plaintiffs by reference in deciding the motion to dismiss because "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case ... may be considered by the district court without converting the motion into one for summary judgment." 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 376, 382 -92 (3d ed.2004). Specifically, without converting the motion into a motion for summary judgment, the court may consider, among other things, "documents

which are attached to or submitted with the complaint."*Pryor v. National Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002); *see U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002).

**\*8** Plaintiffs further asserted that defendants were required to institute appropriate warning notices before utility services were terminated and that plaintiffs pleaded that they did not do so. *See* Compl. ¶ 20. The briefing on the motion to dismiss, however, includes at least two termination notices apparently sent to plaintiffs concerning the property at issue. *See* Plaintiffs' Praecipe for Inclusion of Pertinent Exhibits (Doc. No. 6), Ex. 6 (April 12, 2006 Notice); Water Company's Mem. In Support of Mot. (Doc. No. 15), Ex. A (April 19, 2005 Notice). One of these notices predates the January 6, 2006 termination of water service at issue in this lawsuit. Both of these notices explained a procedure to challenge the termination which contemplates grievance procedures including a hearing. *See id.* These notices identically related that water service will be terminated "because of non-payment of sewage fees pursuant to ordinance." *Id.* These exhibits, which can be considered in ruling on a motion to dismiss without converting it into a motion for summary judgment, demonstrate that plaintiffs had some notice prior to the termination that water service would be terminated.

Under the relevant jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies. The court, under *Alvin,* does not even reach the questions whether plaintiffs, who allege they were deprived of water service without due process of law, were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and whether (2) the procedures available to plaintiffs did not provide " due process of law. *See Alvin,* 227 F.3d at 111 (although district court granted summary judgment because it found that the plaintiff had not been deprived of a property interest, and focused largely on the question whether the alleged incidents comprised such a significant erosion of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 8

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

incidents of his tenure that he was deprived of a property interest, the court of appeals did not reach " this difficult (and interesting) question, however, because, whether or not Alvin has alleged a property deprivation, he has failed to adduce evidence that the defendants infringed upon whatever property right he possessed without due process of law.")

In this case, plaintiffs do not seriously dispute the adequacy of the existing state-law remedies themselves. Plaintiffs do make vague allegations that there is a history of problems with utility service at the location in question, and in particular of problems between Gagliardi and some of the defendants. *See* Com pl. ¶ 21-22, 25. Plaintiffs further allege that the termination was done in part in retaliation for the discovery ruling in the state lawsuit, which could be understood as an oblique allegation that there is some bias or inadequacy in the proceedings as applied to plaintiffs. The court of appeals in *Alvin,* however, rejected a similar argument that futility of proceedings as applied to a particular plaintiff, or allegations of bias, generally relieve a plaintiff of the threshold requirement for making out a procedural due process claim that the plaintiff must first take advantage of existing processes. 227 F.3d at 118-19.
*9 When access to procedure is absolutely blocked or there is evidence that the procedures are a sham, the plaintiff need not pursue them to state a due process claim.... However, since Alvin never invoked the second part of the processes available to him, which appear facially adequate, we will not hold that this step would have been unavailing (in procedure, if not in substance), absent concrete evidence supporting such a contention.

*Id.* at 118 (internal citations omitted). The court of appeals in *Alvin* discussed similar holdings in other decisions in which plaintiffs attempted to make a procedural due process claim charging that bias has infected a review of the deprivation without using all of the procedures available to them. *Id.* at 119.The court of appeals held, however, viewing the evidence in a light most favorable to Alvin, that "there is simply insufficient evidence that the formal hearing would not be held in a fair and impartial manner."*Id.* The court of appeals made

clear:The Constitution does not require perfection at every stage of a process; ... Alvin has not used all the processes available, and he cannot convert his difficulties with quickly triggering the informal process into a contention that the entire process, which he has not yet used, is biased.

*Id.* (internal citations omitted). This argument, though not clearly articulated by plaintiffs, would also be unavailing in this case.[FN8]

> FN8. Although *Alvin* was resolved at the summary judgment stage and this case is being addressed at the motion to dismiss stage, the reasoning in *Alvin* still applies to plaintiffs in this case. *See Jefferson,* 90 F.3d at 1296 ("In fact, where the plaintiff " chooses to plead particulars, and they show that he has no claim, then he is out of luck-he has pleaded himself out of court.").

Plaintiffs here plead facts showing, similar to the plaintiff in *Alvin,* that they did not take advantage of the existing processes made available under state law to challenge the termination of water service. The court, therefore, finds that plaintiffs cannot state a procedural due process claim against any defendant. The court will dismiss this claim with prejudice.

### B. The Substantive Due Process Claim

Plaintiffs allege that defendants violated Vangelder's substantive due process rights guaranteed by the Fourteenth Amendment because depriving her of water shocks the conscience. Compl. ¶ 39. Defendants argue in their motions to dismiss that plaintiffs cannot state a claim for a substantive due process violation because substantive due process protections apply to federal protected rights and the right to water is not such a right.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law."U.S. CONST. amend. XIV. "To prevail on a substantive due process

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 9

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

claim, a plaintiff must demonstrate that an arbitrary and capricious act deprived them of a protected property interest."*County Concrete Corp. v. Town of Roxbury,* 442 F.3d 159, 165 (3d Cir.2006) (quoting *Taylor Inv. Ltd. v. Upper Darby Twp.,* 983 F.2d 1285, 1292 (3d Cir.1993))(internal quotations omitted)."To prevail on a substantive due process claim challenging a state actor's conduct, 'a plaintiff must establish *as a threshold matter* that he has a protected property interest to which the Fourteenth Amendment's due process protection applies.' " *Hill v. Borough of Kutztown,* 455 F.3d 225, 235 n. 12 (3d Cir.2006) (quoting *Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 139-40 (3d Cir.2000) (Alito, J.) (quotation marks and citation omitted))(emphasis added).

*10 Whether a property interest is protected for purposes of substantive due process is a question that is not answered by reference to state law. Rather, for a property interest to be protected for purposes of substantive due process, it must be " fundamental" under the United States Constitution.

*Id.* (citing *Nicholas,* 227 F.3d at 142-143) (internal citations omitted). The United States Court of Appeals for the Third Circuit has explicitly held that the provision of water and sewer services, whether by a municipality or private utility company, is not a federally protected right.*Ransom v. Marazzo,* 848 F.2d 398, 412 (3d Cir.1988). In *Ransom,* a class of Philadelphia residents to whom water and sewer service was denied unless they paid the delinquent service charges incurred, but not paid, by the prior customers of water services at their residences sued the City of Philadelphia for, among other things, a denial of due process. *Id.* at 400.The district court granted the City's motion to dismiss the plaintiff's amended complaint.*Id.* The court of appeals affirmed and held that the state and local policies of denying service until charges for services rendered are satisfied was constitutional. *Id.* at 401.

Concerning the plaintiffs' substantive due process claim at issue in that decision-"seeking nothing less than a ruling that the practice and policy of conditioning water and sewer service on the satisfaction of pre-existing charges result in an unconstitutional deprivation of property regardless

of the procedural safeguards installed,"-the court of appeals rejected plaintiffs' reliance on a district court opinion affirmed without opinion, *Koger v. Guarino,* 412 F.Supp. 1375 (E.D.Pa.1976), *aff'd,* 549 F.2d 795 (3d Cir.1977), and determined that " [s]ubstantive due process refers to and protects federal rights."*Id.* at 411."**The provision of water and sewer services, whether by a municipality or by a private utility company, is not,** however, a federally protected right."*Id.* at 412 (citing *Koger,* 412 F.Supp. at 1386) (emphasis added).

The legal fact that, once a municipality (or, for that matter, a private utility company) establishes a utility for its citizens, a citizen's expectation of receiving that service rises to the level of a property interest cognizable under the Due Process Clause ... merely brings that expectation within the compass of the Fourteenth Amendment's procedural protections.... It does not transform that expectation into a substantive guarantee against the state in any circumstance.

*Id.* (internal citations omitted). The court of appeals in *Ransom,* therefore, "reject[ed] the claim that conditioning the receipt of water and sewer service on the satisfaction of past due charges for services rendered to the applicant's residence raises the question of a substantive due process deprivation." *Id.*

This holding that there is no substantive guarantee to utility service that is enforceable under a claim brought pursuant to the Fourteenth Amendment's substantive due process guarantee equally applies here.[FN9]The court, therefore, finds that plaintiffs cannot state a substantive due process claim against any defendant. The court will dismiss this claim with prejudice.

FN9. Plaintiffs assert that denial of water service to Vangelder "shocks the conscience." Compl. ¶ 39. This language suggests that plaintiffs, who are *pro se,* may be seeking to assert a substantive due process claim under the "state-created danger doctrine" of substantive due process under which a plaintiff must prove "(1) the harm ultimately caused was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the [harm] to occur."*Estate of Smith v. Marasco,* 430 F.3d 140, 153 (3d Cir.2005) (citing *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152 (3d Cir.1995). Case law addressing state-created danger invokes the "shocks the conscience standard." Plaintiffs, however, have alleged no facts in support of that kind of claim and have made no arguments in support of that kind of claim. Indeed, plaintiffs pleaded some facts showing that they cannot state a claim under this doctrine.

### C. The Equal Protection Claim

*11 Plaintiffs allege that defendants have violated their rights under the Equal Protection Clause of the Fourteenth Amendment. Compl. ¶ 36. Defendants argue that plaintiffs cannot state a claim. "A plaintiff stating a claim under the Equal Protection Clause must allege that he has been treated differently because of his membership in a suspect class or his exercise of a fundamental right, or that he has been treated differently from similarly-situated others and that this differential treatment was not rationally related to a legitimate state interest."*Young v. New Sewickley Twp.,* 60 Fed.Appx. 263, 267 (3d Cir.2005) (unpublished)(citing *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, (1985)).

As to Vangelder, plaintiffs allege that she is a resident alien of Korean ancestry. This assertion on its own, however, is not sufficient to state a claim under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs here have alleged nothing other than her status as a resident alien of Korean ancestry as a basis for her equal protection claim. " A § 1983 complaint need only satisfy the liberal notice pleading standard of Federal Rule of Civil Procedure 8(a)." *Young,* 60 Fed.Appx. at 265 (citing *Evancho v. Fisher,* 423 F.3d 347, 353 (3d

Cir.2005))."Nonetheless, a district court is not required to credit a 'bald assertion' when deciding a motion to dismiss under this liberal notice pleading standard, and the plaintiff cannot use allegations of civil rights violations that amount to nothing more than 'conclusory, boilerplate language ' to show that he may be entitled to relief under § 1983."*Id.* (citing *Evancho,* 423 F.3d at 354-55). [FN10]

FN10."[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."*Young v. New Sewickley Twp.,* 60 Fed.Appx. 263, 267 (3d Cir.2005) (unpublished) (citing *Alston v. Parker,* 363 F.3d 229, 235 (3d Cir.2004))."Moreover, the district court must provide the plaintiff with this opportunity even if the plaintiff does not seek leave to amend."*Id.*" Accordingly, even when a plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he has leave to amend the complaint within a set period of time."*Id.* (citations omitted)."The district court may dismiss the action if the plaintiff does not submit an amended pleading within that time, or if the plaintiff files notice with the district court of his intent to stand on the complaint."*Id.* (citing *Shane v. Fauver,* 213 F.3d 113, 116 (3d Cir.2000) ; *Borelli v. City of Reading,* 532 F.2d 950, 951 n. 1 (3d Cir.1976)).

As to Gagliardi, in plaintiffs' response to borough defendants' motion to dismiss, plaintiffs argue that the actions of the defendants were intended to impact Gagliardi as a "class of one." *See* Pl.'s Resp. ¶ 11 (responding to municipal defendants' argument that plaintiffs have failed to identify a municipal policy or custom which resulted in the violation of rights under the supervisory liability standard set forth in *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)).[FN11] The "class of one"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

theory asserted but not argued in any detail by plaintiff was announced in *Village of Willowbrook v. Olech,* 528 U.S. 562(2000) (per curiam).*Hill v. Borough of Kutztown,* 455 F.3d 225, 238 (3d Cir.2006)."According to that theory, a plaintiff states a claim for violation of the Equal Protection clause when he 'alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " *Id.* (quoting *Olech,* 528 U.S. at 564).

> FN11. The Supreme Court *Canton* announced the degree of fault required to hold a public entity liable under a theory of supervisory liability for failure to train public employees. *Canton,*489 U.S. at 388-92. The Supreme Court held that only where a public entity's failure to train its employees in a relevant respect reflects a deliberate indifference to the constitutional rights of its inhabitants can such a claim yield liability. *Canton,*489 U.S. at 392; *see Sample v. Diecks,* 885 F.2d 1099 (3d Cir.1999)(interpreting *Canton).*"We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact."*Canton,* 498 at 388 (emphasis added).

The United States Court of Appeals recently in Hill discussed the "class of one" theory:

Our court has not had the opportunity to consider the equal protection "class of one" theory at any length. From the text of *Olech* itself, however, it is clear that, at the very least, to state a claim under that theory, a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.

**\*12** *Id.* In *Hill,* the court of appeals determined that the equal protection "class of one" claim by the plaintiff in that case, a professional engineer who

worked as a borough manager until he alleged he was constructively discharged and harassed by the mayor of Kutztown, failed because the plaintiff did not allege the existence of similarly situated individuals-i.e., other borough managers-who the mayor treated differently than he treated the plaintiff. *Id.* (citing *Levenstein v. Salafsky,* 414 F.3d 767, 776 (7th Cir.2005)).

Similarly here, as to both the putative Korean ancestry claim and the "class of one" claim, plaintiffs have not alleged that similarly situated individuals were treated differently and that there was no rational basis for the difference in treatment. The court, therefore, finds that plaintiffs have failed to state an Equal Protection claim against all defendants. The court will dismiss these claims without prejudice to plaintiffs' ability to raise them in an amended complaint if plaintiffs can make more than bald conclusions. Plaintiffs are reminded that if they file an amended complaint, they are bound by the requirements of Rule 8 of the Federal Rules of Civil Procedure and must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist, and may not rely upon bald assertions or legal conclusions.

### D. The Right to Petition First Amendment Claim

Plaintiffs allege that defendants obstructed plaintiffs' right to petition guaranteed by the First Amendment to the United States Constitution by not providing them with pretermination notice concerning the termination of utility service. Compl. ¶ 29. Defendants argue that under both forms of right to petition recognized by courts-interference with the access to the courts and retaliation for engaging in protected conduct-plaintiffs failed to state a claim. As to access to the courts, plaintiffs plead no facts showing that their access to the courts was denied. To the contrary, plaintiffs were able to bring this lawsuit without obstacle, and plaintiffs plead facts in their complaint showing that they are in the process, or were in the process, or seeking judicial redress in state court for related issues. Based upon these facts, plaintiffs cannot state a claim for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 12

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

violation of right to petition predicated on access to the courts.

As to retaliation, in the facts plead, and in their response to the borough defendants motion, plaintiffs suggest a claim for retaliation based upon the discovery ruling obtained in the state court action. *See* Compl. ¶ 12; Pl.'s Resp. ¶ 12 (responding to qualified immunity argument by Clark). As a threshold matter, the water company argues that it was not a party to the state court litigation and, therefore, plaintiff cannot state a claim of retaliation against it based upon these facts. The borough, however, was a named defendant in the state court litigation.

**\*13** Retaliation for the exercise of constitutionally-protected rights is itself a violation of rights secured by the Constitution actionable under section 1983. *White v. Napoleon,* 897 F.2d 103, 111-12 (3d Cir.1990). The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment Rights." *Anderson v. Davila,* 125 F.3d 148, 159 (3d Cir.1997) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)). It is well established that a plaintiff's retaliation claim is subject to a three-step, burden shifting methodology. *Ambrose v. Twp. of Robinson,* 303 F.3d 488, 493 (3d Cir.2002) (citing *Bd. of County Comm'rs v. Umbehr,* 518 U.S. 669, 675 (1996)). First, a plaintiff must show that his conduct was constitutionally protected. Second, he must show that his protected activity was a substantial or motivating factor in the alleged retaliatory action. Finally, the defendant may defeat the plaintiff's case "by showing that it would have taken the same action even in the absence of the protected conduct." *Id.* (quoting *Bd. of County Comm'rs v. Umbehr,* 518 U.S. 669, 675 (1996)); *see Hill v. Borough of Kutztown* 455 F.3d 225, 241 (3d Cir.2006); *Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir.2005)("*Scranton* ").

In *Scranton,* the United States Court of Appeals for the Third Circuit addressed a lawsuit brought by police officers alleging that the city terminated them not because they failed to comply with a residency ordinance but because they exercised their First Amendment right to petition the government by previously suing the city. *Id* . at 125.In that case, as here, it cannot be seriously contested that the act in question-the filing of grievance lawsuit against government officials-is protected activity. The question whether this lawsuit was a "substantial or motivating factor" in the borough defendants' decision to direct the utility service be terminated, however, and whether defendants could show that they would have taken the same action even in the absence of Gagliardi's lawsuit and the discovery ruling, are case-specific, fact-specific issues. *See id.* at 125 n. 7.

Plaintiffs have plead facts showing that they engaged in protected activity. They have asserted only the barest allegations in support of any retaliatory motive by the borough defendants. The court, however, at this early stage in the litigation, cannot determine as defendants would like that plaintiffs have failed to state a claim and amendments would be futile. The court, therefore, finds that plaintiffs have failed to state a First Amendment claim against all defendants based upon the facts alleged thus far. The court will dismiss this claim without prejudice to plaintiffs' rights to file an amended complaint that complies with Rule 8 of the Federal Rules of Civil Procedure. Plaintiffs are reminded that if they file an amended complaint, they must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist, and may not rely upon bald assertions or legal conclusions.

### E. The Unreasonable Seizure Fourth Amendment Claim

**\*14** Plaintiffs argue that by terminating water service, defendants violated plaintiffs' rights to be free from unreasonable seizures under the Fourth Amendment to the United States Constitution. "The Fourth Amendment, made applicable to the States by the Fourteenth [Amendment] ... provides in pertinent part that the 'right of the people to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....' " *Soldal v. Cook County, Ill.,* 506 U.S. 56, 61 (1992) (quoting U.S. CONST. amend. XIV). "A 'seizure' of property, we have explained, occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' " *Id.* (quoting *United States v. Jacobsen,* 466 U.S. 109, 113 (1984)); *see Gardner v. McGroarty,* 68 Fed.Appx. 307, 311 (3d Cir.2003) (same)(unpublished). The Fourth Amendment protects the people from unreasonable searches and seizures of "their persons, houses, papers, and effects." *Id.* at 62 (quoting U.S. CONST. amend. XIV). It, however, "does not protect possessory interests in all *kinds* of property." *Id.* at 63 n. 7 (citing *Oliver v. United States,* 466 U.S. 170, 176-77 (1984))(emphasis added).

Defendants argue that utility service cannot reasonably be construed as a personal effect, and contend that they can locate no decisions to the contrary. In their response to the borough defendants' motion, plaintiffs argue that defendants' view of the Fourth Amendment is too narrow, and that the Fourth Amendment secures the right of the people "to be secure in their **persons**" and that the Bill of Rights, including the Fourth Amendment, is a "collection of declaratory and restrictive phrases enunciated to expressly limit the prerogatives of government oppressors, such as the Defendants and their corporate allies."*See* Pl.'s Resp. ¶ 29 (emphasis in original).

The court finds that, based upon the facts plead, even drawing all inferences in plaintiffs favor, plaintiffs have not stated a claim that their persons were seized, nor have they stated a claim that their personal effects were seized. As the Supreme Court made clear in *Soldal:* The Fourth Amendment " does not protect possessory interests in all kinds of property."506 U.S. at 63 n. 7 (citing *Oliver v. United States,* 466 U.S. 170, 176-77 (1984)). Access to utility service cannot reasonably be construed as a "personal effect" which is protected by the Fourth Amendment. The court has located no federal case law supporting such a view, although there are decisions in which plaintiffs challenged the termination of utility service subject to the

procedural due process protections of the Fourteenth Amendment. *See, e.g., Ransom v. Marazzo,* 848 F.2d 398, 412 (3d Cir.1988); but *see Gardner v. McGroarty,* 68 Fed.Appx. 307, 311 (3d Cir.2003)(unpublished) (holding that the search and seizure of an apartment building without a warrant, the posting of it as unfit for habitation, the evacuation of the tenants, and the discontinuation of utility services did not constitute an unlawful search and seizure under the Fourth Amendment).

**\*15** The court, therefore, finds that based upon the facts plead by plaintiffs that plaintiffs cannot state a Fourth Amendment illegal seizure claim against any defendant. The court will dismiss this claim with prejudice.

### F. The Freedom of Contract and To Be Free From Impairment of Contracts Claim

Plaintiffs allege that defendants violated plaintiffs' rights to freedom of contract and to be free from impairment of contracts secured by Article I, Section 10, Clause 1 of the United States Constitution, which provides in relevant part: "No State shall ... pass ... any ... law impairing the obligation of contracts...."U.S. CONST. art. I, § 10, cl. 1. Defendants argue that to assert a viable claim under the contracts clause, plaintiffs must allege that a change in the law operates as a substantial impairment of a contractual relationship. *See General Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992). The Supreme Court explained contracts clause claims in *General Motors* as follows:
Generally, we first ask whether the change in state law has "operated as a substantial impairment of a contractual relationship ."....This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.

*Id.* (internal citations omitted). While " [g]overnment regulations that substantially diminish contractual rights may create an unconstitutional impairment of the contract,"*Callaway Community Hosp. v. Sullivan,* 784 F.Supp. 693, 699 (W.D.Mo.1992) (citing *Thorpe v. Housing Auth. of*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 14

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Durham,* 393 U.S. 268, 278-79 (1969)), "[t]he contract clause does not bar all impairments of contract, but, instead, bars only unreasonable, significant impairments."*Id.* (citing *United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 21, 25 (1977)).

The analysis set forth in *Yellow Cab Co. v. City of Chicago,* 3 F.Supp.2d 919, 922-23 (N.D.Ill.1998), is instructive. "A contracting party may invoke the protections of the Contract Clause when there is an exercise of legislative power."*Id.* at 922 (citing *Arriaga v. Members of Bd. of Regents,* 825 F.Supp. 1, 4 (D.Mass.1992))."By its terms, the Contract Clause applies only to state constitutions, constitutional amendments, statutes, ordinances or any instrumentality of state legislated or delegated authority."*Id.* (citations omitted)."However, courts generally recognize that the Contract Clause also applies to the actions of state subdivisions, including city councils."*Id.* (citing *Horwitz-Matthews, Inc. v. City of Chicago,* 78 F.3d 1248, 1251 (7th Cir.1996))."Where a city 'acts through ordinances, then its contractual approvals and repudiations will be embodied in ordinances.' " *Id.* (quoting *Horwitz-Matthews,* 78 F.3d at 1251). " Consequently, a city ordinance may trigger the protections of the Contract Clause." *Id.*

*16 Unconstitutional impairment of contracts must be distinguished from ordinary breach of contract. " The protections of the Contract Clause, however, only apply to impairments of contract rights; the Contract Clause does not protect private parties from governmental breaches of contract."*Id.*"The Supreme Court has distinguished between an unconstitutional impairment of a contract obligation and a breach of contract for purposes of claims brought under the Contract Clause."*Id.* (citing *Hays v. Port of Seattle,* 251 U.S. 233, 237 (1920)). The Court recognized that "[t]he distinguishing characteristic between a constitutional impairment and a contractual breach is whether the non-breaching party has an available remedy."*Id.* Therefore, [i]f a state exercises legislative power in a way that eliminates the availability of a remedy or action for damages by the non-breaching party, the state has impaired the contract. In contrast, if some

legislative action announces the state's refusal to perform its contractual obligation, the state has simply breached the contract.

*Id.* (noting that the United States Court of Appeals for the Seventh Circuit held that a state or local law unconstitutionally impairs a contract only when the law provides the state or one of its subdivisions with a complete defense to a breach of contract suit, thereby preventing the other party from obtaining damages for breach of contract).

Plaintiffs make some allegations suggesting a contract for utility service, and these allegations are sufficient to meet the liberal pleading requirements of Federal Rule of Civil Procedure 8 with respect to the existence of a contract. Plaintiffs, however, have not alleged (1) the existence of any ordinance passed by the borough defendants; (2) that any ordinance has impaired any contract that may exist; or (3) that any ordinance has *substantially* impaired any contract. With respect to the water company, plaintiffs cannot state a claim for impairment of contracts because the water company is a private company.

The court, therefore, finds that plaintiffs did not meet the pleading requirement of Rule 8 of the Federal Rules of Civil Procedure and failed to state an impairment of contracts claim against any defendant. The court will dismiss this claim without prejudice with respect to the borough defendants and with prejudice with respect to the water company. Plaintiffs are reminded that if they file an amended complaint with respect to the claims dismissed without prejudice, they are bound by the requirements of Rule 8 of the Federal Rules of Civil Procedure and must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist, and may not rely upon bald assertions or legal conclusions.

### G. The Reserved and Unenumerated Rights Under the Ninth Amendment Claim

Plaintiffs allege that defendants violated their reserved and unenumerated rights under the Ninth Amendment to the United States Constitution. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."U.S. CONST. amend. IX. Defendants argue plaintiffs cannot state a claim under the Ninth Amendment because the Ninth Amendment does not independently secure any substantive constitutional rights, but rather has been interpreted to be a rule of construction. *See Warcloud v. Horn,* 1998 WL 126917 (E.D.Pa.1998) ("The Ninth Amendment has never been recognized as independently securing any substantive constitutional rights."*Id.* (quoting *Robinson v. Vaughn,* 1993 WL 451495, at * 6 (E.D.Pa.1993) (quoting *Strandberg v. City of Helena,* 791 F .2d 744, 748-49 (9th Cir.1986))) (internal quotations omitted). Indeed, this court has previously held that the Ninth Amendment *"states but a rule of construction."Nicolette v. Caruso* 315 F.Supp.2d 710, 718 (W.D.Pa.,2003)(Conti, J.)(quoting THE CONSTITUTION OF THE UNITED STATES OF AMERICA: ANALYSIS AND INTERPRETATION 1412 (Johnny Killiam, ed., 1987) (emphasis added in original))."As such, the Ninth Amendment standing alone does not confer substantive rights for purposes of pursuing a constitutional claim."*Id.* (citations omitted)." Specifically, section 1983 civil rights claims premised on the Ninth Amendment 'must fail because there are no constitutional rights secured by that amendment .' " *Id.* (quoting *Charles v. Brown,* 495 F.Supp. 862 (D.C.Ala.1980)).

*17 The court, therefore, finds that plaintiffs cannot state a Ninth Amendment claim against any defendant. The court will dismiss this claim with prejudice.

### II. Fair Debt Collection Act Claims Under 15 U.S.C. § 1692

The Fair Debt Collection Act ("FDCA"), 15 U.S.C. § 1692, "provides a remedy for consumers who have been subjected to abusive, deceptive or unfair debt collection practices by debt collectors."*Piper v. Portnoff Law Associates, Ltd.,* 396 F.3d 227, 232 (3d Cir.2005) (citing *Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 400 (3d Cir.2000); *Zimmerman*

*v. HBO Affiliate Group,* 834 F.2d 1163, 1167 (3d Cir.1987))."The threshold requirement of the FDCPA is that the prohibited practices are used in an attempt to collect a 'debt.' " *Id.* (internal quotations omitted); *see*15 U.S.C. §§ 1692e-f.

A "debt" is defined under the FDCA as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). "Consumer" is defined as " any natural person obligated or allegedly obligated to pay any debt."15 U.S.C. § 1692a(3). "Debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

Plaintiffs do not plead facts in their complaint showing that they owe a debt to the defendants or that the defendants acted as "debt collectors" under the meaning set forth in the statute.[FN12]This lawsuit is based upon the act of shutting off water service to plaintiffs, not upon efforts by the borough defendants or the water company to collect a debt.

> FN12. Indeed, supplemental filings demonstrate that plaintiffs dispute any arrearage on the account in question.

The court, therefore, finds that the facts plead show that plaintiffs cannot state a FDCA claim against any defendant. The court will dismiss this claim with prejudice.

### III. Federal Criminal Statutes for Mail Fraud and Federal Fraud and False Statements

The federal mail fraud statute provides for the imposition of criminal liability for using the mail to execute or attempt to execute a fraudulent scheme.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 16

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*See* 18 U.S.C. § 1341.[FN13] The federal fraud and false statement statute, 18 U.S.C. § 1001, provides for the imposition of criminal liability for the knowing and willful making of material false, fictitious, or fraudulent statements or representations in any matter within the jurisdiction of the executive, legislative, or judicial branch of the federal government. *See* 18 U.S.C. § 1001.[FN14]

   FN13. Section 1341 provides:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
   18 U.S.C. § 1341.

   FN14. Section 1001 provides:
   (a) Except as otherwise provided in this section, whoever, in any matter within the

jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-
   (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
   (2) makes any materially false, fictitious, or fraudulent statement or representation; or
   (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
   shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.
   (b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.
   (c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to-
   (1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or
   (2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.
   18 U.S.C. § 1001.

Defendants argue that it is well-established that there is no private cause of action under the federal criminal statutes for mail fraud or false statements.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

The plain text of these statutes reinforces this argument because nowhere does the text of either statute provide for a private cause of action. *See Clements v. Chapman,* 2006 WL 1739826, *3 (10th Cir.2006)(citing generally *Diamond v. Charles,* 476 U.S. 54, 64-65 (1986) (noting that private citizens cannot compel enforcement of criminal law).[FN15]

> FN15. In *Clements,* the United States Court of Appeals made clear that "Section 1983 cannot 'fill the gap' for what is clearly absent from the federal criminal statutes cited by [the plaintiff], i.e., the existence of a private right of action to enforce those statutes ."*Id.* (citing *Blessing v. Freestone,* 520 U.S. 329, 340 (1997)).

**\*18** In plaintiffs' response to borough defendants' motion to dismiss, plaintiffs acknowledge that there is no private cause of action for enforcing these criminal statutes. *See* Pl.'s Resp. ¶ 29. Plaintiffs state instead that these two federal criminal statutes "are pleaded primarily to indicate the bad faith underlying the actions of the governmental Defendants and the individual offenses alleged do not themselves constitute sources for a private cause of action."*Id.*

The court, therefore, finds that based upon the facts plead by plaintiffs, plaintiffs cannot state a claim under these federal criminal statutes against any defendant. The court will dismiss these claims with prejudice.

### IV. State Law Claims Under the Pennsylvania Constitution, Contract and Tort Law

Where, as here, dismissal of all federal claims is warranted, this court may decline to exercise supplemental jurisdiction over pendant state law claims. *See*28 U.S.C. 1367(c)(3); *Queen City Pizza,* 124 F.3d at 444;*Stechney v. Perry,* 101 F.3d 925, 939 (3d Cir.1996); *Growth Horizons, Inc. v. Delaware County, Pa.,* 983 F.3d 1277, 1284-85 (3d Cir.1993). This case is at the motion to dismiss stage and significant resources of the parties and the judiciary have not yet been expended. Plaintiffs will

have leave to file an amended complaint asserting federal claims that have been dismissed without prejudice so long as plaintiffs in good faith meet the pleading standard of Rule 8 of the Federal Rules of Civil Procedure with respect to those claims. Plaintiffs if they choose to file an amended complaint may avail themselves of this forum at that time, or plaintiffs may avail themselves of the appropriate state forum to resolve their state law claims.

Under these circumstances, the court can find no compelling reason to retain jurisdiction over plaintiffs' state law claims at this time and no prejudice to plaintiffs from their dismissal. The court declines to exercise supplemental jurisdiction over plaintiffs' state-law claims-which include multiple claims under various sections of Article I of the Pennsylvania Constitution as well as other state law claims. Those claims are dismissed without prejudice. *See*28 U.S.C. § 1367; *Queen City Pizza,* 124 F.3d at 444;*Stehney,* 101 F.3d at 939;*Growth Horizons,* 983 F.2d at 1284-85 (3d Cir.1993).

### Conclusion

**AND NOW,** this 28th day of September 2006, upon consideration of defendants' motions to dismiss plaintiffs' complaint (Doc. Nos.3, 10), IT IS HEREBY ORDERED defendants motions are GRANTED.

Plaintiffs' Fourteenth Amendment procedural due process claim and substantive due process claim, Fourth Amendment unreasonable seizure claim, Ninth Amendment reserved and unenumerated rights claim, FDCA claim, and federal criminal statutory claims for mail fraud and false statements are **DISMISSED WITH PREJUDICE** as to all defendants.

Plaintiffs' Article I, Section 10, Clause 1 freedom of contract claim is **DISMISSED WITH PREJUDICE** as to the water company.

**\*19** Plaintiffs' Fourteenth Amendment equal protection claim, First Amendment right to petition

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 18

Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

claim, and Pennsylvania state law claims are **DISMISSED WITHOUT PREJUDICE** as to all defendants.

Plaintiffs' Article I, Section 10, Clause 1 freedom of contract claims are **DISMISSED WITHOUT PREJUDICE** as to the borough defendants.

IT IS FURTHER ORDERED that plaintiffs shall have thirty (30) days from the date of the entry of this order to file an amended complaint making curative amendments; provided that plaintiffs can meet the standards of Rule 8 of the Federal Rules of Civil Procedure. Plaintiffs if they file an amended complaint must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist and may not rely upon mere bald assertions or legal conclusions. Plaintiffs are reminded of the requirements of Rule 11 of the Federal Rules of Civil Procedure.

IT IS FURTHER ORDERED that all other pending motions, including plaintiffs' motion for joinder of additional parties (Doc. No. 11), plaintiffs' motion for declaratory relief (Doc. No. 17), plaintiffs' amended motion for joinder of additional parties (Doc. No. 20), and defendants' motion to strike motion for joinder and motion for declaratory relief (Doc. No. 23), are HEREBY DENIED AS MOOT.

W.D.Pa.,2006.
Gagliardi v. Clark
Not Reported in F.Supp.2d, 2006 WL 2847409 (W.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

C
Saxton v. Central Pennsylvania Teamsters Pension
Fund
E.D.Pa.,2003.

United States District Court,E.D. Pennsylvania.
Drake SAXTON, Jimmy Little, and Thomas C.
Dudley, individually and on behalf of all others
similarly situated, Plaintiffs,
v.
CENTRAL PENNSYLVANIA TEAMSTERS
PENSION FUND; the Central Pennsylvania
Teamsters Pension Fund Trustees-William
Shappell, Keith Noll, Kevin M. Cicak, Tom J.
Ventura, Thomas K. Wotring, and Peter Hassler;
and the Fund Administrator-Joseph J. Samolewicz;
Jointly and Severally, Defendants.
**No. Civ.A. 02-CV-986.**

Dec. 9, 2003.

Alan M. Sandals, Sandals & Associates PC,
Philadelphia, PA, Ann Curry Thompson, Kelman,
Loria, Will, Harvey & Thompson, Detroit, MI, for
Plaintiffs.
Paul C. Evans, Morgan, Lewis & Bockius Llp,
Philadelphia, PA, for Defendants.

*OPINION AND ORDER*
VANANTWERPEN, J.

I. Introduction

**\*1** We have before us Defendants' Motion to
Dismiss Plaintiffs' Amended Complaint for failure
to state cognizable claims pursuant to Fed.R.Civ.P.
12(b)(6). Plaintiffs Drake Saxton, Jimmy Little, and
Thomas C. Dudley, acting on behalf of themselves
and all others similarly situated, allege that
Defendants Central Pennsylvania Teamsters
Pension Fund, Trustees, and Fund Administrator
violated various provisions of ERISA, including
breach of fiduciary duty provisions, §

404(a)(1)(A)-(D), 29 U.S.C. § 1104(a)(1)(A)-(D);
unlawful reduction of accrued benefits, § 204(g), 29
U.S.C. § 1054(g); unlawful forfeiture of accrued
benefits, § 203(a), 29 U.S.C. § 1053(a); illegal
transfers of plan assets, § 4231, 29 U.S.C. § 1411;
and prohibited transactions, § 406(a), 29 U.S.C. §
1106(a). Plaintiffs also assert violations under the
LMRA, § 302, 29 U.S.C. § 186, as well as a
violation of collective bargaining agreements. For
the reasons set forth below, the Defendants' Motion
to Dismiss is granted in part and denied in part.

II. Jurisdiction

This case arises under ERISA, 29 U.S.C. § 1001 *et
seq.*: thus, we have federal question jurisdiction
under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

III. Background

We present the relevant facts as Plaintiffs allege
them in their brief. Defendant, the Central
Pennsylvania Teamsters Fund ("Fund" or "Pension
Plan") is a multi-employer pension fund governed
by the Employee Retirement Income Securities Act (
"ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiffs are
participants in the Fund, which is administered by
three union Trustees, and three employer Trustees,
as well as a Fund Administrator appointed by the
Trustees. The Fund itself, a trust, is comprised of
three distinct pension sub-plans, or sub-trusts, all of
which qualify as separate ERISA benefit plans.
These sub-plans include the Defined Benefit Plan ("
DB Plan"), the Retirement Income Plan 1987 ("RIP
87 Plan"), and the Retirement Income Plan 2000 ("
RIP 2000 Plan"). Each sub-plan is governed by the
Central Pennsylvania Teamster Pension Fund Trust
Agreement, as restated December 9, 1999 ("1999
Trust Agreement" or "Trust Agreement"), as well
as by its own plan document. The DB Plan is a
defined benefit plan, whereas the RIP 87 Plan and
the RIP 2000 Plan are defined contribution or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 2
Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

individual account plans, as defined by ERISA § 3(34), 29 U.S.C. § 1002(34).[FN1]

> FN1. Defined benefit plans generally provide for fixed benefits payments as provided by the plan's terms. *See* 29 U.S.C. § 1002(35). Defined contribution, or individual account plans, create an individual account for each plan participant. The benefits paid to the participant are based entirely on the amount contributed to the participant's account, "and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

Plaintiffs filed the instant action as a class action lawsuit. Named Plaintiffs Drake Saxton, Jimmy Little, and Thomas C. Dudley are participants in both the DB and RIP 87 Plans. In addition to asserting claims against the Fund, Plaintiffs' Amended Complaint alleges various ERISA violations against the Trustees and the Fund Administrator. Briefly, Count 1 of the Amended Complaint seeks declaratory and injunctive relief to clarify and enforce Plaintiffs' rights to future benefits under the DB Plan and the RIP 87 Plan upon this Court's resolution of Plaintiffs' remaining statutory based claims. Count II alleges that Defendant Trustees and Defendant Fund Administrator breached their fiduciary duties through various measures. Counts III and IV aver that the plan amendments adopted by Defendant Trustees in 2002 violated the "anti-cut back" rule of ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1) and constituted unlawful forfeitures of Plaintiffs' accrued benefits under § 203(a), 29 U.S.C. § 1053(a), respectively. Count V contends that the Trustees flouted ERISA § 4231(a), 29 U.S.C. § 1411(a) by causing illegal transfers of plan assets without meeting certain specified requirements. Count VI alleges that Defendants breached collective bargaining agreements with employers. The employers' obligations to contribute to the Fund arise from these agreements. Finally, Count VII sets forth claims pursuant to the Labor Management Relations Act ("LMRA") and seeks to hold Defendant Trustees and Defendant Fund Administrator personally liable for committing prohibited transactions in connection with the violations alleged throughout the Amended Complaint.

**\*2** The Fund was created in 1955 by its settlors, the Transport Employers Association ("TEA") and the Teamsters, Chauffeurs, Warehouseman, and Helpers Local Union No. 429 ("Local 429"). Since then, the Fund and its sub-plans have been amended on multiple occasions. In 1986, the Fund documents were amended to phase out the DB Plan over a three year span, and establish a new "Retirement Income Plan," which, after the RIP 2000 plan was created, became known as the RIP 87 Plan. The DB Plan and RIP 87 Plan had overlapping, but not identical participation. As the collective bargaining agreements ("CBA") governing employer contributions into the DB Plan expired during the three-year window, 95% of future employer contributions were directed into the RIP 87 Plan, and the remaining 5% were directed into the old DB Plan. This apportionment of employer contributions between the two plans was made pursuant to a formula set forth the Trust Agreement. The DB Plan was thereafter amended in 1989, effective January 1990, to direct *all* employer contributions into the RIP 87 Plan. The amendment was implemented based on the Trustees' incorrect assumption that the DB Plan was "fully funded" and thus required no further employer contributions to meet its existing benefit obligations to beneficiaries.

By 1999, however, it became evident that the DB Plan was in danger of not meeting ERISA's minimum funding requirements. The Fund's Settlors, TEA and Local 429, therefore amended the Fund's Trust Agreement in 1999. This agreement, known as the 1999 Second Amended and Restated Central Pennsylvania Teamsters Pension Trust Agreement, contained two important amendments. First, the RIP 2000 Plan was spun off from the RIP 87 Plan. The RIP 2000 Plan was established as a separate defined contribution plan for employers who had joined the Fund since 2000 and whose employees had never participated in the DB Plan. Second, to ameliorate the DB Plan's funding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

problems, an amendment allocated a certain amount of future contributions of RIP 87 Employers from the RIP 87 Plan into the DB Plan for the years 2000 to 2005. The quantity of contributions reallocated was calculated from the total forfeitures [FN2] of RIP 87 Plan employees from the previous year. Significantly, the previous year's forfeitures remained in the RIP 87 Plan. The quantity of forfeitures merely served as a guide for determining the portion of future contributions from RIP 87 Employers that would be allocated to the DB Plan. Thus, while the employers' overall contribution obligations did not diminish, a portion of those contributions were directed into the DB Plan. These amendments to the Trust Agreement were signed by both TEA and Local 429, the Fund's settlors.

> FN2. A forfeiture occurs when a RIP 87 Plan participant terminates membership prior to his/her benefits becoming vested.

In another attempt to surmount the DB Plan's underfunding issue, the Trustees announced two proposals to the membership in 2001. The first involved freezing the RIP 87 Plan, and reactivating the DB Plan for receipt of future employer contributions. The second option reallocated a additional percentage of future contributions of RIP 87 Plan employers into the DB Plan pursuant to a formula based on the participant's age and years of service. The Trustees ultimately selected this latter option, deemed Amendment No. 4, effective March 1, 2002.[FN3] Amendment No. 4 also contained a second, separate amendment. The Trustees added to the amendment provisions of the Trust Agreement the statement, "[n]othing in this Trust Agreement shall preclude the Trustees from acting in their Settlor-capacity as appropriate by law."(1999 Trust Agreement, Art. XI, Sec. 11.1.) Amendment No. 4 was signed and issued by the Trustees, without the signatures of Local 429 and the TEA. Several months later, however, the Trustees reversed their position and adopted Amendment No. 6 to the 1999 Second Amended and Restated Trust Agreement. This amendment, effective January 2003, froze the RIP 87 Plan and allocated all future contributions of RIP 87 Plan employers into the DB Plan.[FN4] Plaintiffs' allegations stem primarily from these

amendments.

> FN3. Amendment No. 4 provides in relevant part:
> Section 2.3. *Contributions to RIP 1987.* Beginning January 1, 2000, all Contributions paid to the Fund by RIP 87 Employers shall be allocated to RIP 1987, except as otherwise provided in Section 2.4, herein.
> Section 2.4. *Contributions to the Defined Benefit Plan.* A portion of the Contributions that each RIP 1987 Employer pays to the Fund will be allocated to the Defined Benefit plan, as follows:
> A. *Forfeitures.* Effective January 1, 2000, the Contributions for each RIP 1987 Employer that would otherwise be allocated to RIP 1987 will be reduced by the dollar value of the Forfeitures that its Employees incurred in RIP 1987 as of the first day of each Fund year....
> B. In addition to the Contributions allocated to the Defined Benefit Plan under subsection (A) above, a portion of the Contributions to the Fund of each RIP 1987 Employer for hours worked by Participants on and after March 1, 2002, will be allocated to the Defined Benefit Plan in accordance with the following formula ...
> (emphasis added).

> FN4. Amendment No. 6 provides in pertinent part:
> Section 2.3 *Contributions to RIP 1987.* Effective January 1, 2000 until December 31, 2002, all Contributions owed to the Fund by RIP 1987 Employers shall be allocated to RIP 1987, except as otherwise provided in Section 2.4, herein. Effective January 1, 2003, all Contributions to RIP 1987 will cease and all Contributions paid to the Fund by RIP 1987 Employers will be allocated to the Defined Benefit Plan.

IV. Standard of Review

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
(Cite as: Not Reported in F.Supp.2d)

Page 4

**\*3** A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), tests the legal sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Accordingly, an action will be dismissed under 12(b)(6) only when the plaintiff has failed to state a claim upon which relief can be granted. The criteria for deciding whether a plaintiff has met this standard have been clearly established. "In reviewing a motion to dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party."*Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). This Court need not credit, however, any conclusory allegations of law, unsubstantiated conclusions, and/or unwarranted factual inferences. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). In addition, a complaint should be dismissed only if it appears to a legal certainty that a plaintiff could prove no set of facts which would entitle him or her to relief. *D.P. Enterprises v. Bucks County Cmty. Coll.,* 725 F.2d 943, 944 (3d Cir.1984).

Generally, a court may not take into account materials extraneous to the pleadings when considering a motion to dismiss. *Angelastro v. Prudential-Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.1985). If, however a document is "integral to or explicitly relied upon in the complaint," it may be considered "without converting the motion [to dismiss] into one for summary judgment."*Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996), *superceded by statute on other grounds,* as noted in *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 197 (1st Cir.1999); *seealsoIn re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (finding district court's reliance on document provided by defendants in ruling on motion to dismiss appropriate because plaintiff's complaint was based on that document, even though complaint did not explicitly refer or cite to it); *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 368 n .9 (3d Cir.1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document")

(quoting *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1996)).

Plaintiffs' allegations, as set forth in the Amended Complaint, are heavily based upon the 1999 Trust Agreement, and the February 2002 and December 2002 amendments thereto, the 1999 RIP 1987 Plan Document, the 1994 DB Plan Document, and the collective bargaining agreements governing the named Plaintiffs' employment. These documents are attached as exhibits to both Plaintiffs' and Defendants' supporting Memoranda. The authenticity of these documents is not in dispute. Thus, it is proper for this Court to consider these documents in adjudicating Defendants' Motion to Dismiss. Notably, if the plan documents are unambiguous, we may construe them as a matter of law. *Kemerer v. ICI Americas, Inc.,* 70 F.3d 281, 288-89 (3d Cir.1995).

V. Discussion

A. *Count 1*

**\*4** Pursuant to 29 U.S.C. § 1132(a)(1)(B), Count 1 of the Plaintiffs' Amended Complaint seeks declaratory relief to clarify and enforce their rights to future benefits under the DB Plan and the RIP 87 Plan. (Am.Compl.¶ 59.) § 1132(a)(1)(B) enables ERISA plan participants or beneficiaries to institute a civil enforcement action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Before a federal court may entertain a claim under this provision, however, the Third Circuit requires that a plaintiff first exhaust any remedies available under the plan. *Harrow v. Prudential Ins. Co.,* 279 F.3d 244, 252 (3d Cir.2002) (citing *Zipf v. Am. Tel. & Tel.,* 799 F.2d 889, 891 (3d Cir.1986)). The exhaustion requirement applies "to ERISA benefit claims, but not to claims arising from violations of substantive statutory provisions."*Id.* Courts require exhaustion of administrative remedies "to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

method of claims settlement; and to minimize the costs of claims settlement for all concerned."*Id.* at 249 (quoting *Amato v. Bernard,* 618 F.2d 559, 567 (9th Cir.1980)). The exhaustion requirement, however, is not absolute. If a plaintiff can provide a "clear and positive" showing that exhaustion would be futile, the requirement is excused.*Brown v. Cont'l Baking Co.,* 891 F.Supp. 238, 241 (E.D.Pa.1995); *seeBerger v. Edgewater Steel Co.,* 911 F.2d 911, 916 (3d Cir.1990) ("Although the exhaustion requirement is strictly enforced, courts have recognized an exception when resort to the administrative process would be futile").

Plaintiffs admit that they have not exhausted their claim. Because the determination and clarification of benefits under the plans depend upon this Court's resolution of Plaintiffs' remaining statutory claims, FN5 they allege that exhaustion under the plans' administrative claim procedures would be futile. (Am.Compl.¶¶ 59, 60.) To support this argument, Plaintiffs characterize Count 1 as a "claim for benefits" not under the current plans' terms, but rather under the terms of the plans as ultimately determined by this Court. This distinction is unavailing because it does not overcome the fundamental nature of the Count as a claim for the clarification and enforcement of future benefits.

> FN5. Plaintiffs' Brief explains that Count 1, seeking a declaration of their rights to benefits, becomes relevant only upon this Court's adjudication of their remaining claims: "Hence, the legality under the ERISA statute of the plan terms are first placed in issue under Counts II through VII. It is only after these statutory claims are decided that the parties and the Court can determine the consequences of these rulings for the actual benefits entitlements of plaintiffs ..." (Pls.' Br. at 20.)

In essence, Plaintiffs first seek reconstitution of the plans' terms through this Court's adjudication of their remaining statutory-based counts before any resolution of claims for benefits. Thus, in one sense, it would be futile to require Plaintiffs to exhaust any claims for benefits before these statutory issues are

resolved, because the changes in the plans' terms constitute the gravamen of the Amended Complaint. But all this means is that Plaintiffs' claim for clarification and enforcement of future benefits is premature. It does not provide a basis to apply the futility exception. Once this Court rules on Plaintiffs' remaining counts, they are then free to exhaust claims for benefits under the reconstituted plans' internal administrative procedures. Because such a claim must first be exhausted through the plans' internal administrative procedures before being brought in federal court, and because the futility exception is inapplicable, Count 1 must be dismissed at this time, without prejudice for Plaintiffs to refile the claim if and when appropriate.

### B. *Count II*

*5 Count II of the Amended Complaint alleges that Defendant Trustees and Defendant Fund Administrator, acting as "fiduciaries" within the meaning of 29 U.S.C. § 1002(21)(A)(1),FN6 breached their ERISA mandated fiduciary obligations through various measures.

> FN6. This provision provides in relevant part:
> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.

To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that the defendant undertook the challenged actions in a fiduciary capacity, and that the action taken constituted a breach of that duty. 29 U.S.C. §§ 1109(a), 1132(a) (3). An ERISA fiduciary, properly identified, must employ within the defined domain "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). The fiduciary should act "solely in the interest of the participants and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 6

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

beneficiaries," and must discharge his duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]."§§ 1104(a)(1)(A), (D).29 U.S.C. § 1109(a) authorizes a beneficiary to bring suit against a fiduciary who has violated any of the fiduciary obligations ERISA imposes.

Specifically, Plaintiffs assert nine separate violations of Defendants' fiduciary duties. (Am.Compl.¶¶ 64(a)-(j).) For purposes of the following analysis, the alleged violations are grouped as follows: (1) inappropriately amending the 1999 Trust Agreement on several occasions in 2002 without the requisite signatures; (2) improperly issuing to retired DB Plan participants the "thirteenth check" through 2000; and (3) failing to prudently and effectively monitor the performance of investment advisors and managers responsible for the investment of plan assets.

### 1. Trust Amendments

For the reasons set forth below, Plaintiffs' claims relating to Defendants' implementation of the 2002 Amendments to the 1999 Trust Agreement are dismissed with prejudice.

#### i. Trustees' Failure to Abide by the Amendment Provisions Of The Trust Agreement In Undertaking Amendment 4

Plaintiffs' Amended Complaint asserts that Defendant Trustees and Defendant Fund Administrator:
[f]ailed to discharge their duties in accordance with the documents and instruments governing the plans by again purporting to amend the 1999 Trust Agreement in February 2002 to arrogate to themselves broad powers to act as settlors in amending the Trust Agreement, again without the authorizing signatures of Fund settlors, Local 429 and TEA, as required by the 1999 Trust Agreement.

(Am.Compl.¶ 64(i).) Specifically, "[a]mendment No. 4 was signed solely by the Fund Trustees, but

not by the TEA or by Local 429, as required by the 1999 Restated Trust Agreement, the document purportedly being amended."(Am.Compl.¶ 51.) Thus, Plaintiffs claim that Defendants' failure to comply with the appropriate Trust Agreement amendment procedures in implementing Amendment No. 4 constituted a breach of their fiduciary obligations. For the following reasons, we find that Plaintiffs have failed to state a claim upon which relief can be granted.

*6 Article XI, section 11.1 of the 1999 Trust Agreement gives the power of amendment to the Trustees or Settlors, and explicitly sets forth the appropriate procedures to be employed when the amending party seeks to amend the Agreement:
The Trustees or the Settlors may amend the Trust Agreement in any manner and at any time, subject to the provisions of the Trust Agreement, ERISA and other federal and/or state law; provided, however, that no amendment shall prejudice the rights of any Participant or Beneficiary with respect to claims which have been opened and are in being pursuant to the rules and regulations of the Fund; provided, further, that no amendment shall cause any of the assets of the Fund to revert to any Employer. Any amendment shall be effective as of the date set by resolution of the Trustees. Amendments shall be in written form. Notwithstanding anything to the contrary set forth herein, any amendment to the Trust Agreement which would affect any rights or obligations of the Trustees or of TEA, as a Settlor, or of the Union, as a Settlor, shall not be effective unless approved in writing by the party or parties affected.

(1999 Trust Agreement, Art. XI, Sec. 11.1 (emphasis added).)

Section 402(b)(3) of ERISA requires that every employee benefit plan provide (1) a "procedure for amending [the] plan and (2) "[a procedure] for identifying the persons who have authority to amend the plan."*Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 82, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). So long as these minimal requirements are met, "ERISA [ ] follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

an amendment procedure or elsewhere, it is bound to that level."*Id.* at 84, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94;*see*29 U.S.C. § 1104(a)(1)(D). Thus, a plan sponsor's failure to act in accordance with the amendment procedures of the governing plan document when implementing an amendment constitutes a breach of fiduciary duty possibly warranting judicial annulment of the amendment. *Curtiss-Wright Corp.,* 514 U.S. at 84-85, 115 S.Ct. 1223, 131 L.Ed.2d 94. In the case at bar, Plaintiffs note that the February 2002 (and presumably December 2002) amendments to the Trust Agreement were promulgated without the signatures of TEA or Local 429. As the 1999 Trust Agreement indicates, however, the Trustees need only obtain the signatures of TEA and Local 429 if the amendment being adopted somehow impacts the rights or obligations of those parties as settlors. Thus, Defendants' adoption of the 2002 amendments without the signatures of either TEA or Local 429 constituted a failure to act in accordance with the Trust Agreement's amendment procedures only if the amendments impacted the settlors as such. Plaintiffs, however, fail to allege that the contested 2002 amendments affected the rights or obligations of TEA and Local 429 as settlors.[FN7] To state a claim for breach of fiduciary duty in this context, it must be alleged that the defendant neglected to administer the plan in accordance with its terms. The absence of any specific allegation that Defendants did not obtain the signatures required by the Trust Agreement *despite* the fact that the 2002 amendments implicated the rights and obligations of TEA and Union as settlors renders Plaintiffs' breach of fiduciary duty claim fatal. This claim of Count II is accordingly dismissed with prejudice for the aforementioned reasons.

> FN7. Plaintiffs' claim that the amendments "severely reduced the accrued benefits of plaintiffs and the members of the Class and their accrual of future benefits under the pre-amendment RIP 87 Plan" (Am.Compl. ¶ 64(h)) does not suggest that TEA or Local 429's rights or obligations as settlors were affected by the amendments.

ii. Plan Amendments As A Fiduciary Act

*7 Plaintiffs allege that Defendant Trustees and Defendant Fund Administrator violated their fiduciary duties under ERISA by adopting various amendments to the 1999 Trust Agreement in 2002. ERISA, a comprehensive statutory scheme, is intended to protect employees enrolled in pension and benefit plans. The responsibility of administering a plan in the best interests of its participants and beneficiaries resides with plan trustees, who are obligated under § 404 of ERISA to act in accordance with a standard of fiduciary conduct. 29 U.S.C. § 1104(A)-(D). Specifically, Plaintiffs aver that the 2002 amendments to the 1999 Trust Agreement violated ERISA § 404 because the amendments "severely reduc[ed] the accrued benefits of plaintiffs and the members of the class and their accrual of future benefits under the terms of the pre-amendment RIP 87 Plan." (Am.Compl.¶ 64(h).)

Before we may consider whether Plaintiffs have stated a claim for breach of fiduciary duty, we must first decide whether the Trustees' adoption of the 2002 amendments invoked ERISA's fiduciary duty provisions. In urging that we answer this question in the affirmative, Plaintiffs argue that in the context of this multi-employer Pension Plan, the Trustees' actions in implementing amendments which affected the allocation of a finite asset pool constituted administrative and fiduciary functions. Defendants, in turn, counter with the proposition that a plan sponsor acts within its power as a settlor when amending any plan. As the following discussion reveals, the issue is not clear-cut. Upon careful consideration, we find that the Trustees functioned as settlors when amending the Pension Plan.[FN8]They were, consequently, free to amend without the restraints imposed by ERISA § 404.

> FN8. We reach our decision today regardless of the November 2002 Department of Labor Bulletin.

In ascertaining whether plan sponsors act in a settlor or fiduciary capacity when amending ERISA-governed benefit plans, courts have drawn distinctions between multi-employer and single-employer plans, and between those plans that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 8

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

"affect the allocation of a finite plan asset pool" to which each participating employer has contributed. *Musto v. Am. Gen. Corp.*, 861 F.2d 897, 912 (6th Cir.1988), *cert. denied*,490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989). Undoubtedly, the general rule is that the ERISA fiduciary obligations do not apply to a plan amendment. But, as the below discussion indicates, by no means has this general rule been unequivocally applied by courts.

Plaintiffs' argument is premised upon the rationale articulated by the Second Circuit in *Siskind v. Sperry Retirement Program, Unisys,* 47 F.3d 498 (2d Cir.1995). Former employees brought suit challenging the defendant corporation's adoption of an amendment to a single-employer pension plan. The plaintiffs argued that the plan amendment, which excluded the plaintiffs from a selective early retirement program, constituted a breach of fiduciary duty to act for the sole benefit of plan participants. *Id.* at 500.In holding that the plan trustees' amendment of the single-employer plan did not invoke ERISA's fiduciary obligations, the Second Circuit explained that "[i]n the single-employer setting, where plan trustees are also corporate officers, their actions must be made in the interest of both the plan's participants and the employer."*Id.* at 506.Because the trustees have dual responsibilities in this regard, subjecting them to fiduciary obligations in their adoption of plan amendments would discourage the creation of benefit plans, a result ERISA intended to prevent. In setting forth its rationale, the Second Circuit distinguished cases where plan amendments were held to be fiduciary functions.[FN9] Those cases involved multi-employer pension plans.

> FN9. In *Chambless v. Masters, Mates & Pilots Pension Plan,* 722 F .2d 1032, 1038 (2d Cir.1985), the Second Circuit recognized the existence of a fiduciary breach cause of action against the trustees of a multi-employer pension fund who amended a vested pension plan.

**\*8** The cases holding plan amendment to be an administrative and fiduciary task concern multiemployer pension plans, jointly administered by trustees representing the employers and trustees appointed by and representing the union. In the multiemployer setting, trustees amending a pension plan "affect the allocation of a finite plan asset pool" to which each participating employer has contributed. For that reason trustees administering a multiemployer plan are expected to act solely for the benefit of beneficiaries and are barred from acting on the employers' behalf.
*Id.* (internal citations omitted).

In drawing a distinction between single-employer plans and multi-employer plans implicating a finite plan asset pool, the Second Circuit garnered support from the Sixth Circuit's dicta in *Musto,* 861 F.2d at 912, that "[i]n amending a *multi-employer* plan, where the level of contributions of each participant employer has generally been set by collective bargaining, the trustees 'affect the allocation of a finite plan asset pool between participants' ... and hence act as plan administrators subject to a fiduciary duty."The Sixth Circuit, however, subsequently refused to treat single-employer and multi-employer plans differently in *Pope v. Central States S.E. & S.W. Areas Health and Welfare Fund,* 27 F.3d 211, 213-214 (6th Cir.1994). In *Pope,* the Court of Appeals held that the trustees of a multiemployer welfare-benefit plan were not subject to fiduciary standards in amending a plan to reduce benefits in order to protect its financial stability. The Third Circuit recognized *Pope' s* impact on the fine distinction drawn by *Musto* as well: *"Pope* stands for the proposition that the Sixth Circuit, despite its authorship of *Musto,* is prepared to treat single- and multi-employer plans similarly in the absence of some other salient difference."*Walling v. Brady,* 125 F.3d 114, 118 (3d Cir.1997).

In the aftermath of these decisions, the Supreme Court has had occasion to address the issue of whether ERISA's fiduciary obligations apply to plan sponsors who amend plan agreements. These decisions, however, arose in the context of single-employer plans. *See,e.g.,Lockheed Corp. v. Spink,* 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). In *Lockheed,* the Court counseled that:
Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. As we said with respect to the amendment of welfare benefit plans ...

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 9

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

"[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust.

*Id.* at 890, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (citations omitted). This is because " ' only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration,' does a person become a fiduciary under § 3(21)(A)," and ERISA's definition of fiduciary does not include plan design.*Id.* (quoting *Siskind,* 47 F.3d at 505). The Court stated that this reasoning applied to both pension and welfare benefit plans. *Id.* Despite the categorical language characterizing the Supreme Court's pronouncement, the Third Circuit expressly refused to recognize that the rule would apply in all situations.*9 *Lockheed* speaks of "plan sponsors," a term that applies to both single-employer sponsors and multi-employer sponsors under ERISA, and the opinion lacks any hint that single- and multi-employer plans should be analyzed differently. At the same time, the silence of *Lockheed* on this topic could arguably be a result of its subject matter, a single-employer plan. The Court did not mention multiemployer plans nor state that its decision was intended to reach them or to address their particular characteristics.... [W]e do not read *Lockheed* to be the definitive word that there are never valid occasions on which to distinguish between the two types of plans....

*Walling,* 125 F.3d at 117. *Walling* involved an amendment to a multi-employer pension fund that lacked a finite asset pool. In no uncertain terms, the Court of Appeals held that "the simple fact that the plan at issue is a multiemployer plan is insufficient to cause the fiduciary duty to attach to the Trustees' actions."*Id.* at 120.Nevertheless, the Third Circuit took notice that "[t]he plan feature (a finite asset pool) on which *Siskind* based its deviation from this bright-line rule is not present here" and concluded that "[t]he rationale for having the fiduciary duty of loyalty apply is therefore absent, because the Trustees have the power to incur unfunded liabilities."*Id.* at 118.Thus, while the Third Circuit's

refusal to impose fiduciary burdens on the trustees before it was grounded in the logic of *Lockheed,* the underlying analysis reveals the court's reluctance to consider the principle articulated in *Lockheed* to be unequivocally independent of the type of plan involved.

Following the *Walling* decision, however, the Supreme Court reaffirmed the general principle that a plan sponsor's decision to amend a plan concerns the composition or design of the plan itself and thus does not implicate ERISA's fiduciary obligations in *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 444, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999).*Hughes* clarified that the prior holding in *Lockheed* does not turn on "the type of plan being amended for the simple reason that the plain language of the statute defining fiduciary makes no distinction."*Id.* Notably, the issue arose before the Supreme Court once again in the context of a single-employer benefit plan. *Id.* Thus, while it does not necessarily diminish the import of *Walling,* it does undermine the notion that the type of plan at issue informs the decision of whether a plan sponsor acts as a fiduciary in undertaking a plan amendment. The Court's textual approach places emphasis on ERISA's definition of fiduciary. Because the term fails to distinguish between various plan permutations, and because it fails to include plan design as a defined function, a plan sponsor is free to amend any employee benefit plan without being subject to fiduciary review.*Lockheed,* 517 U.S. at 890, 116 S.Ct. 1783, 135 L.Ed.2d 153. Indeed, the *Hughes* Court stressed that "[o]ur conclusion applies with equal force to persons exercising authority over a contributory plan, a noncontributory plan, or any other type of plan ." 525 U.S. at 444-45, 119 S.Ct. 755, 142 L.Ed.2d 881 . Thus, the Court held that the plaintiffs' fiduciary claims were directly foreclosed "by *Spink's* holding that, *without exception,* '[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." ' *Id.* at 445,525 U.S. 432, 119 S.Ct. 755, 142 L.Ed.2d 881 (emphasis added). Admittedly, the Court's decision in *Hughes* does not directly dispose of the issue facing this Court, because the Pension Plan *sub judice* is a multi-employer plan involving the allocation of finite plan assets. But the reasons underpinning the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

Court's decision appear to preclude imposition of fiduciary duties on the Trustees in this instance. To prevail, Plaintiffs must address the definition of " fiduciary" set forth in the statute. Yet it appears that under any plausible reading of the term, a plan sponsor's amendments to ERISA governed plans do not fall within its purview. Moreover, the Court's analysis appears to foreclose consideration of any policy driven distinctions premised upon the unique features of the particular plan under review. Therefore, we cannot recognize a legal claim for breach of fiduciary duty stemming from Defendants' promulgation of the 2002 amendments.[FN10]

> FN10. We are aware that a strong argument can be made that specific plan features should inform the fiduciary inquiry, and thus that fiduciary obligations should be imposed on plan sponsors who implement amendments to multi-employer pension funds implicating a finite asset pool. What we do learn from the Supreme Court's pronouncements on this issue is that the critical inquiry lies in determining whether the plan sponsors exercised discretionary authority or control over plan management or administration. While tinkering with plan design does not fall within this definition, the thrust of Plaintiffs' complaint is not simply that the Trustees amended the "form or structure" of the Pension Plan, *Hughes Aircraft*, 525 U.S. at 444, 119 S.Ct. 755, 142 L.Ed.2d 881, but rather that the plan was amended to the detriment of Plaintiffs' present and future accrued benefits. Unlike in the former scenario, a rationale for having fiduciary duties apply in the latter case is present. Unquestionably, ERISA is intended to promote the creation of employee benefit plans, and its provisions should be read with this goal in mind. This explains the Supreme Court's reluctance to inflict on single-employer sponsors the burden of fiduciary obligations when such employers undertake to amend a plan that they have no obligation to provide in the first instance. There is, of course, another

important competing goal: "to mak[e] sure that if a worker has been promised a defined pension benefit upon retirement-and if he has fulfilled whatever conditions are required to obtain a vested benefit-he actually will receive it." *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 375, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980); *seegenerally,*29 U.S.C. § 1001. It is important that employees enrolled in a benefit plan not be deprived of compensation that they *reasonably* anticipate under the plan's purported coverage. Indeed, this competing element may at times run up against ERISA's first purpose. As explicated above, the Pension Fund under review is a multi-employer plan that involves a finite asset pool. The fact that a multi-employer pension plan involves a finite asset pool could justify the imposition of fiduciary obligations on trustees that adopt plan amendments because, in this setting, trustees are charged with *administering* allocation of the finite plan asset pool. Consequently, the trustees' decision to amend a plan in such manner as to alter the benefits could be interpreted as a fiduciary exercise of their administrative discretion under ERISA.

Plaintiffs contend that, through various purported amendments, Defendants reallocated employer contributions among several distinct, protected plans, to the immediate disadvantage of plan participants, who partake in the RIP 87 defined contribution plan. Although Defendants diverted *future* RIP 87 employer contributions to the defined benefit plan, Plaintiffs' reasonably anticipated receipt of benefits from these contributions plus their investment returns. This scenario may pose conflicting choices on the part of the Trustee Defendants as to each class of participants in the separate plans, who do not have identical economic interests. An argument can be made that these actions involve administering the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

allocation of employer contributions and plan assets, and justify imposition of fiduciary obligations. On the other hand, it is the job of sponsors to make difficult choices, not the courts, and as explicated above the Supreme Court's pronouncements on the subject do not leave room for this type of policy-based analysis.

**\*10** Neither the Third Circuit's decision in *Walling* or the Supreme Court's opinions analyzing this matter directly control the situation where trustees of a multiemployer pension fund reallocate a finite asset pool among various sub-plans through an amendment. Yet an examination of the rationales espoused by the Supreme Court in its teachings on the matter support the view that plan sponsors act as settlors in such setting.[FN11] Thus, we find that the Trustees' promulgation of the 2002 amendments to the Trust Agreement constitutes settlor conduct unrestrained by the obligations set forth in 29 U.S.C. § § 1104(a)(1)(A)-(D). Accordingly, we grant Defendants' Motion on this issue, and dismiss this claim of Count II with prejudice.

FN11. As settlors, the Trustees are "free to make any amendment that [does] not run afoul of relevant ERISA regulations." *Walling,* 125 F.3d at 120. In *Hozier v. Midwest Fasteners, Inc.,* the Third Circuit explained that "an employer's decision to amend or terminate an employee benefit plan is unconstrained by the fiduciary duties that ERISA imposes on plan administration. Our conclusion does not imply that an employer has unfettered discretion to amend or terminate plans at will. In the case of pension plans, ERISA's detailed accrual and vesting provisions substantially limit this power."908 F.2d 1155, 1162 (3d Cir.1990). Thus, the Court of Appeals determined that although the defendant could have effected an invalid amendment, he could not have breached any fiduciary duties in deciding to amend the plan because he was simply not acting as an ERISA fiduciary. *Id.*

### 2. The Thirteenth Check

Plaintiffs assert that, in contrast to the explicit terms of the Trust Agreement, Defendant Trustees and Defendant Fund Administrator paid to DB Plan retirees a "thirteenth check" from 1987 through 2000. (*See* Am. Compl. ¶ 64(a)-(f).) Defendants move to dismiss this allegation on the ground that it fails to state a claim for breach of fiduciary duties. For the following reasons, we find that Plaintiffs have stated a claim for breach of fiduciary duties in this context.

The DB Plan required that its participants be issued an additional benefit check, known as the " thirteenth check" so long as certain funding prerequisites were met. Specifically, the DB Plan provided that:
For certain retired participants and their Beneficiaries, an additional retirement benefit check in the form of a bonus check shall be paid ... [This benefit] is payable only to those retired Participants . .. who are entitled to receive a monthly benefit check for each month of the calendar year with respect to which the thirteenth check is being paid. Notwithstanding the preceding, the "thirteenth check " shall only be payable if the Fund Actuary certifies that the unfunded vested liability of the Fund, as calculated for MPPAA purposes as of the last day of the calendar year preceding distribution of the Additional Retirement Benefit check, does not exceed $85,000,000.

(1994 DB Plan, Art. IV, Sec. I(1)(j).) (emphasis added).

Plaintiffs, who were not members of the DB Plan at the time and thus never received any of the additional benefits, do not claim that the Fund Actuary failed to make the requisite certifications. Rather, they aver that the Defendant Trustees and Defendant Fund Administrator encouraged and permitted the Fund Actuary "to use outdated and improper 1951 mortality tables to calculate the funding liability of the DB Plan, thereby distorting and concealing the true funding status of the Plan, depriving it of needed and legally required funding, and jeopardizing the security of the accrued pension benefits of plaintiffs and the members of the Class."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
(Cite as: Not Reported in F.Supp.2d)

(Am.Compl.¶ 64(e).) In response, Defendants argue that their decision to issue the check was a settlor decision not falling within the ambit of ERISA's fiduciary duty provisions. (Defs.' Reply Mem. at 22 .) Because the Fund Actuary made the requisite certifications, Defendants assert that the DB Plan term afforded them no choice but to pay to DB participants the additional benefits. (*Id.*)

**\*11** As noted above, ERISA deems a person to be a fiduciary with respect to a plan "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.... "29 U.S.C. § 1002(21)(a)(I). Thus, "[f]iduciary obligations can apply to managing, advising, and administering an ERISA plan."*Pegram v. Herdich,* 530 U.S. 211, 223, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). ERISA Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) imposes upon fiduciaries the requirement that they discharge their duties solely in the interest of plan participants and beneficiaries and in accordance with plan documents insofar as such documents are consistent with ERISA. These obligations further include monitoring the plan's solvency and adjusting benefit levels if and when appropriate. *SeeDippel v. Joint Bd. Of Trustees of the Operating Engineers Trust Fund,* No. 80-0271, 1982 WL 2085, at \*7 (D.D.C. May 6, 1982) ("The Board obviously retains the discretionary authority and indeed the fiduciary obligation to alter existing types and levels of medical benefits available under the Plan when the financial solvency of the Fund so requires.") (dicta); *cf.Baum v. Nolan,* 853 F.2d 1071, 1074-75 n. 2 (2d Cir.1988) (possibility that payment of pension benefits may affect fund's solvency is a matter of fiduciary duty) (dicta).

We find that Plaintiffs' claim passes muster under Rule 12(b)(6). Because Plaintiffs do not allege that Defendants paid out thirteenth checks in the absence of the Fund Actuary's certification, Defendants have technically adhered to a DB Plan term that affords them no discretion. They have complied with a term that demands issuance of the check upon meeting a specified prerequisite-the actuary's certification. Nevertheless we must at this

point take as true Plaintiffs' factual allegations in the Amended Complaint that Defendants did exercise improper discretion, and thus acted in a fiduciary capacity, in their effort to ensure that the term's prerequisite was met, despite knowledge that the actual circumstances reflected otherwise. *Cf.Fechter v. Conn. Gen. Life Ins. Co.,* 798 F.Supp. 1120, 1124 (E.D.Pa.1991) ( "[P]laintiffs allege that Connecticut General transcended their usual role as an actuary and became a fiduciary by purposely using an allocation formula that, contrary to the plain language of the Plan, would permit most of the surplus assets to revert to the Company so that the Company would not question Connecticut General's excessively high premium. We have no doubt that if plaintiffs can prove their allegations, then as a matter of law, Connecticut General is an ERISA fiduciary"). Defendants have a fiduciary duty to faithfully administer the terms of the DB Plan, and to act prudently in determining whether the payment of a benefit was in fact authorized. *See Gruby v. Brady,* 838 F.Supp. 820, 829 (S.D.N.Y.1993) (denying motion to dismiss fiduciary breach claim that trustees maintained benefits at excessive levels in plan that was in financial difficulty despite trustees following dictates of plan documents because "if the benefits levels as set forth in the Fund's governing plan documents are excessive, the Trustee Defendants may not avoid their fiduciary duties to Members by hiding behind documents which are inconsistent with ERISA"). Permitting or encouraging the Fund Actuary to use an improper assumption in calculating the unfunded vested liability of the DB Plan in order to satisfy the term's prerequisite which subsequently necessitates a certain result, all with the knowledge that continued payments were imprudent and would put the entire Fund in financial jeopardy, states a claim for breach of fiduciary duty.[FN12]

FN12. Dicta contained in *Concrete Pipe and Products of California v. Construction Laborers Pension Trust For Southern California,* 508 U.S. 602, 633 n. 19, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) buttresses our finding that Plaintiffs' allegations state a cognizable breach of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

fiduciary duty claim. In the context of holding that the MPPAA's presumptions in favor of multi-employer plans did not deny employer access to an impartial decision maker and thus did not violate due process rights, the Supreme Court noted that:

we know of no [case] in which a plan sponsor was found to have replaced an actuary's actuarial methods or assumptions with different ones of its own. Although we express no view on the question whether a plan sponsor must adopt the assumptions used by the actuary, we note that the legislative history of § 1082, which was enacted as part of ERISA in 1974, suggests that the actuarial [sic] assumptions must be "independently determined by an actuary," and that it is " inappropriate for an employer to substitute his judgment ... for that of a qualified actuary" with respect to these assumptions. *Id.* (quoting S.Rep. No. 93-383, p. 70 (1973)).

**\*12** Defendants may not avoid their fiduciary obligations by circumventing a term that purportedly provides them with no discretion. Accordingly, Defendants' Motion to Dismiss this claim of Count II is denied.

### 3. Imprudent Investment of Plan Assets

Plaintiffs' last breach of fiduciary duty claim is premised on the allegation that Defendant Trustees and Defendant Fund Administrator:

[f]ailed to prudently and effectively monitor and oversee the performance of the investment advisors and managers who were responsible for the investment of plan assets, and instead continued to employ the services of the same investment advisors and managers despite their unusually poor results from 1998-2000, thereby causing a significant loss of assets to the plans, further jeopardizing the funding of the DB Plan and diminishing the values of the individual accounts of plaintiffs and the members of the Class in the RIP 87 Plan itself and as transferred into the reformulated DB Plan.

(Am.Compl.¶ 64(g).) As explained below, we find that Plaintiffs have adequately alleged a breach of fiduciary duty claim.

Specifically, Plaintiffs assert that the DB Plan and RIP 87 Plan performed poorly because of mismanagement of plan assets by the Trustee appointed investment managers. During this same period, however, other similar multi-employer pension funds experienced a rapid growth in the values of assets held and invested. (Am.Compl.¶ 41.) Although "[t]his sub-par performance and mismanagement was either known to the Trustees and Fund Administrator, or would have been discovered by them had they made prudent and proper efforts to monitor and supervise the performance of the managers who had been engaged to invest plan assets,"(*Id.*), Defendants " did not investigate, consider pursuing, or pursue a legal cause of action or other remedies either against the plans' investment advisors or managers ... or against the current and former Trustees who failed to take prudent action...." (Am.Compl.¶ 42.) Defendants' Motion to Dismiss challenges whether Plaintiffs have met the liberal pleading requirements of Fed.R.Civ.P. 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."A complaint that " contains only conclusory allegations and lack[s] any factual assertions for support fails even the liberal standard of Federal Rule of Civil Procedure 12(b)(6) ."*Crowley v. Corning, Inc.,* 234 F.Supp.2d 222, 230 (W.D.N.Y.2002).

Few cases discuss the adequacy of pleading a breach of fiduciary duty claim in this specific context. Indisputably, Defendants' investment conduct is governed by ERISA's fiduciary provisions. *See*29 U.S.C. §§ 1104(a)(1)(B)-(C). [FN13] With respect to the Defendants' fiduciary duties when they retain outside professional assistance, the Third Circuit has stated:

> FN13.29 U.S.C. §§ 1104(a)(1)(B)-(C) provide in pertinent part:
> (1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances if is clearly prudent not to do so.

While we would encourage fiduciaries to retain the services of consultants when they need outside assistance to make prudent investments and do not expect fiduciaries to duplicate their advisers' investigative efforts, we believe that ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary. *13 *In re Unisys Corp. Sav. Plan Litig.,* 74 F.3d 420, 435 (3d Cir.1996).

We find that Plaintiffs' breach of fiduciary duty claim, as alleged in the Amended Complaint, satisfies the pleading requirements of Fed.R.Civ.P. 8 . The essential elements of the claim are alleged. In addition to alleging the fiduciary status of Defendants, the Amended Complaint sets forth Defendants' fiduciary duties and specifies the Defendants' involvement in breaching those duties. ( *See* Am. Compl. ¶¶ 41-42, 64(g).) As summarized above, the Amended Complaint rests on more than mere conclusory allegations. Defendants' reliance on *Crowley* is inapposite. Unlike the situation confronting the district court in *Crowley,* the crux of Plaintiffs' claim here is that if Defendants were actually unaware of the Fund's poor investment performance, they would have been aware had they done the type of investigation and oversight that the Third Circuit demands of fiduciaries who employ outside consultants. If, on the other hand, Defendants did possess knowledge of the Fund's inadequate performance, and yet failed to take any remedial measures, this too constitutes a breach of fiduciary duty. Because Plaintiffs set forth sufficient facts under which relief could be granted, Defendants' Motion to Dismiss this claim of Count II is denied.[FN14]

FN14. Defendants further argue that, as a matter of law, a breach of fiduciary duty claim cannot arise from a fund's poor investment performance over a short period of time. Defendants' Reply Memorandum references two cases in support of this proposition. (*See* Defs.' Reply Mem. at 23 (citing *Lalonde v. Textron, Inc.,* 270 F.Supp.2d 272, 280 (D.R.I.2003); *Wright v. Or. Metallurgical Corp.,* 222 F.Supp.2d 1224, 1234 (D.Or.2002)).) Defendants, however, fail to note that both decisions adjudicated the validity of plaintiffs' breach of fiduciary duty claims in the context of an ESOP plan. These plans, unlike other ERISA benefit plans, involve unique considerations. Indeed, "ESOPs are unlike other benefit plans, because they have competing purposes which, at times, can be in tension with one another. Any allegation of breach of a fiduciary duty must be considered in light of the special natures of ESOPs."*Textron,* 270 F.Supp.2d at 278.

Accordingly, we find with respect to Count II that Plaintiffs (1) have failed to state a claim for breach of fiduciary duty for Defendants' alleged inappropriate amendments to the 1999 Trust Agreement; and (2) have successfully stated a claim for breach of fiduciary duty for (a) Defendants' alleged improper issuance of the "thirteenth check," and (b) Defendants' alleged failure to prudently and effectively monitor the performance of investment advisors and managers responsible for the investment of plan assets.

### C. *Count III*

Count III of Plaintiffs' Amended Complaint alleges that Defendants unlawfully reduced accrued benefits in the RIP 87 Plan through their amendment of the 1999 Trust Agreement. For this claim, Plaintiffs rely on § 204(g)(1) of the ERISA statute, which prohibits the reduction of accrued benefits by amendment of an employee pension plan. *See*29 U.S.C. § 1054(g)(1). Defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

counter that while the amendments to the RIP 87 Plan impact future employer contributions, they do not in any way affect accrued benefits. Thus the issue before us in Count III is whether the amendments to the plan constituted a reduction in " accrued benefits."

ERISA defines "accrued benefit" in an individual account plan as "the balance of the individual's account."29 U.S.C. § 1002(23)(B). Neither party here has identified cases that are particularly helpful in establishing how the term "accrued benefit" has been interpreted in practice. However, we believe the Third Circuit's discussion of an "accrued benefit " in *Hoover v. Cumberland, Maryland Area Teamsters Pension Fund,* 756 F.2d 977 (3d Cir.1985), though written in the context of a defined benefit plan dispute, is instructive. *Hoover* contains an extensive discussion of ERISA's legislative history. Of particular note is the court's citation of language in the Congressional Report accompanying the ERISA bill, which highlights the purpose behind its accrued benefit and vesting protections. The Report states:

*14 Unless an employee's rights to his accrued pension benefits are nonforfeitable, he has no assurance that he will ultimately receive a pension. Thus, pension rights which have slowly been stockpiled over many years may suddenly be lost if the employee leaves or loses his job prior to retirement. Quite apart from the resulting hardships, ... such losses of pension rights are inequitable, since the pension contributions previously made on behalf of the employee may have been made in lieu of additional compensation or some other benefit which he would have received.

*Hoover* at 987, citing S.Rep. No. 383, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad. News 4890, 4930.

This language indicates that when Congress included § 204(g)(1) in ERISA, it intended to ensure that employees would receive the funds that employers had already set aside for their retirement, not to guarantee a certain amount of future employer contributions. Such a provision reflects the balance Congress undoubtedly sought to achieve between protecting employees' retirement funds and

maintaining private pension plans as an attractive option for employers. That ERISA was meant to protect contributions that had already been made on behalf of employees is further substantiated in the Act's "Congressional findings and declaration of policy."*See*29 U.S.C. § 1001. This Section establishes the means by which Congress intended to protect employees' retirement income. Specifically, it sought to do so

by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b).

Nowhere in this section or in subsequent portions does the Act *require* employers to make contributions on behalf of employees. Rather, it simply seeks to make employee benefit plans more transparent and predictable and to preserve their integrity and financial well-being when employers *choose* to contribute to them. This goal has been realized through the decisions of courts which have focused on enforcing the terms of pension plan documents, as can be seen from the cases discussed below.

*Hoover* illustrates how ERISA's protections work in practice when applied to a defined benefit pension plan, where the employer agrees to make regular payments to participants of a fixed amount upon reaching retirement. In *Hoover,* the court held that the employer reduced employees' accrued benefits when it lowered the "unit multiplier" it used to calculate the amount of benefits that employees accrued each year. *Id.* at 980.Under the Internal Revenue Code, 26 U.S.C. § 411(a), an employer is required to state the formula by which accrued benefits are calculated in a defined benefit plan each year. *Id.* Since this formula "represents the interest in a retirement benefit that a participant earns each year," it "enables a worker to mark his or her progress toward the full pension benefit due at retirement."*Id.* Thus when the employer in *Hoover* lowered the multiplier from $25.00 to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 16

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

$6.00, it diminished by seventy-five percent the amount of funds that had already been theoretically set aside by the employer under the formula it created. *Id.* at 986.By finding the employer in violation of ERISA, the court held it liable for the level of funds it had voluntarily agreed to set aside for employees. In keeping with the purposes and principles of ERISA, the court's decision turned on the terms of the Plan documents, which obligated the employer to utilize a certain formula for calculating the benefits accrued thus far. In so doing, it effectively defined "accrued benefits" as the product of the formula set out by the employer in Plan documents, which is dependant on the amount of time *thus* served by employees. Courts have offered a comparable analysis when protecting accrued benefits in defined contribution plans by similarly focusing on the terms of Plan documents. In *Izarelli v. Rexene Products Corp.,* 24 F.3d 1506 (5th Cir.1994), the plaintiffs argued that their accrued benefits were unlawfully reduced when their employer initially contributed 101,794 shares of stock to the Plan one year, but, after amending the Plan, ultimately allocated a much smaller amount to the individual accounts of Plan participants. *Izarelli,* 24 F.3d at 1509-16. While the district court held that the act of contributing the shares to the Plan created an accrued benefit, the Fifth Circuit reversed, drawing a distinction between contributions to the Plan and allocations to individual accounts. *Id.* at 1515.The court drew this distinction from the Plan document itself, which stated that "contributions initially are held in the 'Unprorated Fund,' i.e. 'that portion of the assets or property in the [Plan] ... which at any particular time, has not been allocated to a particular Member's Account." *Id.* at 1516.Additionally, the court noted that the Plan gave the employer " ' complete discretion' to control the 'time and manner of allocating Stock among [participants'] Accounts.' " *Id.* Thus the court held that the district court had clearly erred in finding the 101,794 share contribution an accrued benefit because the Plan specified that contributions were not the same as allocations. *Id.* at 1518.In so doing, the court declined to protect what it deemed were *expected* contributions to the individual accounts.

*15 The First Circuit's approach to defining "

accrued benefits" comports with those of the Third and Fifth Circuits. In *Campbell v.. BankBoston,* 327 F.3d 1 (1st Cir.2003), the plaintiff sued his former employer for making amendments that converted its defined benefit plan to a cash balance system because they ultimately resulted in a reduction in his retirement benefits.*Campbell,* 326 F.3d at 2. In implementing the amendments, the employer placed participants' accrued benefits, in other words, the amount that had been earned up until the conversion, into an account which was guaranteed a certain level of interest under the new cash balance plan. *Id.* at 4-5.In exchange for the guaranteed level of interest under the cash balance plan, the accounts ceased to accrue benefits under the old defined benefit plan. *Id.* Had the plaintiff been able to continue accruing benefits under the old plan, he would have eventually been entitled to an annual retirement benefit of $31,882.12. *Id.* However, as a result of the conversion, his benefits were reduced by approximately $3,000 per year. *Id.* The court held that this was not a reduction in the plaintiff's *accrued* benefits, but a reduction in his *expected* benefits. *Id.* at 8-9.The employer had not reduced the amount of benefits accrued by the employee, it simply chose to guarantee a certain interest rate, in lieu of future accruals. The court concluded that the employer was within its rights under the Plan and the law to modify or eliminate future benefits, since ERISA does not offer protection for "expected benefits." *Id.*

Plaintiffs' reliance on *John Blair Communications, Inc. v. Telemundo Group, Inc.,* 26 F.3d 360, 367 (2d Cir.1994), is not particularly helpful to this discussion or even applicable when determining when an accrued benefit has been reduced. We discuss it merely to explain why we do not rely on it here. The case concerned an alleged violation of ERISA § 208, which states that assets cannot be transferred to a new plan unless participants are entitled to receive a benefit that is equal to or greater to what they were entitled to under the old plan. 29 U.S.C. § 1058. The plaintiff argued that it received decreased benefits under the new plan because there was a three and a half month delay between the valuation of benefits under the old plan and when the benefits were actually transferred to the new plan. *John Blair,* 26 F.3d at 363-64. In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

spite of the fact that the funds under the old plan were appreciating and earning interest during the three and a half month period before they were actually transferred, the plaintiff's account was never credited for this increase in value. *Id.* The court held that the trustee had violated § 208 because the individuals' accounts post-transfer of plan assets "did not reflect the gains occurring during the interim period before the actual transfer." *Id.* at 366.

As stated above, we believe that the holding in this case is too abstract to be applied to the instant case, particularly since it concerns an unrelated section of ERISA. However, even if we were to attempt to apply it to this analysis, it would not be inconsistent with our discussion of accrued benefits thus far. *John Blair* stands for the proposition that trustees must acknowledge and credit appreciation and interest earned in defined contribution accounts. As in *Hoover, Izarelli*, and *Campbell*, the court interpreted ERISA to protect benefits as they existed prior to any alteration of the plan. Thus the participants in the plan in *John Blair* were entitled to any gains (and losses) that occurred up until the point of the actual transfer. We fail to see then how the holding in *John Blair* can be interpreted as offering protection for anything beyond the appreciation and interest earned on funds in a defined contribution plan. Since this case does not concern appreciation and interest earned in a defined contribution plan, we do not find it is an appropriate precedent.

**\*16** Applying the foregoing discussion to the case at hand, we find that the Defendants did not reduce accrued benefits in the RIP 87 Plan. Accepting Plaintiffs' facts as true, Defendants made several amendments to the RIP 87 Plan which adversely affected its future growth. The first amendment, effective January 1, 2000, caused a portion of employer contributions intended for the RIP 87, in the amount of forfeitures incurred by employees in that fund year, to be invested into the DB Plan. The second amendment resulted in an additional portion of the funds intended for the RIP 87 Plan by employers to be diverted to the DB Plan, according to a formula based on the number of hours worked by participants after March 1, 2002. The final

amendment, Amendment No. 6, caused all contributions intended for the RIP 87 to be made to the DB Plan, of which all RIP 87 Plan participants became members.

Although these amendments undeniably reduced and eventually stopped future employer contributions to the RIP 87 Plan, they did not reduce the existing balances of members' individual accounts. Plaintiffs' own brief supports this conclusion. Plaintiffs described the initial reduction in contributions as a "derogation of the *expectation* [emphasis added] and agreement that contributions on their behalf would be made to the defined contribution RIP Plan and used to earn income to increase their individual account balances."(Pls' Br. at 11.) As to the final amendment, in Plaintiffs' own words, it "froze the RIP 87 Plan for all future accruals of benefits after January 1, 2003 (other than those gains or losses from future investment performance), and directed all employer contributions made on behalf of all RIP 87 Plan participants on and after January 1, 2003 into the DB Plan."(*Id.* at 12.)These characterizations of the amendments strongly support Defendants' claim that Plaintiffs have failed to state a claim upon which relief can be granted. However, even if Plaintiffs had not made these apparent admissions, the foregoing discussion of relevant case law leads us to the same conclusion. In each of the cases discussed above, the court looked to see if the alterations or amendments to the employers' pension plans impacted benefits retroactively or just future benefits. In *Hoover*, the application of a new formula to benefits already earned by employees was considered a reduction of accrued benefits. In *Izzarelli*, however, a decision not to allocate the full amount of stock contributed to a plan was not considered a reduction in accrued benefits because the stock had not actually been applied to members' accounts and thus there was no deduction of benefits from participants' existing balances. Nor did the court in *Campbell* consider it a reduction in benefits when the employer decided to stop benefits from continuing to accrue, and instead replaced accruals with a guaranteed interest rate. In each of these cases, the court determined whether the amendments impacted benefits retroactively or prospectively. Only where the amendments were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 18

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

considered retroactive did the court find them in violation of ERISA because, as the court found in *Campbell*, ERISA does not protect *expected* benefits.

**\*17** The Defendants here made a decision to reduce employer contributions to the RIP 87 Plan and eventually eliminate them altogether. However, it did not in any way alter the balances of the individual accounts that had accrued in the RIP 87 Plan. Plaintiffs' facts do not dispute this. Nor did the Defendants act inconsistently with Plan documents by diverting employer contributions to the DB plan, which Plaintiffs allege, had already accrued to the RIP 87 Plan. Plaintiffs argue that since Plan documents mandate direct contribution to the RIP 87 Plan, any diversion of contributions to the DB Plan is a reduction in accrued benefit. However, as correctly quoted in Plaintiffs' own brief, the Second Amended and Restated Central Pennsylvania Teamsters Pension Trust Agreement counters the notion that RIP 87 Employers contributions are deposited directly and fully to the RIP 87 Plan. Specifically, it states that "Contributions paid to the Fund by RIP 1987 Employers shall be paid to RIP 1987, except as otherwise provided in Section 2.4, herein [emphasis added]." (*See* Art. II, Sec. 2.3.) In other words, contributions made by RIP 87 employers to the Fund are to be paid to the RIP 87 Plan, but only in accordance with the terms of Section 2.4, which initially reduced contributions to RIP 87 and then, as amended, stopped them altogether.

Other portions of the Second Amended Trust Agreement controvert Plaintiffs' contention that RIP 87 employer contributions directly accrued to the RIP 87 Plan, rather than the Fund. For example, the preamble to the Second Amended Trust Agreement makes it clear that employers make contributions to the "Fund," not to individual pension plans or individual accounts. It notes that employers "pay contributions to the Fund on behalf of their employees who were participants of the Fund." Furthermore, Section 7.1 of Article VII states that " [N]o Employer, Employee, Union, Local Union or other party shall have any right, title or interest in or to the Fund or any part thereof." The relevant collective bargaining agreements conform to this

principal by stating that employers obligate themselves to contribute to the Fund and not specific plans under the Fund. (*See* Art. 65 of the National Master United Parcel Service Agreement and Art. 50 of the National Master Freight Agreement.) Thus we find as a matter of law that employer contributions were to the Fund and not directly to the RIP 87 Plan. As such, the diversion of employer contributions to the DB Plan prior to their allocation to the RIP 87 Plan cannot be considered a reduction of accrued benefits in the RIP 87 Plan.

The only way in which we could conceive of Plaintiffs making a claim upon which relief could be granted here is if Plaintiffs had alleged that the balances in participants' accounts were reduced so that they no longer reflected the rate of accrual set out in Plan documents as of the time they were amended. For example, if the balance at the time of amendment was recalculated using a monthly contribution amount for the year 1997 that was less than the amount promised under the case of the National Master United Parcel Service Agreement ($737.52), that would seem to constitute a reduction in accrued benefits. However, Plaintiffs have not made such an allegation. As such, we must conclude that with regard to Count III, Plaintiffs have failed to state a claim upon which relief can be granted and the Motion to Dismiss Count III must therefore be granted. Plaintiffs' Count III claim is dismissed with prejudice.

### D. *Count IV*

**\*18** Plaintiffs' Count IV claim appears to be a variation of Count III, though we confess we had some difficulty understanding the basis for the claim. It relies on section § 203(a) of ERISA, which states that "each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Plaintiffs appear to argue from this, and their collective bargaining agreements, that they are entitled to "a nonforfeitable right to accrue and to ultimately receive payment of the pension benefits purchased by these employer contributions on their behalf."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 19

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

We do not believe that Plaintiffs have stated a claim upon which relief can be granted in Count IV. A claim under § 203(a) of ERISA is only valid if accrued benefits have been withdrawn from participants' accounts. *SeeHughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 441, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). It is not a guarantee that employers will make future contributions to pension plans. Since we have already found in Count III that Defendants' amendments to the pension plan did not reduce Plaintiffs' accrued benefits, we find that none of Plaintiffs' accrued benefits have been forfeited under § 203(a). Therefore Count IV must be dismissed with prejudice.

### E. Count V

Count V of the Amended Complaint, asserted against Defendant Trustees and Defendant Fund Administrator, alleges illegal transfers of plan assets in violation of ERISA § 4231, 29 U.S.C. § 1411(a). [FN15] Specifically, Plaintiffs claim that the following five transactions constituted unlawful transfers of assets:

FN15.29 U.S.C. § 1411 is part of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1461. The MPPAA was enacted as an amendment to ERISA, and is referenced as "Subtitle E-Special Provisions for Multiemployer Plans."
29 U.S.C. § 1411(a) provides that:
Unless otherwise provided in regulations prescribed by the corporation, a plan sponsor may not cause a multiemployer plan to merge with one or more multiemployer plans, or engage in a transfer of assets and liabilities to or from another multiemployer plan, unless such merger or transfer satisfies the requirements of subsection (b) of this section.
29 U.S.C. § 1411(b) provides in pertinent part:
A merger or transfer satisfies the requirements of this section if-

(1) in accordance with the regulations of the corporation, the plan sponsor of a multiemployer plan notifies the corporation of a merger with or transfer of plan assets or liabilities to another multiemployer plan at least 120 days before the effective date of the merger or transfer;
(2) no participant's or beneficiary's accrued benefit will be lower immediately after the effective date of the merger or transfer than the benefit immediately before that date;
(4) an actuarial valuation of the assets and liabilities of each of the affected plans has been performed during the plan year preceding the effective date of the merger or transfer, based upon the most recent data available as of the day before the start of that plan year, or other valuation of such assets and liabilities performed under such standards and procedures as the corporation may prescribe by regulation.

[D]efendant Trustees and Defendant Fund Administrator did not comply with the notice requirements of Section 4231(b)(1) or the valuation requirements of Section 4231(b)(4) when they (a) diverted employer contributions to and plan assets of the RIP 87 Plan to the DB Plan; (b) diverted participant forfeitures and plan assets of the RIP 87 Plan to the DB Plan; (c) transferred the RIP 2000 participants and associated assets out of the RIP 87 Plan; (d) diverted assets of the RIP 87 Plan into the DB Plan in March 2002 under Option 2; or (e) transferred all RIP 87 Plan participants and associated assets into the DB Plan in January 2003. (Am.Compl.¶ 79.) As a result, "the accrued benefits of RIP 87 Plan participants were lower immediately following each of these transfers and diversions of plan assets, in violation of Section 4231(b)(2)." (Am.Compl.¶ 80.) Significantly, all of Plaintiffs' contentions arise out of transfers from a defined contribution plan into either a defined benefit or a second defined contribution plan. Because we determine that § 4231 of ERISA does not apply to transfers of assets to or from a defined contribution plan, Plaintiffs cannot prove any set of facts warranting relief.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 20

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

Section 4231 of ERISA is contained within title IV of the statute, 29 U.S.C. § 1301 *etseq.*29 U.S.C. § 1321(a), located in title IV, subchapter III, subtitle B, enumerates the specific plan types that title IV does and does not encompass:
**\*19** "(a) Plans covered Except as provided in subsection (b) of this section, this subchapter applies to any plan...."

Subsection (b) of § 1321 then states:"This section does not apply to any plan (1) which is an individual account plan, as defined in paragraph (34) of section 1002 of this title...."

Plaintiffs do not dispute that the RIP 87 and RIP 2000 Plans are defined contribution plans, as that term is delineated by § 1002(34):The term, " individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participants's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

Defendants correctly posit that these definitions govern 29 U.S.C. § 1411, because this section is set forth in title IV, subchapter III, subtitle E of ERISA. Consequently, as title IV expressly excludes defined contribution plans from its domain, § 1411 does not regulate transfers of assets and liabilities between defined contribution plans, or between a defined contribution and a defined benefit plan. Bolstering this interpretation is a regulation promulgated by the Pension Benefit Guarantee Corporation ("PBGC "), an administrative agency within the United States Department of Labor charged with interpreting the MPPAA. The following regulation is applicable to part 2 of subsection E of ERISA, which includes 29 U.S.C. §§ 1411-1415.
(a) Purpose. The purpose of this part is to prescribe notice requirements under section 4231 of ERISA for mergers and transfers of assets or liabilities among multiemployer pension plans....
(b) Scope. This part applies to mergers and transfers among multiemployer plans where all of the plans immediately before and immediately after the transaction are multiemployer plans covered by title IV of ERISA.

29 C.F.R. § 4231.1 (emphasis added). The PBGC's interpretations of MPPAA provisions, while not binding, are entitled to substantial deference. *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 169 (3d Cir.2002). We believe that the PBGC's reading of these interrelated statutory provisions represents sound statutory interpretation. *SeeLocal 1115 Pension Fund v. Local 144 Hosp. Pension Fund,* 876 F.Supp. 39, 40-41 (S.D.N.Y.1994) (deferring to analogous PBGC regulation in holding that subtitle E of title IV of ERISA does not apply to multiemployer plans that are defined contribution plans). Accordingly, we defer to it. Plaintiffs do not allege that unlawful transfers of assets occurred between defined benefit plans. Instead, they allege unlawful asset transfers from a defined contribution plan into either a defined benefit or second defined contribution plan. Section 4231 is simply not implicated in the latter scenario because, "all of the plans immediately before and immediately after the transaction" are *not*"multiemployer plans covered by title IV of ERISA."29 C.F.R. § 4231.1. Plaintiffs can adduce no set of facts to substantiate a claim under § 4231 of ERISA. Defendants' Motion to Dismiss this claim is thus granted, and Plaintiffs' Count V claim is dismissed with prejudice.

### F. Prohibited Transaction Claims

**\*20** In Counts II, V, and VII of the Amended Complaint, Plaintiffs have alleged that Defendant Trustees and Defendant Fund Administrator engaged in various transactions in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D). FN16 Congress enacted this section "to bar categorically a transaction that [is] likely to injure the pension plan."*Comm'r v. Keystone Consol. Indus., Inc.,* 508 U.S. 152, 160, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993). To effectuate this purpose, § 406(a)(1) "plac[es] certain transactions outside the scope of their [plan fiduciaries] lawful authority." *Lockheed v. Spink,* 517 U.S. 882, 888, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

FN16.29 U.S.C. § 1106(a)(1)(D) states in pertinent part that:
(a) Transactions between plan and party in interest
(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect-
(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

To sustain an alleged transgression of § 406(a)(1)(D),[FN17] the Third Circuit requires that five elements be satisfied:

FN17. ERISA § 408 lists specific exceptions to the per se prohibitions in § 406. *See* 29 U.S.C. § 1108(b). Plaintiffs do not allege that any of these exceptions apply.

(1) the person or entity is "[a] fiduciary with respect to [the] plan"; (2) the fiduciary "cause[s]" the plan to engage in the transaction at issue; (3) the transaction "use[s]" plan assets; (4) the transaction's use of the assets is "for the benefit of" a party in interest; and (5) the fiduciary "knows or should know" that elements three and four are satisfied. *Reich v. Compton,* 57 F.3d 270, 278 (3d Cir.1995) (quoting 29 U.S.C. § 1106(a)(1)(D)). When a fiduciary runs afoul of the rules promulgated in § 406(a)(1), ERISA § 409, 29 U.S.C. § 1109(a)[FN18] renders him/her personally liable for, *inter alia,* any losses the plan incurred as a result of the breach.

FN18. Section 409(a) provides:
Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which has been made through use

of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Specifically, Count II of the Amended Complaint states that the Defendants:
Entered into, or enabled or allowed, a series of per se prohibited transactions using plan assets, as more fully specified in this Complaint, including paying to the DB Plan retirees a "thirteenth check" in violation of the established minimum funding requirements for such payments and the terms of the Plan, and diverting contributions which had been allocated to and/or received by the RIP 87 Plan and hence were assets of that plan into the separate DB Plan.

(Am.Compl.¶ 64(d).)

Although we found that Plaintiffs have successfully alleged a breach of fiduciary duty claim stemming from Defendants' issuance of the "thirteenth check," *see* discussion *infra* Part V.B., we find that they have failed to adequately plead a claim for breach of § 406(a)(1)(D). The Amended Complaint does allege elements one, two and three of the § 406(a)(1)(D) claim-namely that Defendants acted in a fiduciary capacity when they issued the thirteenth check, that Defendants, as fiduciaries, caused the challenged transaction to occur, and that the transaction used plan assets. (Am.Compl.¶¶ 37, 38, 62, 64(a).) As noted above, however, element four of the five element test requires that the challenged transaction employ plan assets "for the benefit of" a party in interest. The Third Circuit has held that this factor requires manifestation of a subjective intent to benefit a party in interest. *Compton,* 57 F.3d at 279. In other words, it encompasses more than merely having "the *effect* of benefitting" a party in interest. *Id.* (emphasis added). Plaintiffs do assert that the Trustees
**\*21** on a continuing basis encouraged and allowed the Fund actuaries to improperly use outdated 1951 mortality tables ... to calculate the unfunded vested liability of the DB Plan in order to justify their conclusion that the DB Plan was 'fully funded," that it required no additional employer contributions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

to satisfy its benefits obligations to participants and their beneficiaries, and that the continued payment of the 'thirteenth check' to retirees of the DB Plan was permissible under the terms of the DB Plan.

(Am.Compl.¶ 38.) We fail to recognize how this allegation can be construed as identifying the party in interest that was benefitted by the Defendants' issuance of the thirteenth check-a benefit paid to DB Plan participants. Certainly the allegation suggests that the employers benefitted as a result of Defendants' actions in ensuring that the Fund appeared to be fully funded. It does not allege or even insinuate, however, that a party in interest benefitted through the Defendants' decision to continue to pay bonus benefits to the DB Plan participants. Plaintiffs' failure to allege this element of a § 406(a)(1)(D) renders their claim fatal. As such, this prohibited transaction claim of Count II is dismissed without prejudice to Plaintiffs' right to file a Second Amended Complaint.

The second portion of the above quoted Amended Complaint also fails to state a claim warranting relief. (*See* Am. Compl. ¶ 64(d).) Plaintiffs contend that the 2002 amendments to the 1999 Trust Agreement, that "divert[ed] contributions which had been allocated to and/or received by the RIP 87 Plan ... into the separate DB Plan,"(*Id.*), constituted a prohibited transaction under ERISA § 406(a)(1)(D).29 U.S.C. § 1106(a)(1)(D) mandates that fiduciary status must exist for a transaction to constitute a prohibited one. *See*29 U.S.C. § 1106(a)(1)(D). As explicated in Part V.B.2. of this opinion, the 2002 amendments to the 1999 Trust Agreement were instituted by Defendants in their settlor capacity. *See* discussion *infra* Part V.B.2. Thus, § 406(a)(1)'s requirement of fiduciary status is not met. *See*Lockheed, 517 U.S. at 891, 116 S.Ct. 1783, 135 L.Ed.2d 153. As a matter of law then, Plaintiffs cannot prove any set of facts with respect to the challenged plan amendments that would justify relief under § 406(a)(1)(D). This prohibited transaction claim of Count II is thus dismissed with prejudice.

Next, Count V of the Amended Complaint alleges that:
Inasmuch as defendant Trustees and defendant Fund

Administrator did not comply with the requirements of Section 4231(a) and (b), the transfers constitute prohibited transactions under ERISA Section 406(a), 29 U.S.C. § 1106(a), pursuant to Section 4231(c).

(Am.Compl.¶ 81.) As Part V.E. of this opinion explains, ERISA § 4231 is not applicable to the circumstances presently confronting this Court. Moreover, as described above, the purported transfers were the product of Trust Amendments that we found the Defendants to have instituted in their settlor capacity. In addition, we found as a matter of law in Part V.C. of this opinion that the Trust documents provide for employer contributions into the Fund, as opposed to any of the individual plans that comprise the Fund. The Fund then distributes these employer contributions-plan assets-among the participating plans pursuant to the allocation formula set forth in the Trust Agreement. The various amendments to this Agreement reallocated a percentage of *future* RIP 87 employer contributions into the Fund to the DB Plan. Consequently, we determined that the existing assets of the RIP 87 Plan, a defined contribution plan, were never transferred to another plan. As discussed above, a prohibited transaction claim under § 406(a)(1)(D) requires there to be a transfer of plan assets. The unambiguous language of the plan documents precludes a finding that, by virtue of the Trust Amendments, plan assets were transferred out of the RIP 87 Plan. Accordingly, Plaintiffs have failed to state a prohibited transaction claim with respect to the supposed illegal transfer of plan assets. As such, this prohibited transaction claim of Count V is dismissed with prejudice.

*22 Finally, Plaintiffs allege in Count VII of the Amended Complaint that:
Defendant Trustees and defendant Fund Administrator engaged in a series of prohibited transactions by, inter alia, paying the DB retirees a "thirteenth check" in violation of the established minimum funding requirements for such benefit.

(Am.Compl.¶ 87.) For the reasons set forth in the above discussion regarding the "thirteenth check,", we find that Plaintiffs have failed to successfully

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 23

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

state a claim for violation of ERISA § 406(a)(1)(D). Count VII continues:In addition, defendant Trustees' and defendant Fund Administrator's agreement to accept, and their acceptance of, employer contributions made on behalf of RIP 87 Plan participants but then to divert those plan assets into the different DB Plan, for the benefit of the DB Plan, violates ... ERISA Section 406, because such payments are not for the sole and exclusive benefit of the employees for whom such contributions were made and received.... Such payments and diversions are also prohibited transactions under ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), because they constitute a direct or indirect use and transfer of assets of one plan (the RIP 87 Plan) to benefit employers who are parties in interest to that plan by reducing their independent funding obligations to another plan (the DB Plan).

(Am.Compl.¶ 88.) Once again, for the reasons reiterated above, this claim must be dismissed with prejudice.

For the foregoing reasons, Plaintiffs' prohibited transaction claims are dismissed.

### G. *Count VI*

Count VI of Plaintiffs' Amended Complaint advances the claim that Defendant Trustees and Defendant Fund Administrator breached relevant Collective Bargaining Agreements by amending the Trust Agreement so as to reallocate employer contributions from the RIP 87 Plan to the DB Plan. Specifically, Plaintiffs aver that:
Plaintiffs and other similarly situated Class members have contractual rights under their respective CBA's to employer contributions, which are made on their behalf in consideration of their current services to the employers, to be directed into their RIP 87 Plan accounts. Insofar as the CBA's define the employees' rights to pension benefits and contributions with respect to the RIP 87 Plan, the CBA's constitute documents and instruments governing the RIP 87 Plan. In violation of those rights under the Plan, defendant Trustees have purported to amend the Trust Agreement, and defendant Trustees and defendant Fund

Administrator have acted, so as to divert all employer contributions from the RIP 87 Plan to the DB Plan without obtaining the necessary and corollary amendments of the relevant CBA's. In so doing, these defendants have violated the CBA instruments governing the RIP 87 Plan and breached their strict fiduciary duty to act in accordance with the CBA's.

(Am.Compl.¶ 83.) The CBAs relevant to the named Plaintiffs' participation in the Fund include the National Master Freight and Central Pennsylvania Supplemental Agreement, and the 1997 and 2002 National Master United Parcel Service agreement and Central Pennsylvania Supplemental Agreement. (*See* Defs.' Mem. at 29.) These CBAs unequivocally provide that employer contributions be made to the Central Pennsylvania Teamsters Pension Fund in accordance with the terms of the Trust Agreement and Pension Plan. [FN19] Although it thus appears that the relevant CBAs do not require that participating employers' contributions be allocated specifically to the RIP 87 Plan, nonetheless we accept as true at this stage of litigation Plaintiffs' assertion that "[a]t all times following 1989, the CBA's pursuant to which employer contributions are owed to the Fund and the plan have directed that these employer contributions in varying amounts must be made into plaintiffs' and other Class members' accounts in the RIP 87 Plan."(Am.Compl.¶ 54.) We hesitate to construe the CBAs as a matter of law despite the unambiguous language of the above-referenced CBAs only because Plaintiffs allude to other possibly relevant CBAs and employer participation agreements that they claim support their allegation, but which they have not yet received through discovery.

> FN19. Article 50(a) of the National Master Freight Agreement provides in relevant part:
> "The Employer agrees to make the following contributions to the Central Pennsylvania Teamsters Pension Fund for each eligible employee, probationary and casual covered by this Agreement, *in accordance with the terms of the Trust*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

*Agreement."*
(emphasis added).

In addition, Article 50(c) states that "[a]ll contributions shall be made at such a time and in such a manner as the Trustees require ..."

Similarly, Article 65(1)(a) of the relevant UPS Agreements provided:

The Employer hereby agrees to contribute to the Central Pennsylvania Teamsters Pension Fund the following monthly contributions, in accordance with the terms of the Trust Agreement and Pension Plan executed by the Employer, subject to the qualifications hereinafter specified: ... In addition, allocations between the Defined Benefit Plan and the Retirement Income Plan shall be made by the Joint Supplemental Area Committee in the manner determined by the Settlers [sic] of the Central Pennsylvania Teamster Pension Fund, or, to the extent lawful, the Trustees of the Central Pennsylvania Teamsters Pension Fund.

**\*23** Significantly, Plaintiffs' claim rests on the presupposition that the Trust Agreement does not conflict with the provisions in the CBAs that allegedly require employer contributions to be routed directly into the RIP 87 Plan. (*See* Pls.' Br. at 54 ("[n]othing in the provisions of the CBA's *in this case,* which expressly require that the employer contributions be paid to the RIP '87 or to the RIP 2000, in any way conflicts with the terms of the Trust Agreement.... In total, they require direction of employer contributions into particular plans and the Trustees do not have the discretion to do otherwise").) We found as a matter of law, however, that the Trust Agreement has at all times explicitly mandated that employer contributions be paid to the Fund, and then allocated to the various sub-plans comprising the Fund as provided by the Trust Agreement's allocation formula. *See* discussion *infra* Part V.C. Thus, contrary to Plaintiffs' assumption, there exists an apparent conflict between the Trust Agreement and the CBAs, as interpreted by Plaintiffs.

This conflict is pertinent because, in the absence of

any provision in the Trust Agreement to the contrary, the Trust Agreement term will prevail over the conflicting CBA term. *SeeSinai Hosp. of Balt.v. Nat'l Benefit Fund for Hosp. & Health Care Employees,* 697 F.2d 562, 567 (4th Cir.1982) (holding that "[l]abor-management contracting parties ... cannot control expenditures from funds already vested in a trust entity where the trust instrument reposes that authority solely with the trustees. Likewise, neither an employer nor a union, singly or together, can alter the terms of a trust instrument such as the one involved in this case unless the power to do so was reserved when the trust was created or properly amended"); *seealso Hale v. Trustees of United Mine Workers Health & Ret. Funds,* 23 F.3d 899, 902 (4th Cir.1994) (holding that collective bargaining agreement is not enforceable against trustees of pension fund); *Cent. States, Southeast and Southwest Areas Pension Fund v. Tank Transport, Inc.,* 779 F.Supp. 947, 951 (N.D.Ill.1991) (noting that trustees of multiemployer pension fund are not bound to arbitration provision in a collective bargaining agreement of a participating employer and its union). In short, the Trustees are bound only by the terms of the Trust Agreement. Consequently, they cannot be held liable for breaching a conflicting term in a CBA.

Nothing in the 1999 Trust Agreement indicates that the provisions of any CBA prevail over the terms of the Trust. As this Court has previously noted, " ' [t]he provisions of the trust agreement provide the framework with which a court should analyze an employer's obligation to a ... fund." ' *Cent. Pa.. Teamsters Pension Fund v. W & L Sales, Inc.,* 778 F.Supp. 820, 829 (E.D.Pa.1991) (quoting *Ind. State Council of Roofers v. Adams Roofing,* 753 F.2d 561, 564 (7th Cir.1985)). The Trust Agreement itself belies Plaintiffs' argument that the Trust Agreement obligates the Trustees to comply with the terms of the CBAs insofar as the employers' contribution obligations are concerned. Indeed, the Trust Agreement sets forth the exact opposite proposition:

**\*24** Each Employer shall make prompt contributions or payments to the Fund in such amount and pursuant to the terms and conditions set forth in this Agreement and the Collective

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

Page 25

Bargaining Agreement in effect from time to time between the Employer or his bargaining representative and the Local Union.... A Collective Bargaining Agreement or other written document that provides for Contributions to the Fund in an amount or in a manner that is not in accord with or does not comply with the Trust Agreement or with any rules promulgated by the Trustees ... is null and void to the extent of such inconsistency.

(1999 Trust Agreement, Art IV, Sec. 4.1(A).) This Court employed a similar analysis in *W & L Sales* to reach the same conclusion that the trust agreement, rather than the conflicting CBA, controlled determination of pension eligibility. 778 F.Supp. at 829-30.

Unless the Trust Agreement expresses otherwise, and we find that it does not, Defendants cannot be held liable for breaching a CBA term that conflicts with the unambiguous provisions of Trust Agreement. Accordingly, Count VI which contains Plaintiffs' claim for violation of collective bargaining documents must be dismissed with prejudice.

### H. *Count VII*

Defendants move to dismiss Plaintiffs' claim for violation of § 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186.[FN20] Specifically, Plaintiffs contend that the Fund provisions providing for the allocation of contributions from participating RIP 87 Plan employers into the DB Plan violated §§ 302(b) and (c)(5) of the LMRA because such payments were not undertaken for the "sole and exclusive benefit of the [RIP 87 Plan] employees for whom such contributions were made and received."(Am.Compl. ¶ 88.) In response, Defendants assert that § 302(e) of the LMRA does not create a private cause of action for purported violations of §§ 302(b) and (c)(5).[FN21] Additionally, Defendants argue that even if this Court had jurisdiction, no such transgression occurred because employer contributions to a multi-employer pension plan need only be used to benefit the Fund's beneficiaries, as opposed to the particular employee on whose behalf

the employer contributed. (*See* Defs.' Mem. at 41-42.)

FN20. § 302(a) prohibits an employer, or association of employers, from, *inter alia,* rendering payments to any representative of its employees. This provision provides in part:
"(a) ... It shall be unlawful for any employer or association of employers ... to pay, lend, or deliver ... any money or other thing of value-
(1) to any representative of any of his employees, who are employed in an industry affecting commerce; or
(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer ...;"
§ 302(b)(1) prohibits employee representatives from receiving the payments proscribed by subsection (a). This provision provides:
"(b) ... (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section."
§ 302(c) then enumerates exceptions to the broad prohibitions contained in subsections (a) and (b). This provision provides in pertinent part:
"(c) ... The provisions of this section shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, ...; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund ...; and (c) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; ..."

FN21. § 302(e) states:

"(e) The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of title 28 (relating to notice to opposing party) to restrain violations of this section, without regard to the provisions of section 17 of title 15 and section 52 of this title, and the provisions of chapter 6 of this title."

Plaintiffs failed to adequately reply to this part of Defendants' Motion to Dismiss.[FN22]Therefore, we dismiss Plaintiffs' LMRA claim against Defendants pursuant to Local Rule of Civil Procedure 7.1(c).*See Toth v. Bristol Township,* 215 F.Supp.2d 595, 598 (E.D.Pa.2002) (dismissing plaintiff's claim on Motion to Dismiss under Local Rule 7.1 because plaintiff did not respond to portion of defendants' motion discussing claim); *Smith v. Nat'l Flood Ins. Program,* 156 F.Supp.2d 520, 522 (E.D.Pa.2001) (" [B]ecause plaintiffs failed to address defendants' motion to dismiss with respect to defendants' argument that costs, interest, and attorneys' fees are not recoverable under the National Flood Insurance Act, the court will grant this aspect of the defendants' motion to dismiss as unopposed"). We suppose that, given their lack of response, Plaintiffs do not challenge this dismissal.

FN22. Plaintiffs' Brief In Opposition discusses the prohibited transaction claims comprising Count VII, but fails to assert any arguments in support of Count VII's LMRA claims. Plaintiffs merely state that, "[t]his [prohibited transaction claim] is true whether or not LMRA Section 302(b), 29 U.S.C. § 186(b), confers an independent basis of jurisdiction."(Pls.' Br. at 58.)

**\*25** Even if we were to undertake a cursory examination of the claim, however, we would find that we do not have jurisdiction to adjudicate it. Plaintiffs' claim contests Defendant Trustees and Defendant Fund Administrator's administration of the Fund's assets. (*See* Am. Compl. ¶ 88.) Such a claim is permissibly brought, and indeed has been brought, under, *inter alia,* the fiduciary duty provisions of ERISA. (*Seegenerally* Am. Compl.) The Supreme Court has made clear that an attack on the actual administration of trust funds cannot be properly brought under §§ 302(b) and (c)(5) of the LMRA, because these provisions are directed towards policing the *purposes* for which a trust fund is established.

We hold today that § 302(e) does not provide authority for a federal court to issue an injunction against a trust fund or its trustees requiring the trust funds to be administered in the manner described in § 302(c)(5). By its unmistakable language, § 302(e) provides district courts with jurisdiction "to restrain violations of this section."A "violation" of § 302 occurs when the substantive restrictions in §§ 302(a) and (b) are disobeyed, which happens, not when funds are administered by the trust fund, but when they are "pa[id], len[t], or deliver[ed]" to the trust fund, § 302(a), or when they are "receive [d], or accept[ed]" by the trust fund, or "request[ed], [or] demand[ed]" for the trust fund, § 302(b)(1). And the exception to violation set forth in paragraph (c)(5) relates, not to the purpose for which the trust fund is in fact used (an unrestricted fund that happens to be used "for the sole and exclusive benefit of the employees" does not qualify); but rather to the purpose for which the trust fund is "established," § 302(c)(5), and for which the payments are "held in trust," § 302(c)(5)(A). The trustees' failure to *comply* with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22952101 (E.D.Pa.), 32 Employee Benefits Cas. 1126
**(Cite as: Not Reported in F.Supp.2d)**

these latter purposes may be a breach of their
contractual or fiduciary obligations and may subject
them to suit for such breach; but it is no violation of
§ 302.

*Local 144 Nursing Home Pension Fund v. Demisay,*
508 U.S. 581, 587-89, 113 S.Ct. 2252, 124
L.Ed.2d 522 (1993). Accordingly, Count VII which
contains Plaintiffs' allegation under the LMRA
would be dismissed with prejudice pursuant to
Fed.R.Civ.P. 12(b)(6) had we not already dismissed
this claim under Local Rule of Civil Procedure
7.1(c).

### VI. Conclusion

For the foregoing reasons, Defendants' Motion to
Dismiss is granted in part and denied in part. An
appropriate order follows.

E.D.Pa.,2003.
Saxton v. Central Pennsylvania Teamsters Pension
Fund
Not Reported in F.Supp.2d, 2003 WL 22952101
(E.D.Pa.), 32 Employee Benefits Cas. 1126

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Michael R. Robinson, hereby certify that on this 31st day of December, 2007, I caused to be electronically filed a true and correct copy of the foregoing *Motion to Dismiss, Opening Brief in Support Thereof, and (Proposed) Order* with the Clerk of Court using CM/ECF which will send notification of such filing. A copy of the document was served on the following persons by U.S. Mail:

Mr. James Coppedge
c/o Coppedge Real Estate, LLC
P.O. Box 4482
Philadelphia, PA 19140

Mr. James Coppedge
c/o Coppedge Real Estate, LLC
3742 N. 18th Street, Apt. 1-A
Philadelphia, PA 19140

/s/ Michael R. Robinson
Michael R. Robinson (Del. Bar No. 4452)
**SAUL EWING LLP**
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899-1266
Telephone: (302) 421-6800
Email: mrobinson@saul.com